**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| In Re: | ) | Chapter 7 |
| | ) | Case No. 19-20688(jjt) |
| BEST HOME PERFORMANCE OF CT, LLC | ) | |
| *Debtor.* | ) | May 21, 2019 |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS AND/OR STRIKE THE PETITION FOR INVOLUNTARY BANKRUPTCY AND FOR PERMISSION TO INTERVENE, AND OTHER RELIEF THAT THE COURT DEEMS JUST, FAIR, AND EQUITABLE**</u>

Justin Buck ("Buck") hereby files this memorandum of law in support of his Motion to Dismiss the Petition for Involuntary Bankruptcy (the "Petition") filed on April 30, 2019 against Best Home Performance of CT, LLC ("Best Home") by Energy Efficiencies Solutions LLC ("EES"). As set forth in greater detail below, the Petition is nothing but a sham and a collusive attempt by the majority owner of both Best Home and EES to strip her own brother, Buck—the minority owner in each of those companies—of his 40% interest in Best Home and to attempt to saddle him with legitimate debts of Best Home. These oppressive tactics should not be permitted.

Indeed, the Petition fails to satisfy the jurisdictional requirements of 11 U.S.C. § 303(b) in that EES does not hold a claim that is not the subject of the bona fide dispute as to liability or amount. Consequently, this Court lacks subject matter jurisdiction over Best Home and, therefore, it should dismiss the Petition pursuant to Fed. R. Bankr. P. 1011(b) and Fed. R. Civ. P. 12 (b)(1). Alternatively, a hearing is requested whereby the alleged creditor, EES, will be required to establish the legitimacy of this claim, which it cannot do. The reality is, and the record will show, that Best Home's own outside General Counsel stated as recently as January 29, 2019 that Best Home did not owe EES any money. In addition, no aspect of the alleged debt is reflected in any of the books and records of either

company.  It is, quite simply, a claim that is contrived and the product of collusion with one

goal in mind: to liquidate the interest of Buck and cause him further harm.

In any event, while Buck asserts that he has standing to bring this Motion to Dismiss,

he also requests permission to intervene to challenge the Petition by filing the Motion to

Dismiss.

In support of this Motion to Dismiss, Buck states as follows:

## I.    **FACTUAL BACKGROUND**

By way of background, Best Home is a Connecticut Limited Liability Company,

which maintains its address in Windsor, Connecticut.  *See* Affidavit of Justin Buck ("Buck

Aff."), attached hereto as **Exhibit A**, at ¶ 3.  Best Home is owned by two siblings, Justin Buck

and Leticia Colon de Mejias ("Colon"), as follows: 60% by Colon and 40% by Buck.  *Id.*[1]

Energy Efficiencies Solutions LLC is a Connecticut Limited Liability Company, which

maintains its address in Windsor, Connecticut.  *Id.* at ¶ 4.  EES is owned as follows: 67% by

Colon and 33% by Buck.  *Id.*[2]

### A.    **Colon's Lock Out Tactics.**

Conflict erupted between Colon and Buck, and Colon used her majority status to

engage in a variety of maneuvers, which effectively locked him of both companies.  While

there were reciprocal claims of financial mismanagement, Colon has not provided any

---

[1] Best Home performs insulation work and currently has large contracts with certain utility companies.  Buck Aff. at ¶ 13.  Therefore, if Best Home is forced into bankruptcy, it will be unable to perform those contracts, significantly impacting Buck's monetary interest in Best Home and greatly impacting Best Home's ability to perform contracts to which it is a party.  *Id.*

[2] In or around January of 2014, Colon asked Buck to sign an amended Certificate of Formation, which indicated that Buck's interest in EES was reduced to 5%.  *Id.*  However, Buck was not provided any consideration for a reduction in his interest in EES in January of 2014.  *Id.*  As such, Buck continues to be a 33% owner in EES and expects to be treated accordingly.  *Id.*

evidence to support those claims.[3]  In fact, Colon apparently retained the services of Blum Shapiro many months ago to conduct an investigation of the books and records.  General Counsel for Best Home and EES, Attorney Mary Miller (hereinafter referred to as "General Counsel"), agreed repeatedly to provide the results of the "investigation."[4]

On or about January 29, 2019, Buck was removed as General Manager of Best Home and as Field Manager of EES.  Buck Aff. at ¶ 5; *see* email attached as **Exhibit 2** to Natale Aff. Soon thereafter, Buck was removed from Best Home's bank account and was suspended from his employment with both Best Home and EES.  Buck Aff. at ¶ 5; *see* **Exhibit 2** to Natale Aff.

Then, on or about February 4, 2019, Buck was terminated from his employment at both Best Home and EES.  Buck Aff. at ¶ 6; *see* letters attached as **Exhibit 1** to Buck Aff. Both Best Home and EES thereafter failed to pay Buck wages and fringe benefits, in an amount totaling approximately $7,600.  Buck Aff. at ¶ 7.  To date, and despite the representation made by General Counsel on February 1, 2019 that Buck would be paid his wages once full access to the Best Home Quickbooks was provided (which is it undisputed that such access was, in fact, provided), no such payment has been made by either Best Home or EES.  *Id*.; *see* **Exhibit 3** Natale Aff.

---

[3] Colon and her husband were using EES's funds to pay their home mortgage, their personal minivan, pool supplies, HVAC work for Colon's in-law's Florida house, and a nanny to care for Colon's grandchild, among other things.  Buck Aff. at ¶ 12.

[4] In fact, General Counsel agreed to provide to the undersigned Mr. Lattimer's report by February 9, 2019— and she then again promised several times thereafter since the report was not provided by that initial deadline.  *See* emails attached as **Exhibit 1** to affidavit of Anthony J. Natale ("Natale Aff."), attached hereto as **Exhibit B**.  To date, however, no such report has been provided.  *See* Natale Aff. at ¶ 4.

B. **The Phony EES Claims and this Bankruptcy Petition.**

Buck ran the affairs of Best Home right through the time of his termination.  Buck Aff. at ¶ 14.  He is completely unaware of what could possibly form the basis for a debt owed of $363,436.61 by Best Home to EES and he disputes that claim.  *Id.* at ¶¶ 14-15.

Significantly, as recently as January 29, 2019, General Counsel for Best Home and EES, acting as their agent, stated in an email to the undersigned that $9,000 was withdrawn from Best Home's bank account for "payment to EES for past due invoices for the work performed by EES last year."  *See* email attached as **Exhibit 4** to Natale Aff.  In that same email, General Counsel—again, as agent for both EES and Best Home—conceded that "***now that EES has been paid, Best has no outstanding bills***" (emphasis added).  *See id.*  That is an incredible admission and it stands in stark contrast to the Involuntary Bankruptcy Petition filed by General Counsel's husband, Attorney Marc Miller (hereafter referred to as "Bankruptcy Counsel"), in which he certified to this Court that EES was owed a "trade debt" in the amount of $363,436.31 and that Best Home "is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount." *See* Docket No. 4 at pp. 2-3.

 The basis for the Petition is a sham and it should be dismissed.  There was just a single invoice issued by EES in 2018 and it was paid in full.  *See* Buck Aff. at ¶ 8.  Such invoice was for "administration services" in the amount of $18,241.52 and, again, was paid in full by Best Home.  *Id.*; *see* invoice attached as **Exhibit 2** to Buck Aff.

During the early morning hours of February 1, 2019, after Colon had terminated Buck's management role, suspended him as an employee, and deprived him access to the books and records of Best Home, EES—acting through Colon—emailed to Buck several

invoices for alleged monies owed by Best Home to EES for the years 2016, 2017, and 2018. *See* invoices attached as **Exhibit 3** to Buck Aff. Specifically, there were two invoices issued for 2016, two invoices for 2017, and one invoice for 2018, all of which totaled nearly $1.2 million! *See id.* The alleged debt for the years 2016, 2017, and 2018 was, upon information and belief, ***not carried in the books and records of EES***—which Colon and her husband controlled. Buck Aff. at ¶ 10.[5] And such debt was never carried in the books of Best Home! *Id.* Rather, it appears that those amounts, just like the amount now appearing in the Petition, were simply figures contrived by Colon without any basis in reality. It bears emphasis that those invoices were never submitted to Best Home prior to February 1, 2019 even though they apparently were for certain items rendered years earlier. *Id.* at ¶ 9.

All of that notwithstanding, when the undersigned received the Petition, questions were asked concerning the alleged debt. Bankruptcy Counsel was asked by Buck's counsel how that debt was found to exist given the previous representation made by General Counsel just a few months back, indicating that Best Home had no outstanding bills. Bankruptcy Counsel responded to that inquiry with the following:

> Finally, your suggestion that the monies claimed to be owed by Best to EES are somehow in dispute as to liability or amount is not well taken. Since the email you referenced was sent, Best has engaged the services of Andrew Lattimer of Blum Shapiro to review the available financial records of Best in order to determine the amount that Best owes to EES. The amount noted in the petition was provided to me by Mr. Lattimer. Again, this number is based on the available financial records, but I have been advised by my client that

---

[5] It should also be noted that Best Home issued several invoices to EES between June of 2018 and January 2019 for labor and materials it provided to EES. Buck Aff. at ¶ 11; *see* statement attached as **Exhibit 4** to Buck Aff. The amount owed for those invoices totals approximately $265,000 and, as of the date that Buck was fired, that amount had not been paid. *Id.*

In addition, it is undisputed that Best Home lent EES $21,000 during December 2018 and January 2019 in order for EES to make payroll. *Id.* at ¶ 12. Indeed, EES had trouble making payroll, given that Colon and her husband were using EES's funds to pay their home mortgage, their personal minivan, pool supplies, HVAC work for Colon's in-law's Florida house, and a nanny to care for Colon's grandchild, among other things. *Id.*

Ms. Colon, in her capacity as sole manager of Best, agrees with Mr. Lattimer's base line determination. I nonetheless remain confident that an affidavit from Ms. Colon, in her capacity as sole manager of Best, stating that that amount owed to EES is not in dispute, should alleviate any concerns that might otherwise be raised.

*See* email attached as **Exhibit 5** to Natale Aff.

Counsel for Buck then reiterated her longstanding request for the Lattimer report

by stating the following:

We have been asking Attorney Mary Miller for Andrew Lattimer's report for months.  It was promised to us by February 9, 2019 by Attorney Miller--and then several times thereafter--and we have yet to receive it.  Please send me Lattimer's report.

*See id*.  Bankruptcy counsel responded by stating the following:

I don't have any report, only an oral statement by Mr. Lattimer as to the most conservative amount that Best could owe EES. That oral statement was the basis for the filing.

*See id*.  The undersigned then communicated directly with Mr. Lattimer, asking for basic

facts concerning this claim.  He wrote:

I am counsel to Justin Buck, a forty percent owner in Best Home Performance LLC of Connecticut.  Please see the email below.   As you can see from the email below, [Bankruptcy Counsel] is putting your opinion front and center as his good faith basis for why he, as counsel to EES, put Best into an Involuntary Bankruptcy.  Can you furnish me whatever information that you have that is the basis for the amount that you allegedly indicated to [Bankruptcy Counsel] is owed by Best to EES?  My client does not agree with that view and we find the claim especially suspect in that, *inter alia*, it never came to light until just very very recently when the Petition was filed.  You should also know that if you have any questions regarding any amount that you think may be owed by Best to EES, please let me know and I will talk to my client about answering any questions that you may have.  We do think that a diligent and complete review by you will lead you to conclude that those amounts are not owed.  But for now, we would greatly appreciate developing a better understanding of the point of view that was the basis for your "oral statement" - was this labor, materials or both or some other items that were sold by EES to Best?  When they were furnished?  Was there an agreement?  If so, when was it entered into?  When were the invoices issued and if so were they issued in the ordinary course and by whom?  Do you have

the invoices? Was demand for payment ever made etc. Perhaps [Bankruptcy Counsel]'s reliance on your "oral statement" was misplaced and if that is the case, please let all parties copied on this email know, including me. This is a serious matter and your oral statement is apparently being used by one company to place another into bankruptcy. So, we hope and expect that it will be addressed by you and your firm with the level of attention and review necessary. Again, at the risk of being repetitive, your oral statement is now apparently being used and relied upon to force Best into Bankruptcy which , if that action is allowed, my client will be significantly damaged. This could result in my client's entire interest in the LLC being liquidated and him suffering other harm. Again, if and to the extent that you did not intend for your statement, to be given such reliance, please let us know and we hope that [Bankruptcy Counsel] will proceed accordingly. I do think that it is important that you and your firm know the extent that that "oral statement" is now being relied upon by EES's Bankruptcy Counsel to result in action against Best.

In addition, I understand that you have been working on a "report" dealing with Best and EES. Can you furnish me a copy of that as well. Again, Justin is a 40 percent owner in Best and is entitled to this information.

*See id.*

      General Counsel responded by indicating that Mr. Lattimer would not be able to send to the undersigned anything directly, "as Best is entitled to withhold certain documents and Andrew, a non-attorney, should not be forced to make such a call." *See* email attached as **Exhibit 6** to Natale Aff.

      The undersigned also wrote to Bankruptcy Counsel with the following request:

Anything else that you can provide us other than this "oral statement" that you relied upon? The questions I asked of Mr. Lattimer are asked of you as well.

*See id.* Bankruptcy Counsel responded—not with any information regarding the debt or basis for it or how is what arrived—but instead with the following:

Frankly speaking, Mr. Lattimer's opinion, comment, or basis for same is irrelevant to this discussion of what or how much is owed. Under the applicable Connecticut statute, as well as the applicable section of the Bankruptcy Code, if the sole manager of Best has decided that these monies are owed, then they are owed. It will be up to the bankruptcy court to

determine what, if any, claims by EES will be paid from the bankruptcy process.

*See* email attached as **Exhibit 7** to Natale Aff.

So that is essentially the backdrop for this claim. There is no basis for it, no corroborating evidence, and efforts to develop an understanding for how it was arrived at have been met with stonewalling tactics. First, Bankruptcy Counsel writes that he relied on an oral statement from Mr. Lattimer as to the amount owed, then when Mr. Lattimer is questioned on it, Bankruptcy Counsel states that Mr. Lattimer's point of view "is irrelevant." *See* email attached as **Exhibit 7** to Natale Aff. Rather, Bankruptcy Counsel essentially claims that the debt is owed because Colon says it is owed and that is the good faith basis for the Petition, and he then goes on to threaten that if Buck plans to challenge that amount, he and his counsel will be faced with sanctions. *See id*.

### C. **Buck disputes both the liability and amount set forth in the Petition.**

Buck disputes both the liability and the amount set forth in the Petition filed against Best Home. In fact, he has no idea on what basis EES could claim that Best Home owes it $363,436.61. Buck Aff. at ¶ 14. He was very much involved in the day to day affairs of Best Home and ran the company until he was excluded in early 2019. *Id.* Indeed, Colon was not involved in running or managing Best Home for least the last 18 months prior to the time that she fired Buck. *Id.* Buck did not authorize the purchase of labor, materials, or services of any kind from EES in the amount stated in the Petition and he is unaware that his sister, Colon, did. *Id.* Other than Buck or Colon, no one else would be authorized to make such purchases on behalf of Best Home. *Id*.

Both Best Home and EES are small companies, and Buck would certainly know if Best Home owed EES that sum of money and, again, he does not know of any grounds to

conclude that that sum would be owed or any amount close to that and, as such, he very much disputes that it is owed.  *Id*. at ¶¶ 14-15.  Again, the only invoice issued by EES to Best Home was in December of 2018 and that was for Administrative Services and that was paid in full by Best Home.  *Id*. at ¶ 8.

If this Petition is allowed, Buck's forty percent (40%) interest in Best Home will potentially be eliminated and he could face personal liability for credit cards of Best Home which were incurred on behalf of Best Home for goods and services purchased primarily for the benefit of Best Home, which he may have personally guaranteed.  *Id*. at ¶ 16.  As of the time he was fired from Best Home, Best Home was performing numerous profitable contracts that were being paid in the ordinary course and Best Home was a profitable going concern.  *Id*.  Given the above, Buck believes that the Petition is not brought in good faith and requests that it be dismissed.  *Id*. at ¶ 17.

II.    **ARGUMENT**

A.    **Buck, as the Sole Minority Owner of Best Home, Has Standing to Contest What is a Sham Bankruptcy Petition.**

Given the emails sent by Bankruptcy Counsel, it is expected that he will assert that Buck does not have standing to challenge this Petition.  Buck does not agree with that position.  Specifically, he will suffer significant injury if this sham Petition is permitted to proceed.  He is a member and 40% owner of Best Home and his rights will be significantly impacted if this sham Petition is allowed to go forward.  In fact, he adamantly disputes both the liability and amount of the claim set forth in the Petition.  In any event, Buck requests permission to intervene in this matter.

11 U.S.C. § 303(d) specifically provides that "the debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under

this section."[6]  While there is no express statutory authority for stockholders (or LLC members) to contest an involuntary petition filed against their corporation, courts recognize that this is ***not an inflexible rule***.  *In re Westerleigh Development Corp.*, 141 B.R. 38, 40 (Bankr.S.D.N.Y. 1992) (dismissing involuntary petition after finding that petition was filed by corporate shareholder to gain leverage over another shareholder).  In fact, courts acknowledge that under certain circumstances, shareholders (*i.e.* non-debtors or general partners that have not joined in the petition) are, in fact, permitted to contest an involuntary petition against their corporation where there was a plan or scheme to achieve fraud "or other proscribed conduct."  *Id.*, quoting *In re The Ceiling Fan Distributor, Inc.*, 37 B.R. at 702.  Similarly, the court in *In re Oakland Popcorn Supply, Inc.,* 213 F.Supp. 665 (N.D.Cal.1963), stated that "[w]hile it is true that stockholders of a bankrupt corporation have no statutory right to contest an involuntary petition, it ***is within the discretion of the bankruptcy court to permit them to do so***.  *Id.* at 667 (citations omitted); *see also In re Super Vent Window Co.*, 52 F.Supp. 356 (S.D.Fla.1943) (stockholders permitted to intervene to assert defense to creditor's involuntary petition for corporation's adjudication in bankruptcy, in view of sharp contests and adverse claims between petitioning creditor and stockholders); *In re National Republic Co.*, 109 F.2d 167, *cert. denied*, 309 U.S. 671, *rehearing denied*, 309 U.S. 698 (1940) (court, in its discretion, may permit stockholders and state court receivers to intervene on a proper showing).[7]

---

[6] The Bankruptcy Code, which was enacted long before the advent of limited liability companies, has not yet been amended to deal with the unique features of the limited liability company.  *See* Preventing Voluntary and Involuntary Petitions by Limited Liability Companies, 18 Bankr. Dev. J. 51, 73 (2001).  So, there appears no reason that a member of limited liability company would not be permitted to answer a sham petition, but a general partner of a partnership can.

[7] In fact, even third parties that have an interest in the matter were able to successfully contest (and have dismissed) collusive involuntary petitions.  *See, e.g., In re Central Park Estates, LLC*, 485 B.R. 72 (Bankr.S.D.N.Y.

For example, in *In re Westerleigh Development Corp.*, the debtor would have been unable to answer the involuntary petition because its only two shareholders disagreed about contesting the petition and neither had authority to act for the corporation given that each owned 50% of the corporation. 141 B.R. at 40. The Bankruptcy Court held that either shareholder should be afforded standing to contest the involuntary petition filed against the corporation, especially when the petitioner was the family owned corporation of the other 50% shareholder. *Id.*

In any event, Buck should be permitted by this Court—and respectfully requests permission—to intervene in this matter to contest the sham involuntary Petition filed against Best Home. Indeed, under Fed. R. Bankr. P. 2018(a), permissive intervention may be permitted to "any interested entity" upon a showing of cause. *See* Fed. R. Bankr. P. 2018(a)("In a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."). Cause includes, *inter alia*, "an economic interest in the case or one of its aspects or a concern with its precedential ramifications." *In re City of Bridgeport*, 128 B.R. 686, 687-88 (Bankr.D.Conn.1991), citing *In re Ionosphere Clubs, Inc.,* 101 B.R. 844, 853 (Bankr.S.D.N.Y.1989); *In re Public Serv. Co. of New Hampshire,* 88 B.R. 546, 551 (Bankr.D.N.H.1988); 8 *Collier on Bankruptcy* ¶ 2018.03[3] at 2018-7 (15th ed. 1988) ("The cause is an economic or similar interest in the case or one of its aspects. Intervention might also be permitted to an entity based on that entity's concern with precedential ramifications of an aspect of a case..."). The Court in *In re Public Service Co. of New Hampshire*, 88 B.R. 546 (Bankr.D.N.H.1988) stated that "[t]he factors that courts have

---

2013) (dismissing involuntary petition after third party filed motion to strike, demonstrating the collusion between the petitioning creditor and debtor).

considered in determining whether to grant permissive intervention are whether the intervenor's interests are already adequately represented, and whether intervention would result in undue delay or prejudice to the original parties." *Id.* at 551, citing *In re Longfellow Industries, Inc.,* 76 B.R. 338, 341 (Bankr.S.D.N.Y.1987), *In re Hyde Park Partnership,* 73 B.R. 194, 197 (Bankr.N.D.Ohio 1986), *In re George Rodman, Inc.,* 33 B.R. 348, 350 (Bankr.W.D. Okl.1983), C. Wright and A. Miller, *Federal Practice and Procedure* § 1913 at 552.[8]

Given Buck's 40% ownership in Best Home, and the fact that he may be liable for Best Home's business debts if this Petition proceeds, he certainly has an economic interest in this matter and, as such, he requests permission from this Court to intervene in this matter to contest what he believes is a sham Petition filed against Best Home.

**B. The Petition does not satisfy the requirements that EES's claim is not subject to a bona fide dispute as to liability and/or amount and this Court, therefore, lacks subject matter jurisdiction over Best Home.**

The Court should dismiss the Petition pursuant to Fed. R. Bankr. P. 1011(b) and Fed. R. Civ. P. 12(b)(1) because this Court lacks subject matter jurisdiction over Best Home given that the Petition does not (and cannot) satisfy the requirements of 11 U.S.C. § 303(b). Alternatively, the Court should order an evidentiary hearing whereby evidence of the alleged undisputed nature of this claim can be heard and proven by the alleged creditor, EES.

As a preliminary matter, and as the Second Circuit recently noted, "[i]nvoluntary bankruptcy petitions help ensure the orderly and fair distribution of an estate by giving

---

[8] In addition, Section 305 gives the bankruptcy court the power to dismiss an involuntary petition *sua sponte*. Specifically, that Section provides that "[t]he court, after notice and a hearing, may dismiss a case... at any time if... the interests of creditors and the debtor would be better served by such..." 11 U.S.C. § 305(a); *see also In re Accident Claims Determination Corp.*, 146 B.R. 64, 67-68 (Bankr. E.D.N.Y. 1992) (dismissing involuntary petition where petitioning creditors were intending to harass debtor and its principals).

creditors an alternative to watching nervously as assets are depleted, either by the debtor or by rival creditors who beat them to the courthouse." *In re Murray*, 900 F.3d 53, 59-60 (2d Cir. 2018), citing *In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 245-46 (9th Cir. BAP 2007). It also noted, however, that "[d]espite these benefits, involuntary bankruptcy petitions have 'serious consequences [for] the alleged debtor…'" *In re Murray*, 900 F.3d at 59, citing *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015), quoting *In re Reid*, 773 F.2d 945, 946 (7th Cir. 1985); *see also In re Macke Int'l Trade*, 370 B.R. at 246. "By giving creditors the ability to bring a debtor into bankruptcy, Congress created a power that could be abused." *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 419 (3d Cir. 2016).

Importantly, "[s]uch a remedy exists as an avenue of relief for the benefit of the overall creditor body… ***[It] was not intended to redress the special grievances, no matter how legitimate, of particular creditors***… [Such creditors] must seek redress under state law, in the state courts[,] and not in the bankruptcy court." *In re Murray*, 900 F.3d at 59-60, quoting *In re Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 486 (Bankr. E.D.N.Y. 1997) (emphasis added).

In part because of the unusual nature of involuntary petitions,[9] Congress provided bankruptcy courts with a variety of tools with which to police their use. *In re Murray*, 900 F.3d at 60. To begin, a petition ***must*** meet the statutory requirements for filing under 11 U.S.C. § 303. *Id.* Specifically, Section 303(b) provides, in relevant part, as follows:

---

[9] In fact, most bankruptcy filings are initiated as voluntary petitions under 11 U.S.C. § 301 by a debtor seeking a fresh start. *In re Murray*, 900 F.3d at 59. Far fewer are initiated as involuntary petitions by creditors, much less a single creditor, under 11 U.S.C. § 303. *Id.*, citing Administrative Office of the United States Courts, Judicial Facts and Figures, tbl. 7.2, http://www.uscourts.gov/sites/default/files/data_tables/jff_7.2_0930.2016.pdf (last visited Aug. 13, 2018).

> An involuntary case against a person is commenced by the filing with the
> bankruptcy court of a petition under chapter 7 or 11 of this title--(1) by three
> or more entities, each of which is either a holder of a claim against such
> person that is ***not contingent as to liability or the subject of a bona fide
> dispute as to liability or amount***, or an indenture trustee representing such
> a holder, if such noncontingent, undisputed claims aggregate at least $16,750
> more than the value of any lien on property of the debtor securing such
> claims held by the holders of such claims; (2) if there are fewer than 12 such
> holders… by one or more of such holders that hold in the aggregate at least
> $16,750 of such claims…

11 U.S.C. § 303(b).

With regard to Section 303(b)'s references to "bona fide" disputes as to liability and/or amount, the Court of Appeals for the Second Circuit adopted an "objective test" to define the term "bona fide dispute." *In re EM Equipment, LLC*, 504 B.R. 8, 13 (Bankr.D.Conn. 2013), quoting *In re Rand Int'l Leisure Prods., LLC*, No. 10-71497(AST), 2010 WL 2553999 (Bankr.E.D.N.Y. June 18, 2010), citing *In re BDC 56 LLC,* 330 F.3d 111, 118 (2d Cir.2003), *abrogated on other grounds* in *In re Zarnel*, 619 F.3d 156 (2d Cir.2010).  To determine whether a bona fide dispute exists, the bankruptcy court "must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *Id.* at 117.  The objective standard allows a creditor to be disqualified whenever there is any legitimate basis for the debtor not paying the debt, factual or legal.  *In re Rand Int'l Leisure Prods., LLC*, 2010 WL 2553999, at *3.[10]

---

[10] It should also be noted that Section 303(h)(1) provides, *inter alia,* that the Court shall order relief against the debtor in an involuntary case ***only*** if "the debtor is generally not paying such debtor's debts as such debts become due…"  In making such a determination, this Court has explained it as follows: "The Court must first undertake a rough calculus of the number and amount of the Alleged Debtor's delinquent and current debts on the petition date.  The Court then utilizes the results of that calculus to determine if the ratio of delinquent to current debts is supportive of a pattern of 'generally not paying.'" *In re Speer*, 522 B.R. 1, 9 (Bankr.D.Conn. 2014), quoting *In re Jacques,* No. 09-22027, 2010 Bankr.LEXIS 2499 *21 (Bankr.D.Conn. July 23, 2010), citing *In re Palace Oriental Rugs, Inc.,* 193 B.R. 126, 129 (Bankr.D.Conn.1996).  The burden of establishing that the debtor is generally not paying such debtors' debts as such debts become due falls on the petitioning creditor. *See id.*

When applying this objective test, the Second Circuit has made clear that a

***petitioning creditor must first establish a prima face case that no bona fide dispute***

***exists—as to liability or amount***—before any burden shifts to the debtor. *Id*. at *4, citing

*In re BDC 56 LLC,* 330 F.3d at 118.[11]  Indeed, the petitioning creditor "bear[s] the ultimate

burden of proving that all statutory requirements of… Section 303 have been met." *In re*

*EM Equipment, LLC*, 504 B.R. 8, 13 (Bankr.D.Conn.2013), quoting *In re Palace Oriental Rugs,*

*Inc.,* 193 B.R. 126, 128 (Bankr.D.Conn.1996).  Similarly, the petitioning creditor "bear[s] the

ultimate burden of proving by a preponderance of the evidence that the Alleged Debtor is

generally not paying its debts as such debts become due." *Id.*

When an involuntary petition does not meet the requirements of Section 303(b)—

including the requirement that the claim must not be subject to a bona fide dispute—it

**<u>must</u>** be dismissed for, in that instance, the bankruptcy court lacks subject matter

jurisdiction over the alleged debtor.  *See In re BDC 56 LLC*, 330 F. 3d at 118 (noting that

requirement in § 303(b) that petitioning creditor's claim not be subject to a bona fide

dispute is "subject matter jurisdictional"); *In re Elsa Designs, Ltd.*, 155 B.R. 859, 863 (Bankr.

S.D.N.Y 1993) (same).  Accordingly, a creditor attempting to invoke the bankruptcy court's

jurisdiction in an involuntary case must "demonstrate at the earliest practicable point" that

its involuntary petition satisfies the requirements of Section 303(b).  *In re BDC 56 LLC*, 330

F. 3d at 118.  A motion to dismiss pursuant to Fed. R. Civ. P. 12(b) is a "procedural vehicle

available for the adjudication of involuntary bankruptcy petitions." *In re Elsa Designs*, 155

---

[11] It should also be noted that while the statutory requirements set forth in § 303(b) do permit single creditors to file an involuntary petition, courts tend to scrutinize such petitions closely.  *In re Murray*, 900 F.3d at 60.  In fact, some courts refuse to consider sole-creditor petitions unless there are exceptional circumstances, such as where the creditor has no adequate alternative remedy under non-bankruptcy law, though other courts instead fall back on "a close examination of the 'generally not paying test' prescribed by 11 U.S.C. § 303(h)(1)" to resolve single creditor involuntary bankruptcy.  *See In re Fischer*, 202 B.R. 341, 346-48 (E.D.N.Y. 1996) (citing cases); *Cf. In re EM Equipment, LLC*, 504 B.R. at 21 (citing cases).

B.R. at 863; *see* Fed. R. Bankr. P. 1011(b) (requiring defenses and objections to involuntary petition to be presented as prescribed by Fed. R. Civil P. 12); Fed. R. Civ. P. 12 (permitting defenses of lack of jurisdiction over subject matter and failure to state claim upon which relief can be granted to be presenting by pre-answer motion).

Here, this Court lacks subject matter jurisdiction because EES does not hold a claim that is "not the subject of a bona fide dispute" as to liability or amount and, therefore, the Petition must be dismissed. 11 U.S.C. § 303(b)(1). Indeed, and as set forth in detail above, EES has not satisfied, nor will it be able to satisfy, its burden of establishing that there is no bona fide dispute that $363,436.31 is owed by Best Home to EES. In addition, according to Buck, Best Home is actually owed approximately $265,000 and does not owe EES any amount of money. *See supra* at p. 5. In fact, Buck—who was very much involved in the day to day affairs of Best Home and ran the company until he was excluded in early 2019—has no idea on what basis EES could claim that Best Home owes it $363,436.61. *See supra* at pp. 4, 8.

Accordingly, because EES does not hold a claim that is not the subject of a bona fide dispute, the Court must dismiss the Petition for lack of subject matter jurisdiction over Best Home.

### C.   **The Petition lacks good faith and was filed in bad faith.**

Given the history of what occurred in this matter as set forth above, Buck maintains that the Petition lacks good faith and, in fact, has been brought in bad faith. Quite simply, the majority member of EES is also the majority member of Best Home. She is using that dual position as a basis to create an Involuntary Petition so that she can wipe clean her brother's minority interest in Best Home and potentially saddle him with debt of Best

16

Home that he may have personally guaranteed.  Additionally, she is seeking to cause harm to countless creditors of Best Home who are otherwise entitled to be paid their money from a company that was, until Buck was terminated, a profitable going concern.

As such, Buck respectfully requests that the Petition—which he maintains is brought in bad faith—be dismissed.  Indeed, when an involuntary petition is found by a bankruptcy court to be filed in bad faith and in collusion with the debtor, the traditional remedy is dismissal of the case.  *See In re Central Park Estates, LLC*, 485 B.R. 72 (Bankr.S.D.N.Y.2013) (dismissing involuntary petition after third party filed motion to strike, demonstrating the collusion between the petitioning creditor and debtor), citing *In re WLB–RSK Venture,* 296 B.R. 509, 515 (Bankr.C.D.Cal.2003) (dismissing involuntary petition after a finding that it was filed against the debtor as a litigation tactic); *In re Manhattan Industries, Inc.,* 224 B.R. 195, 201 (Bankr.M.D.Fla.1997).

While Buck understands that this Court may not be inclined to conclude on the papers that this Petition lacks good faith, he requests an evidentiary hearing whereby EES will be required to somehow make a showing that it has properly implicated the jurisdiction of this Court, which it will not be able to do, and Buck requests that the Court rule on the lack of good faith in connection with the issues raised by his Motion to Dismiss.

## III. <u>CONCLUSION</u>

For all of the foregoing reasons, Justin Buck respectfully requests that the Petition for Involuntary Bankruptcy filed on April 30, 2019 against Best Home Performance of CT, LLC by Energy Efficiencies Solutions LLC be dismissed and that this Court order any other relief that the Court deems just, fair, and equitable, including an award of costs and attorney's fees.  In addition, Buck seeks an order permitting him to intervene in this case.

Finally, in the absence of this Motion being granted on the papers, Buck seeks an evidentiary hearing whereby this Court can evaluate whether the alleged creditor, EES, has brought the Petition in good faith and where EES will be required to prove, which it cannot do, that there is no bona fide dispute as to the liability or amount it claims is owed by Best Home in its Petition.

Respectfully submitted,
JUSTIN BUCK

By His Attorneys,
NATALE & WOLINETZ

___/s/ Anthony J. Natale_____
Anthony J. Natale
Federal Bar No.  ct08451
116 Oak Street
Glastonbury, Connecticut 06033
Telephone:    (860) 430-1802
Facsimile:     (860) 430-1809
anatale@natalelawfirm.com

## **CERTIFICATION**

This is to certify that on this 21st day of May, 2019, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.


                                                          /s/ Anthony J. Natale
                                                          Anthony J. Natale
                                                          Federal Bar No.  ct08451
                                                          116 Oak Street
                                                          Glastonbury, Connecticut 06033
                                                          Telephone:    (860) 430-1802
                                                          Facsimile:    (860) 430-1809
                                                          anatale@natalelawfirm.com