**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

------------------------------------------------------------X

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 7 |
| BEST HOME PERFORMANCE OF CT, LLC, | ) | |
| | ) | Case No. 19-20668 (JJT) |
| Debtor. | ) | |
| ------------------------------------------------------------) | | |
| | ) | July 3, 2019 |
| JUSTIN BUCK, | ) | |
| | ) | |
| Movant – Intervenor | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ENERGY EFFICIENCIES SOLUTIONS, LLC | ) | |
| | ) | |
| Respondent. | ) | |

------------------------------------------------------------X

## OBJECTION TO MOTION FOR SANCTIONS PURSUANT TO 11 U.S.C. §303(i), F. R. BANKR. P. 9011, 28 U.S.C.§ 1927 AND 11 U.S.C § 105

The Respondent ENERGY EFFICIENCIES SOLUTIONS, LLC, (hereinafter "EES") by and through counsel of record, hereby objects to the Motion for Award of Sanctions (hereinafter the "Motion") filed by intervening creditor JUSTIN BUCK (hereinafter "Buck") on May 22, 2019. For the following reasons, EES submits that the Motion is procedurally defective, fails to establish an adequate factual or legal basis for the relief requested, and is otherwise improper. Additionally, even if the Motion is otherwise proper, the amount of sanctions requested by Buck is patently unreasonable, given the limited scope of this litigation, as well as the defective nature of the documentation provided by Buck's counsel in support of the award.

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS…………………………………………………………………2

TABLE OF AUTHORITIES……………………………………………………………...5

I.   STATEMENT OF FACTS………………………………………………………..12

II.  BRIEF STATEMENT OF ISSUE...……………………………………………….16

III. LAW AND ARGUMENT……………………………………………………….....16

     a.   Requested Relief Under 11 U.S.C. §303(i) is Improper, And Must be Denied……16

          i.    Award to Buck is Improper Under §(i)(1)……....................17

          ii.   Award to Buck is Improper Under 11 U.S.C. §303(i)(2).........................19

          iii.  Even if Otherwise Entitled to an Award Under 11 U.S.C. §303(i),
              There Can Be No Award Against Counsel of Record…………………...23

          iv.   Lack of Bad Faith Precludes an Award Under U.S.C. §303(i)(2)……...25

              1.  Buck Has Burden of Proving Bad Faith to Justify an Award...............25

              2.  Improper Use Test……………………………………………………26

              3.  Improper Purpose Test........................................................................27

              4.  Reasonable Person Test……………………….....................................28

              5.  Reasonable Inquiry Into Facts and Law………………………………29

          v.   Even if Otherwise Entitled to an Award Under U.S.C. §303(i), the
              Award Sought by Buck is Unreasonable……………………………….32

               1.  Lump Billing Renders Fee Unreasonable on its Face…......................33

              2.  Double Billing Renders Fee Unreasonable on its Face………………34

              3.  Buck Has Failed to Comply with Local Rule 2016-1 Regarding
                 Compensation of Professionals…………………………………….36

              4.  Buck's Counsel Performed and Billed for Unnecessary Work………38

              5.   137 Hours to File a Motion to Dismiss is Facially

Unreasonable……………………………………………...……………39

b.   Requested Relief Under F.R. Bankr. 9011 is Improper and Must Be
Denied…………………………………………………………………………41

i.  Buck's Request for Rule 9011 Relief Procedurally Defective
and Must Be Denied……………………………………………………41

ii.  Rule 9011 Award Against EES is Improper…………………………………42

1. Standard of Review……………………………………………………42

2.  EES Performed a Reasonable Investigation Into the Facts
Alleged in the Petition, Which Was Well Grounded in Fact…………44

3.  EES Has Not Filed the Petition for an Improper
Purpose………………………………………………………………...49

4.  The Relief Sought by Buck is Unsupported…………………………50

iii. An Award Against Counsel of Record is Improper……………………………51

1.  Standard of Review……………………………………………………..51

2.  Counsel Performed a Reasonable Investigation Into the Facts
Alleged………………………………………………………………52

3.  Counsel Has Not Presented a Frivolous Claim………………………56

4.  Counsel As Not Filed the Petition for an Improper Purpose…………57

5.  The Relief Sought by Buck is Unsupported…………………………58

c.   Requested Relief Under 28 U.S.C. § 1927 is Improper and Must be Denied………58

i.  Standard of Review……………………………………………………58

ii. The Petition Filed by Counsel is Not Motivated by Improper Purposes…...........59

iii. The Petition Filed by Counsel is Not Entirely Without Color…………………...59

iv. The Relief Sought By Buck is Unsupported…………………………………60

d.   Requested Relief Under 11 U.S.C. §105 is Improper and Must Be Denied………..61

i.   Standard of Review……………………………………………………………….61

ii.   The Petition Filed by Counsel is Not Motivated by Improper Purposes………61

iii.   The Petition Filed by Counsel is Not Entirely Without Color…………………62

iv.   Relief Sought by Buck is Unsupported……………………………………………62

IV.  CONCLUSION…………………………………………………………………………...63

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Associated Indem. Corp. v. Fairchild Indus., Inc.,* 961 F.2d 32, (2d Cir.1992)…………………16

*Ball v. A.O. Smith Corp*., 451 F.3d 66 (2d. Cir. 2006)………………………………………..51

*Bankers Tr. Co. BT Serv. Co. v. Nordbrock (In re Nordbrock),* 772 F.2d 397 (8th Cir. 1985)….23

*Calloway v. Marvel Entertainment Group,* 854 F.2d 1452 (2d Cir 1988)…………………..52, 57

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)…………………………………………………61

*Cinema Serv. Corp. v. Edbee Corp.*, 774 F.2d 584 (3rd Cir.1985)……………………………..43

*Cruz v. Local Union No. 3 of International Brotherhood of Electrical Workers,*
34 F.3d 1148 (2d Cir. 1994)…………………………………………………………………..63

*Eastway Constr. Corp. v. City of New York*, 762 F.2d 243 (2d Cir. 1985)……………..16, 43, 52

*Eisemann v. Greene*, 204 F.3d 393 (2d Cir. 2000)……………………………………………59

*Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.),*
378 F.3d 916 (9th Cir. 2004)…………………………………………………………………..31

*Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531 (9th Cir.1986)………….52

*Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 49 F.3d 939 (3d Cir. 1995)………35

*IBM Credit Corp. v. Compuhouse Sys., Inc.*, 179 B.R. 474 (W.D.Pa.1995)…………………….31

*In re 8Speed8, Inc.*, 921 F.3d 1193 (9th Cir. 2019)……………………………………….19, 22

*In re 680 Fifth Avenue Associates*, 218 B.R. 305 (Bankr. S.D.N.Y. 1998)………………….43, 50

*In re Ambotiene*, 316 B.R. 25 (Bankr. E.D.N.Y. 2004)…………………………………………62

*In re Ames Dep't Stores, Inc*., 76 F.3d 66 (2d Cir. 1996)………………………………………33

*In re Angelika Films 57th, Inc.*, 227 B.R. 29 (Bankr. S.D.N.Y. 1998)…………………………33

*In re Anmuth Holdings,* 600 B.R. 168  (Bankr. E.D.N.Y. 2019)…………………………….17, 24

*In re Baumblit*, 15 Fed. Appx. 30 (2d Cir. 2001)……………………………………………..42

*In re Bayshore Wire Products Corp.,* 209 F.3d 100 (2d Cir. 2000)……………...25, 26, 27, 28, 29

*In re Belmonte*, 524 B.R. 17 (Bankr. E.D.N.Y. 2015)………………………………………...42

*In re Better Care, Ltd.*, 97 B.R. 405 (Bankr. N.D. Ill. 1989)……………………………….26

*In re Broadview Lumber Co.*, 137 B.R. 775 (Bankr. W.D. Mo. 1992)…………………………..31

*In re Brous*, 370 B.R. 563 (Bankr. S.D.N.Y. 2007)……………………………………………..33

*In re Chan*, 556 B.R. 61 (Bankr. E.D.N.Y 2016)……………………………………………..42

*In re Channel Master Holdings, Inc.,* 309 B.R. 855 (Bankr. D. Del. 2004)……………………36

*In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222 (2d Cir. 1991)………………………42, 56

*In re Commonwealth Sec. Corp.,* No. 06-30746-SGJ-7, 2007 WL 309942
(Bankr.N.D.Tex. Jan. 25, 2007)…………………………………………………………………24

*In re Cultrera*, 2007 WL 1891482 (Bankr. D. Conn. 2007)……………………………………..42

*In re DiLeito*, 468 B.R. 510 (Bankr. D. Conn. 2012)…………………………………………34

*In re Diloreto*, 388 B.R. 637 (Bankr. E.D. Pa. 2008)…………………………………………33

*In re Dimas, LLC.,* 357 B.R. 563 (Bankr. N.D. Cal. 2006)…………………………………...33

*In re Drexel Burnham Lambert Grp., Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991)……………..33

*In re Exchange NetworkCorp.,* 92 B.R. 479 (Bankr. D. Colo. 1988)……………………………24

*In re Int'l Mobile Advert. Corp.,* 117 B.R. 154 (Bankr.E.D.Pa.1990)…………………………...24

*In re Kidwell,* 158 B.R. 203 (Bankr. E.D. Cal. 1993)…………………………………………23

*In re EM Equipment, LLC*, 504 B.R. 8 (Bankr. D. Conn. 2013)………………………………...31

*In re Express Car & Truck Rental, In*c., 440 B.R. 422 (Bankr. E.D. Pa. 2010)…………………32

*In re Food Gallery at Valleybrook*, 222 B.R. 480 (Bankr. W.D. Pa. 1998)……………………31

*In re Forever Green Athletic Fields, Inc.*, 2017 WL 1753104 (E.D. Pa.)………………………36

*In re Fox Island Square Partnership,* 106 B.R. 962 (Bankr.N.D.Ill.1989)…………………18, 24

*In re Frenz*, 142 B.R. 611 (Bankr. D. Conn. 1992)………………………………………34, 40, 43

*In re F.R.P. Industries, Inc.,* 73 B.R. 309 (Bankr. N.D. Fla. 1987)……………………………..31

*In re Glannon,* 245 B.R. 882 (D.Kan. 2000)………………………………………………………24

*In re Green*, 422 B.R. 469 (Bankr. S.D.N.Y 2010)……………………………………….......61

*In re Hentges*, 351 B.R. 758 (Bankr. N.D. Okla. 2006)…………………………………26, 29, 57

*In re Hill*, 377 B.R. 8 (Bankr. D. Conn. 2007)…………………………………………………51, 58

*In re Hirsch*, Case No. 1–02–17966, 2008 WL 5234057 (Bankr. E.D.N.Y. 2008)……………..33

*In re Hoffman*, 403 B.R. 237 (Bankr. E.D.N.Y. 2009)…………………………………………42

*In re JLM*, 210 B.R. 19 (2d Cir. 1997)…………………………………………………………..33

*In re Keene Corp.*, 205 B.R. 690 (Bankr. S.D.N.Y. 1997)………………………………………33

*In re Landmark Distribs., Inc.,* 195 B.R. 837 (Bankr. D.N.J. 1996)………………………...17, 18

*In re McMillan,*  543 B.R. 808 (N.D.Tex. 2016)………………………………………………...24

*In re Mike Hammer Prod., Inc., 294 B.R. 752* (9th Cir. BAP 2003)……………………18, 20, 21

*In re Miller*, 414 Fed. Appx. 214 (11th Cir. 2011)……………………………………………42

*In re Obasi*, 2011 WL 6336153 (Bankr. S.D.N.Y. 2011)…………………………………48, 56

*In re Omega Trust*, 120 B.R. 265 (Bankr. S.D.N.Y.1990)………………………………………50

*In re Onyx Telecommunications, Ltd.*, 60 B.R. 492 (Bankr. S.D.N.Y. 1985)…………………...31

*In re Parikh*, 508 B.R. 572 (Bankr. E.D.N.Y 2014)……………………………………….44,48

*In re Pennie & Edmonds LLP*, 323 F.3d 86 (2d Cir. 2003)……………………………………...43

*In re Petralex Stainless, Inc.*, 78 B.R. 738 (Bankr. E.D. Pa. 1987)…………………………27, 50

*In re Poseidon Pools of America*, 180 B.R. 718 (Bankr. E.D.N.Y. 1995)………………………34

*In re VII Holdings Co.*, 362 B.R. 663, (Bankr. D. Del. 2007)…………………………..18, 20, 21

*In re Ramsden,* 17 B.R. 59 (Bankr.N.D.Ga. 1981)…………………………………………………24

*In re Reid,* 773 F.2d 945 (7th Cir. 1985)……………………………………………..10, 22, 23, 32

*In re Reveley*, 148 B.R. 398 (Bankr. S.D.N.Y 1992)………………………………………………25

*In re RMAA Real Estate Holdings, LLC,* 2010 WL 5128647
(Bankr. E.D.Va. 2019)………………………………………………………………………...20

*In re Ross*, 135 B.R. 230 (Bankr. E.D. Pa. 1991)…………………………………………………..32

*In re Spectee Group*, 185 B.R. 146 (Bankr. S.D.N.Y 1995)……………………………………60

*In re Squillante*, 259 B.R. 548 (Bankr. D. Conn. 2001)…………………………………40, 49, 56

*In re St. Stephen's 350 E 116th St.,* 313 B.R. 161 (Bankr.S.D.N.Y.2004)………………………60

*In re Sutter*, 543 F.2d 1030 (2d Cir.1976)…………………………………………………………59

*In re Tarasi & Tighe*, 88 B.R. 706 (Bankr. W.D. Pa. 1988)………………………………………32

*In re Taxman Clothing Co.,* 49 F.3d 310 (7th Cir.1995)…………………………………………..33

*In re Taub*, 439 B.R. 276 (Bankr. E.D.N.Y. 2010)………………………………………………..44

*In re Turner*, 80 B.R. 618 (Bankr. D. Mass. 1987)…………………………………27, 50, 59, 62

*In re Val W. Poterek & Sons, Inc.,* 169 B.R. 896 (Bankr. N.D.Ill. 1994)…………………………24

*In re Ward*, 190 B.R. 242 (Bankr. D.Md. 1995)…………………………………………………34

*In re West End Fin. Advisors, LLC*, No. 11–11152 (SMB),
2012 WL 2590613 (Bankr. S.D.N.Y., July 3, 2012)……………………………………………33

*In re Willow Lake Partners II, L.P.*, 156 B.R. 638 (Bankr. W.D. Mo. 1993)…………………..31

*In re Witt*, 481 B.R. 468 (Bankr. N.D. Ind. 2012)…………………………………………………….50

*In re Worldwide Direct, Inc.,* 316 B.R. 637 (Bankr. D.Del. 2004)…………………………………..34

*Jama v. Immigration & Customs Enforcement*, 543 U.S. 335 (2005)………………………….32

*Landon v. Hunt,* 977 F.2d 829 (3ʳᵈ Cir. 1992)……………………………………………………..25

*LNC Invs., Inc. v. Secured Equip. Trust of Eastern Airlines, Inc.*
*(In re Secured Equip. Trust of Eastern Air Lines, Inc.),*
No. 91 Civ. 5049 (MBM), 1992 WL 295943 (S.D.N.Y. Oct.8, 1992)…………………………25

*Margo v. Weiss*, 213 F.3d 55 (2d Cir. 2000)……………………………………………………..52

*Miles v. Okun (In re Miles),* 430 F.3d 1083 (9ᵗʰ Cir. 2005)……………………..17, 18, 20, 21, 22

*Milltex Industries Corp. v. Jacquard Lace Co., Ltd.*, 55 F.3d 34 (2d Cir. 1995)………………..61

*Mone v. Comm'r of Internal Revenue*, 774 F.2d 570, 574 (2d Cir. 1985)………………………58

*Murphy v. Business Cards of Tomorrow, Inc.*, 854 F.2d 1202 (9th Cir. 1988)…………………52

*Nakash v. U.S. Dep't of Justice*, 708 F.Supp. 1354 (S.D.N.Y.1988)…………………………….44

*Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir. 1986)………………………………..16, 51, 52, 57, 61

*Pacific Electric Wire & Cable Co., Ltd. v. Set Top Int'l Inc.*,
No. 03 Civ. 9623(JFK), 2005 WL 2036033 (S.D.N.Y. Aug. 23, 2005)………………………….59

*Perez v. Posse Comitatus*, 373 F.3d 321 (2d Cir. 2004)……………………………………….51

*Phillips v. Berlex Laboratories, Inc.*, No. 3:05CV81, 2006 WL 1359124
(D.Conn., May 11, 2006)………………………………………………………………………...61

*Rodick v. City of Schenectady,* 1 F.3d 1341 (2d Cir. 1993)………………………………………..16

*Romeo v. Sherry*, 308 F. Supp. 2d 128 (E.D.N.Y. 2004)……………………………………..58

*Rosenberg v. DVI Receivables XVII, LLC,*  835 F.3d 414 (3d Cir. 2016)………………………17

*Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323 (2d Cir.1999)……………59, 60, 62

*Sherman v. Reilly (In re Reilly)*, 244 B.R. 46 (Bankr. D. Conn. 2000)…………………………56

*Sierra Club v. U.S. Army Corps of Engineers*, 776 F.2d 383 (2d Cir.1985)……………………59

*Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997 (2d Cir. 1988)………………………………………16

*Susman v. Schmid (In re Reid),* 854 F.2d 156 (7ᵗʰ Cir. 1988)………………………………...23

*Sussman v. Bank of Israel*, 56 F.3d 450 (2d Cir. 1995)……………………………………43, 50

*United States Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.,*
58 B.R. 1008 (Bankr. N.D.N.Y.1986)…………………………………………………………..25

*Two Star Surgical Supply, Inc. v. New York State Dep't of Social Serv.*
*(In re Two Star Surgical Supply, Inc.),* 92 B.R. 26 (Bankr. E.D.N.Y.1988)……………………52

*United States v.* Seltzer, 227 F.3d 36 (2d Cir. 2000)…………………………………………61

*Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110 (2d Cir. 2009)………………………59

**STATUTES**

11 U.S.C. §303……………………………………………………………………….…*passim*

11 U.S.C. §303(i)………………………………………………………………………..*passim*

11 U.S.C. §303(ii)……………………………………………………………………….*passim*

11 U.S.C. §303(i)(1)……………………………………………………………………..*passim*

11 U.S.C. §303(i)(2)……………………………………………………………………..*passim*

11 U.S.C. §303(b)(1)……………………………………………………………………31, 40

11 U.S.C. §303(d)…………………………………………………………………………18

11 U.S.C. §544……………………………………………………………………………26

**LEGISLATIVE HISTORY**

1978 U.S.C.C.A.N. 5787, 5820 H.R. Rep. No. 95-595 (1977)………………………………...21

1978 U.S.C.C.A.N. 5963, 6280; S.Rep. No. 95-989(1978)…………………………………………………21

## RULES

Local Rule 2016-1…………………………………………………………………………………..36

F. R. Bankr. P. 9011(a)……………………………………………………………………..*passim*

F. R. Bankr. P. 9011(b)(3)……………………………………………………………………48

F.R. Bankr.P. 9011(c)(1)(A)…………………………………………………………………41, 42

F.R. Bankr. P. 9015……………………………………………………………………………42

F. R. Civ. P. 11………………………………………………………………………………43, 51

## TREATISE

Collier on Bankruptcy ¶303.33 (16th ed.)……………………………………………………18

## I.    STATEMENT OF FACTS

The instant case derives from mismanagement by the Debtor, which rendered it insolvent and unable to pay EES and its other creditors. Leticia Colon (hereinafter "Colon") maintains a 60 percent interest in the Debtor, along with a 95 percent interest in EES.[1] (ECF #39, pg.1.) Buck, conversely, maintains a 40 percent interest in the Debtor and a 5 percent interest in EES. (ECF #39, pg. 1.) On or about December 3, 2018, Colon became aware of serious financial discrepancies with regard to the Debtor. (ECF #18, pg. 4.)While many of the financial irregularities have been addressed in EES' objection to Buck's Motion to Dismiss (ECF #19), the substance of the discovery was that Buck was engaged in a systematic effort to overcharge EES in favor of the Debtor over a period of at least three years. (ECF #18, pg. 6.) It was further discovered by Colon that Buck had undertaken various efforts to divert monies otherwise due to the Debtor for his own use; monies which could have been used to repay EES for the years of overpayments. (ECF# 18, pg. 4-5.)After discovery of several instances of Buck's improper conduct, Colon terminated Buck from his position as a manager of the Debtor. (ECF#18, pg. 5.)

From the December 3, 2018 meeting with Buck until the filing of the involuntary bankruptcy petition in question (hereinafter the "Petition") Colon and her team at EES undertook extensive efforts to ascertain both the depth and the extent of the monies owed to EES by the Debtor, as well as the improper actions of Buck during his time as a manager of the Debtor. Throughout this process, both Colon and EES were hamstrung by Buck's refusal to provide access to relevant accounting records. On or about February 6, 2019, Colon contacted the undersigned counsel about the prospect of filing an involuntary bankruptcy on behalf of EES against the Debtor. Affidavit of Marc T. Miller in Opposition to Motion for Sanctions (hereinafter the "Miller Aff."),

---

[1] Buck disputes the percentage of Colon's ownership, but does not dispute that she is the majority owner of both the Debtor and EES.

¶ 4. On that date, the undersigned counsel met with Colon and her entire team at EES for several hours regarding the involuntary bankruptcy process, including both the requirements and consequences of filing pursuant to 11 U.S.C. §303. Miller Aff. ¶¶ 5-11.  During this time, while acknowledging the difficulties associated with reviewing records that were unavailable due to Buck's unwillingness to provide same, Colon and her team at EES were confident that they could not only satisfy the requirements of 11 U.S.C. §303, but would be able to substantiate same with both documentation and a review by an outside accountant who had already been retained for this purpose— Andrew Lattimer, a certified public accountant and partner at Blum Shapiro in Hartford (hereinafter "Lattimer"). Miller Aff. ¶ 13.

During this initial meeting, the undersigned counsel informed Colon and the EES team that he would not be in a position to file an involuntary bankruptcy absent a clear showing of the amount of the bona fide undisputed debt owed, derived from a review of the available records and approved by an outside accountant. Miller Aff. ¶ 8. Colon and her team informed the undersigned counsel that this review had already been commenced by Lattimer, and the report of his review would be available shortly. Miller Aff. ¶ 8.

During this initial meeting, the undersigned counsel inquired of Colon as to the reason why she wanted to file an involuntary bankruptcy against the Debtor. Miller Aff. ¶ 42. In response to said inquiry, Colon stated that she needed to do something to stop the fraudulent conduct of Buck in raiding the Debtor, and otherwise allowing Buck to take advantage of his position to the detriment of EES. Id. Further, Colon stated that she wanted to use the involuntary bankruptcy process to try and reverse the preferential transfers made by Buck during his tenure as a manager of the Debtor. Id.

On or about February 7, 2019, the undersigned counsel contacted Lattimer. Id. During this time, the undersigned counsel reminded Lattimer that EES intended to file the Petition, but that, per counsel's directive, EES was waiting for his report to be finalized prior to the filing. Id., Exhibit C. Lattimer responded to the undersigned counsel, indicating he was still waiting both on documentation from Colon as well as further discussion. Id., Exhibit C. From that date until March 8, 2019, the undersigned counsel repeatedly reminded Colon of the necessity of a report from Lattimer prior to any filing. Miller Aff. ¶ 17.

On or about March 8, 2019, the undersigned counsel met with Colon, the EES team, and Lattimer regarding the Petition. During said meeting, which lasted several hours, Edgardo Mejias (hereinafter "Mejias"), Chief Financial Officer of EES presented the undersigned counsel with the results of the EES internal review. Miller Aff. ¶ 14-15. Mejias informed the undersigned counsel that the amount owed by the Debtor to EES that was easily substantiated with documentation was $363,436.31. Miller Aff. ¶ 25. Mejias indicated the amount owed by the Debtor to EES was likely substantially higher than that amount, but that he still needed to review additional documents. Miller Aff. ¶ 25.

At that same meeting, Lattimer informed the undersigned counsel that he "had no reason to doubt the number" provided by Mejias, but that he was unable to say for sure without doing a more substantive review of the available records. Miller Aff. ¶ 15. The undersigned counsel then informed Colon, Lattimer and the EES team that no involuntary petition would be filed without a complete audit by Lattimer, as the undersigned counsel was unwilling to rely solely on the representations of Mejias, Colon, and the EES team, in light of the potential consequences of filing an involuntary petition. Miller Aff. ¶ 16. Colon, Mejias, and the EES team indicated that

they would ensure that Lattimer performed a complete audit, which would be incorporated into the findings of the Colon, Mejias and EES team prior to filing, as a full report. Miller Aff. ¶ 17.

On or about March 18, 2019, the undersigned counsel received an email from Mejias, indicating that Lattimer was reviewing the final draft of the report of the monies due from the Debtor to EES. Miller Aff. ¶ 18, Exhibit A. On April 28, 2019, Mejias sent the undersigned counsel a report dated April 16, 2019 (hereinafter the "Report"). Miller Aff. ¶ 19, Exhibit B. The Report indicated the extensive scope of the audit and included supporting documentation for same. Miller Aff., Exhibit B. The Report provided that it was "created from information obtained from reviewing customer files, BEST QuickBooks' company files, bank account transactions & statements, and utility invoicing systems."[2] Miller Aff., ¶20, Exhibit B. The Report further stated that the "audits" were performed by "Andrew Lattimer CPA, Partner, Blum Shapiro, accountant for both EES and BEST" along with Mejias and other members of the EES team. Miller Aff. ¶ 20, Exhibit B. The Report specifically identified $334,674.37 in overpayments by EES to the Debtor, along with $71,964.72 in diverted sales, again owed by the Debtor to EES. Miller Aff. ¶ 20, Exhibit B. Based on both the comprehensive nature of the Report, as well as the statement that it was the result of an audit performed by Lattimer and Mejias' comments that the report was under review by Lattimer prior to it being provided to the undersigned counsel, the undersigned counsel accepted the conclusions of the Report as true. Miller Aff. ¶ 22.

Nonetheless, in an exercise of caution, the undersigned counsel again inquired of EES as to the amount owed by the Debtor to EES that could be readily proven with documentary evidence, should it become necessary to do so. Miller Aff. ¶¶ 23-25. On April 29, 2019, by telephone, EES informed the undersigned counsel that the amount of the debt owed by the Debtor to EES that (1) was not the subject of a bona fide dispute and (2) could be readily proven with documentary

---

[2] More specific facts regarding these investigations are contained below in Part III.b.ii.2.

evidence reviewed by both EES and Lattimer was $363,436.31.  Miller Aff. ¶ 25. Based on all the available information, EES filed the Petition on April 30, 2019. (ECF# 1.)

## II.    BRIEF STATEMENT OF ISSUE

Buck moves for the imposition of sanctions on the ground that the filing of the Petition on April 30, 2019 was made in bad faith. When making such determination, lower courts are instructed to "resolve all doubts in favor of the signer." Oliveri v. Thompson, 803 F.2d 1265, 1275 (2d Cir.1986), cert. denied, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).  As more fully articulated in an earlier decision of the Second Circuit, "[c]ourts must strive to avoid the wisdom of hindsight in determining whether a pleading was valid when signed, and any and all doubts must be resolved in favor of the signer." Eastway Constr. Corp. v. City of New York, 762 F.2d 243, 254 (2d Cir.1985), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988); accord Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir.1993); Associated Indem. Corp. v. Fairchild Indus. Inc., 961 F.2d 32, 34–35 (2d Cir.1992); Stern v. Leucadia Nat'l Corp., 844 F.2d 997, 1005 (2d Cir.1988).

## III.    LAW AND ARGUMENT

### a.    Requested Relief Under 11 U.S.C. §303(i) is Improper, And Must Be Denied

Buck first requests an award of sanctions pursuant to 11 U.S.C. §303(i), which provides, in relevant part:

> If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment
> (1) Against the petitioners and in favor of the debtor for –
>     a.  Costs; or
>     b.  A reasonable attorneys fee; or
> (2) Against any petitioner that filed the petition in bad faith, for –
>     a.  Any damages proximately caused by such filing; or

b.  Punitive damages.

Based on the plain reading of the applicable statute, the relief requested by Buck is

unavailable to him.

### i.  Award to Buck is Improper Under 11 U.S.C. §303(i)(1)

In an opinion directly on point, the Ninth Circuit has held that damages under § 303(i)(1)

may be awarded only to the alleged debtor, notwithstanding the fact that related people or

entities with a "close relationship" to the debtor may also be harmed by the filing of an

involuntary petition:

> When Congress enacted the comprehensive Bankruptcy Reform Act of 1978 after
> a decade-long debate, it could not have gone unrecognized that debtors'
> shareholders or close immediate family members might also suffer the same types
> of harm or emotional distress as their family members who are subject to
> involuntary bankruptcy proceedings. Yet Congress determined that bankruptcy
> courts could award damages predicated on the bad faith filing of involuntary
> petitions only to the debtors themselves—those participants in involuntary
> bankruptcy proceedings who suffer most directly the harm from frivolous or
> spiteful filings. The relevant Senate and House Reports state:
>
> "[I]f a petitioning creditor filed the petition in bad faith, the court may award the
> debtor any damages proximately caused by the filing of the petition. These
> damages may include such items as loss of business during and after the pendency
> of the case, and so on."

Miles v. Okun (In re Miles), 430 F.3d 1083, 1091 (9th Cir. 2005). Courts in the Second Circuit

have recently adopted the reasoning of the Miles court; that fees incurred by a non-debtor are not

recoverable under 11 U.S.C. §303(i). See In re Anmuth Holdings, 600 B.R. 168, (Bankr.

E.D.N.Y., March 27, 2019) (citing In re Landmark Distribs., Inc., 195 B.R. 837, 852 (Bankr.

D.N.J. 1996)and  Rosenberg v. DVI Receivables XVII, LLC, 835 F.3d 414, 418 (3d Cir. 2016))

When EES filed the involuntary petition, an involuntary case was commenced only with

respect to the Debtor. An involuntary case was not commenced with respect to Buck. The Court

can enter judgment under § 303(i) only in favor of a Debtor. In re Miles; 430 F.3d 1083 1093–94 (9th Cir. 2005); see also Rosenberg, 835 F.3d 414, 419 (3d Cir. 2016); In re Mike Hammer Prods., Inc., 294 B.R. 752, 755 (9th Cir. BAP 2003); In re VII Holdings Co., 362 B.R. 663, 668 (Bankr. D. Del. 2007); Collier on Bankruptcy ¶ 303.33 (16th ed.); In re Landmark Distribs, Inc., 195 B.R. 837, 852 (Bank D.N.J. 1996) (Fees incurred by a "non-debtor . . . should not be borne by the Petitioning Creditors").

Notwithstanding the overwhelming body of authority explicitly stating that Buck may not recover an award under 11 U.S.C. §303(i)(1), Buck cites inapposite case law for the alternate proposition. First, in citing In re Fox Island Square Partnership, Buck ignores that the party seeking fees in that case properly answered the involuntary petition as a partner in a general partnership. See 11 U.S.C. §303(d). In the instant case, Buck did not answer and defend the bankruptcy filing as a partner (as the Debtor is not a partnership) but, rather, filed a motion to dismiss as an intervenor with disputed standing. (ECF #9) In addition, Buck is not looking to recover fees on behalf of the Debtor, but only on behalf of himself.

Buck also cites In re Synergistic Technologies, Inc., In re Ed Jansen's Patio, Inc., Havens v. Leong Partnership and In re Jr. Food Mart of Arkansas for the same proposition. A review of these cases, however, further illustrates that no award in favor of Buck is proper. In Synergistic Technologies, the court awarded fees to a shareholder because the Debtor, otherwise, had no means to defend against the involuntary petition. In the case at bar, the Debtor retains a manager that not only is fully empowered to defend against the voluntary petition, but has actively determined that no defense to the Petition should be mounted, as it is in the best interest of the Debtor to recover improper preferential transfers. Affidavit of Leticia Colon, ¶ 15-19; (ECF #18, pg. 7.) See 11 U.S.C. §303(i). In Leong Partnership, the putative debtor in the involuntary

bankruptcy did not legally exist, a situation which is dissimilar to the case at bar. In Ed Jansen's Patio, Inc., the Court relied on a unique provision of Florida law (after acknowledging only the debtor could obtain an award under 11 U.S.C. §303(i)) to find that a party with an interest assigned by the putative debtor was sufficient to allow for an award. No such assignment was present in the case at bar, nor does the unique Florida statute apply in this case. Finally, the court in Food Mart of Arkansas noted that a non-debtor *may* be entitled to damages, but failed to indicate the statutory basis for such a potential award.

Perhaps the most glaring illustration that Buck is not entitled to an award under 11 U.S.C. §303(i)(1) is the fact that he relies on a Ninth Circuit *dissent* in In re 8Speed8, Inc., 921 F.3d 1193 (9th Cir. 2019). The majority opinion in that same case explicitly holds that a 50 percent shareholder in the Debtor that successfully moved to dismiss an involuntary petition may not be awarded attorneys fees under 11 U.S.C. §303(i) *or* (ii). Id. at 1195-96. In issuing its ruling, the Court in 8Speed8 notes "[s]ection 303(i) is intended to alleviate the consequences that involuntary proceedings impose on the debtor. Those consequences include loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment. A third party, who intervenes freely in an involuntary action, does not face those same consequences." (Citations omitted, internal quotation marks omitted.) Id. at 1196.

Buck seeks a judgment award in favor of himself, personally, and not in favor of the Debtor. The plain language of 11 U.S.C. §303(i), all Courts of Appeal that have addressed this issue, and the one case in the Eastern District of New York all state that Buck may not personally be awarded a judgment pursuant to 11 U.S.C. §303(i)(1). Accordingly, an award in favor of Buck under this statute is improper.

### ii.  Award to Buck is Improper Under 11 U.S.C. §303(i)(2)

Standing under § 303(i)(2) is also limited only to the debtor. Buck notes that § 303(i)(1) expressly limits an award of costs or attorney's fees to the debtor, but that § 303(i)(2) does not. He argues that the difference—the omission of the limiting phrase "in favor of the debtor" from subsection (2)—means that there is no limitation on who may recover under subsection (2) and permits it, and all others who may be injured by the bad faith filing, to recover their damages and punitive damages.

However, the Court should be mindful that the introductory clause of § 303(i) also mentions the debtor. It provides that the sanctions contained in subsections (1) and (2) may not be awarded if the debtor and all of the petitioners consent to dismissal of the involuntary petition or if the debtor waives "the right to judgment." Clearly, the debtor controls the availability of damages under subsection (2) and can always waive the benefits of it. If damages under subsection (2) were available to third parties, it would be odd that the debtor could unilaterally waive them for the third parties. Generally, only an injured party can waive damages caused to it, not someone else who did not suffer those damages.

Other courts have addressed the question of standing to assert damages by a non-debtor under § 303(i)(2). None allowed non-debtors to recover damages. See, e.g., Miles, 430 F.3d 1083, 1094; Mike Hammer Productions, Inc., 294 B.R. 752,754-55 (9th Cir BAP 2003); VII Holdings Co., 362 B.R. 668 (Bankr. D. Del. 2007); In re RMAA Real Estate Holdings, LLC, 2010 WL 5128647 (Bankr. E.D.Va. 2010).

In Miles, the court denied recovery under § 303(i) to the debtor's wife and children who were trying to recover for damages related to ten involuntary petitions that had been filed against the debtor. 430 F.3d at 1094. The court noted that § 303(i)(1) and (2), read together, did create an ambiguity, noting that although 303(i)(1) is clear that only a debtor may recover under that

subsection, subsection 303(i)(2) is ambiguous because it does not include the language "in favor of the debtor." Id. at 1093. Because of this ambiguity, the court looked to the legislative history, public policy, and applicable case law to determine whether § 303(i) precludes non-debtors from recovering. Id.

The legislative history of § 303(i) indicates that only the debtor may recover damages resulting from an involuntary bankruptcy proceeding filed in bad faith. Specifically, the House and Senate reports provide, "[I]f a petitioning creditor filed the petition in bad faith, the court may award the debtor any damages proximately caused by the filing of the petition. These damages may include such items as loss of business during and after the pendency of the case, and so on." H.R.Rep. No. 95–595, at 324 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6280; S.Rep. No. 95–989, at 34 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5820 (identical text).

Second, as a matter of public policy, the court noted that allowing a non-debtor to recover damages could lead to "abuse" of the bankruptcy system. Miles, 430 F.3d at 1094. It stated: The introductory clause to § 303(i) provides that "the debtor" may waive the right to judgment, which would then enable the debtor to waive the third parties' damages. If such were the case, "debtors could extort payments from either the petitioning creditors or the non-debtors seeking damages, in exchange for either waiving or not waiving the damages claims." In re Mike Hammer Prods., Inc., 294 B.R. at 754.

While the Ninth Court of Appeals in Miles left open "the question of whether non-petitioning creditors may seek damages under § 303(i)(2)," its analysis suggests the same result. Id. at 1094 n. 7. That question was addressed in In re VII Holdings Co., where two non-petitioning creditors requested attorneys' fees and costs pursuant to §§ 105(a) and 303(i), incurred because of the involuntary bankruptcy filed by another creditor. 362 B.R. at 664. The

petitioning creditor in the case had a relationship with another party in interest with a history of using dilatory tactics, such as filing bankruptcies on the eve of foreclosure, to forestall the sale of the property at issue. Id. at 664–65. In opposition to the request for damages, the petitioning creditor argued that the non-petitioning creditors lacked standing to recover damages under 303(i). Id. at 667. The court agreed, finding that § 303(i)(1) clearly limited recovery to the debtor and that while § 303(i)(2) did not limit recovery to the debtor by its terms, the structure and scheme of § 303(i) limited recovery to the debtor under subsections (1) and (2). Id. at 664.

The propriety of an award in favor of a shareholder of a putative debtor under 11 U.S.C. §303(i)(2) was recently examined, again, by the Ninth Circuit Court of Appeals in the matter of In re 8Speed8, Inc., 921 F.3d 1193 (9th Cir. 2019). That case exhibited a similar fact pattern to the case at bar. The Ninth Circuit was unpersuaded by the shareholder's presentation of itself as a martyr and correctly noted that "[t]he Code has within its sections a remedy for cases like this: Section 305 gives the bankruptcy court the power to dismiss an involuntary petition sua sponte . . . and [the shareholder's] appearance in this case was just as voluntary as was the appearance of the third parties in Miles." Id. at 1195-96.

The Ninth Circuit further opined that "reading § 303(i) to permit only the debtor to seek damages is consistent with its purpose and the policy interests underlying it. Section 303(i) is intended to alleviate the consequences that involuntary proceedings impose on the debtor. Those consequences include loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment. In re Reid, 773 F.2d 945, 946 (7th Cir. 1985). A third party, who intervenes freely in an involuntary action, does not face those same consequences." (Internal quotation marks omitted.) Id. at 1196.

Finally, the Ninth Circuit states that even if an award to a shareholder under 11 U.S.C. §303 were proper, it "would still not guarantee costs, fees, or damages. An award under § 303(i) —which states that the court *may* award costs, fees, or damages—is not mandatory." Id. at 1196 (citing, inter alia, Susman v. Schmid (In re Reid), 854 F.2d 156, 159 (7th Cir. 1988); Bankers Tr. Co. BT Serv. Co. v. Nordbrock (In re Nordbrock), 772 F.2d 397, 400 (8th Cir. 1985); In re Kidwell, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993)). "Indeed, the plain language of the statute clearly contemplates that fees and costs will not be awarded in all cases, even though a party will ordinarily incur attorneys' fees in seeking to dismiss the petition." (Internal quotation marks omitted.) Id at 1196.

From Buck's perspective, he has failed to cite any cases that explicitly have held that a minority shareholder of the Debtor may recover under 11 U.S.C. §303(i)(2). Indeed, the sole case cited by Buck for the proposition concerns a general partner in a partnership debtor, a proper party to answer an involuntary petition. Buck cites no authority, appellate or otherwise, that a minority shareholder may recover. Conversely, the four cases cited in opposition to Buck's argument are well reasoned and note the text, the legislative history and public policy indicate that standing to assert a claim for damages under § 303(i)(2) is limited to the debtor. For these reasons, an award to Buck under 11 U.S.C. §303(i)(2) is improper.

### iii.  Even If Otherwise Entitled to an Award Under 11 U.S.C. §303(i), There Can Be No Award Against Counsel of Record

`       Should it otherwise be determined that an award in favor of Buck is appropriate under 11 U.S.C. §303(i), no such award should be imposed against counsel of record. As noted previously, the plain language of 11 U.S.C. §303(i) provides for a possible imposition of a judgment "against the petitioner" or "petitioners."

In the instant case, the undersigned counsel is clearly not the petitioner. Indeed, there is ample authority for the proposition that an award under 11 U.S.C. §303(i) may not imposed against a petitioner's attorney. See, e.g., In re McMillan, 543 B.R. 808 (N.D.Tex. 2016) (§303 allows relief only against the actual petitioner parties); In re Glannon, 245 B.R. 882, 892–93 (D.Kan. 2000) (attorneys for petitioning creditors cannot be liable under plain language of §303(i)); In re Int'l Mobile Advert. Corp., 117 B.R. 154, 158 (Bankr.E.D.Pa.1990) (attorney for petitioning creditor not liable under §303(i) because attorney was not a petitioner); In re Fox Island Square Partnership, 106 B.R.at 967 (Bankr.N.D.Ill.1989) (§303(i) "does not provide for an award against the petitioners' attorney"); In re Ramsden, 17 B.R. 59, 61 (Bankr.N.D.Ga.1981) (no authority under §303 to assess the costs and damages against attorneys, but rather only against offending petitioners); In re Commonwealth Sec. Corp., No. 06–30746–SGJ–7, 2007 WL 309942, at *8 (Bankr.N.D.Tex. Jan. 25, 2007) (noting that "Section 303(i) technically does not permit for a sanction against a petitioner's attorney").

Buck nonetheless refers the court to four cases for the proposition that, despite the plain limiting language of 11 U.S.C. §303(i), a judgment should be entered against the undersigned counsel. As before, all of the cases cited by Buck are inapposite for this proposition. Each case, rather than acknowledging the propriety of an award of sanctions against an attorney under 11 U.S.C. §303(i), clearly provides that an award of sanctions against an attorney for a "bad faith" filing of an involuntary bankruptcy petition may only be made pursuant to F. R. Bankr. P. 9011. See In re Val W. Poterek & Sons, Inc., 169 B.R. 896, 909 (Bankr. N.D. Ill. 1994) (issuing award against attorney under Rule 9011 only); In re Anmuth Holdings, LLC, 600 B.R. at 168 (Bankr. E.D.N.Y 2019) (no mention of award against attorney whatsoever); In re Exchange Network Corp., 92 B.R. 479, 480-81 (Bankr. D. Colo. 1988) (acknowledging limitation on award against

counsel); <u>Landon v. Hunt</u>, 977 F.2d 829 (3rd Cir. 1992) (issuance of sanctions against attorney

for violation 11 U.S.C. §303(i) is improper, and F.R. Bankr. P. 9011 should be used instead).

Accordingly, even if this Court determines an award in favor of Buck under 11 U.S.C. §

303(i) is proper, it should not be imposed against the undersigned counsel.

### iv.   Lack of Bad Faith Precludes an Award Under 11 U.S.C. §303(i)(2)

#### 1.   Buck Has Burden of Proving Bad Faith to Justify an Award

In order to render judgment against EES pursuant to 11 U.S.C. §303(i)(2), the Court must

make a particularized finding of "bad faith." <u>In re Bayshore Wire Products Corp.</u>, 209 F.3d 100,

105 (2d Cir. 2000). Moreover, "there is a presumption of good faith in favor of the petitioning

creditor, and thus the alleged debtor has the burden of proving bad faith." <u>United States Fidelity</u>

<u>& Guar. Co. v. DJF Realty & Suppliers, Inc.</u>, 58 B.R. 1008, 1011 (N.D.N.Y.1986), quoted in

<u>LNC Invs., Inc. v. Secured Equip. Trust of Eastern Airlines, Inc. (In re Secured Equip. Trust of</u>

<u>Eastern Air Lines, Inc.)</u>, No. 91 Civ. 5049(MBM), 1992 WL 295943, at *6 (S.D.N.Y. Oct.8,

1992). Moreover, the burden is a heavy one, requiring proof by at least a preponderance of the

evidence. <u>In re Reveley</u>, 148 B.R. 398 (Bankr. S.D.N.Y 1992); <u>United States Fidelity &</u>

<u>Guaranty Co. v. DJF Realty & Suppliers, Inc.</u>, 58 B.R. 1008, 1013 (N.D.N.Y.1986).

> Because bad faith is not defined in the bankruptcy code, and because there is no
> legislative history addressing the intended meaning of this language, courts have
> used different approaches to determine whether a petition was filed in bad faith
> [for purposes of § 303(i)(2)]. Some courts have used an improper use test, which
> finds bad faith when a petitioning creditor uses involuntary bankruptcy
> procedures in an attempt to obtain a disproportionate advantage for itself, rather
> than to protect against other creditors obtaining disproportionate advantages,
> particularly when the petitioner could have advanced its own interests in a
> different forum. Other courts have applied an improper purpose test, where bad
> faith exists if the filing of the petition was motivated by ill will, malice, or a desire
> to embarrass or harass the alleged debtor. A third line of cases employs an
> objective test for bad faith based on what a reasonable person would have
> believed. Finally, as the Eleventh Circuit has observed, a number of courts have

sought to model the bad faith inquiry under §303(i)(2) on the standards set forth
in Bankruptcy Rule 9011.

(Citations and quotation marks omitted.) <u>Bayshore</u>, 209 F.3d at 105. The Second Circuit has

considered all four tests without embracing one over the others.

No matter which test is adopted by this Court, however, the inescapable conclusion is that

Buck has not met his burden of showing "bad faith" sufficient to justify an award pursuant to 11

U.S.C. §303(i)(2).

## 2.  Improper Use Test

"Some courts have concluded that a petition is filed in bad faith when a petitioning

creditor uses involuntary bankruptcy procedures in an attempt to obtain a disproportionate

advantage for itself, rather than to protect itself against other creditors obtaining disproportionate

advantages." (Quotation marks omitted.) <u>Bayshore</u>, 209 F.3d at 105. Nonetheless, creditors are

justified in filing an involuntary bankruptcy against a debtor where exclusive bankruptcy powers

and remedies may be usefully invoked to recover transferred assets, to "insure an orderly ranking

of creditor's claims" and "to protect against other creditors obtaining a disproportionate share of

debtor's assets." <u>In re Better Care, Ltd.</u>, 97 B.R. 405, 411 (Bankr. N.D. Ill. 1989). Creditors may

also properly "use the bankruptcy process to install a trustee to prevent future transfers or

wasting or dissipation of assets, or to investigate and to challenge the legitimacy of entities that

may be operating as alter egos of the debtor." <u>In re Hentges</u>, 351 B.R. 758, 772 (Bankr. N.D.

Okla. 2006).

In the instant case, EES filed the Petition because Buck, another creditor of the Debtor,

was using his control over the Debtor to obtain a disproportionate share of the Debtor's assets, to

the detriment of EES. (ECF# 18, pg.7) EES hoped that the unique avoidance powers of 11

U.S.C. §544 provided to the Chapter 7 Trustee would allow the improper acts of Buck to be at

least partially cured. Id. Further, it was the hope and intention of EES that the filing of the

Petition along with the appointment of a Chapter 7 Trustee, would both prevent additional

dissipation of assets from the Debtor to Buck, and would allow an investigation into the new

business entity, new office space, new bank account and new telecommunications service Buck

was using as "alter egos" of the Debtor in order to further divert funds from the Debtor and other

creditors. Id. Here, EES did not act to obtain a disproportionate advantage over other creditors

but, rather, to prevent Buck from using his own disproportionate advantage. Accordingly, the

Court should not make a finding of bad faith under this test.

### 3.  Improper Purpose Test

Courts have also found bad faith when "the filing of the petition was motivated by ill

will, malice or a desire to embarrass or harass the alleged *debtor*." (Emphasis added.) Bayshore,

209 F.3d at 105. With respect to this test, courts have excused petitioners from a bad faith

finding where the improper purpose was not the sole reason for the filing. In re Petralex

Stainless, Inc., 78 B.R. 738 (Bankr. E.D. Pa. 1987) (court held that filing to circumvent a state

court ruling is not per se improper, where petitioner also had legitimate reasons for filing); In re

Turner, 80 B.R. 618, 627 (Bankr. D. Mass. 1987) (although creditors used bankruptcy petition

partly to obtain "potential leverage," they were not in bad faith where they were primarily

motivated by their legitimate goals).

In the instant case, Buck alleges the following improper purpose for the Petition:

> The Petition was an improper attempt by Colon – the majority owner and one in
> exclusive control of both Best Home and EES – to strip her brother, Buck, of his
> 40% interest in Best Home and to saddle him with legitimate debts of Best Home.
> Indeed, the Petition reeks of bad faith, is part of an effort to annihilate Buck, and is
> simply another step in the campaign employed by Colon to use every process, albeit
> improperly, to inflict harm on Buck.

(ECF #39, pg. 1.)

Notably, despite the hyperbole above, at no point is there an allegation of ill will, malice, or a desire to embarrass or harass the alleged *debtor*. Instead, Buck's counsel merely asserts ill will, malice or a desire to embarrass or harass *Buck personally*. A plain review of <u>Bayshore</u> indicates this is insufficient to show bad faith under the improper purpose test.

However, if the Court concludes that it is possible to find bad faith due to ill will or malice directed at a third party, EES' legitimate purpose of the filing would still preempt such a finding here. EES filed the Petition for the legitimate purpose of trying to stop Buck from stealing money from the Debtor at the expense of EES and to use the unique powers of the Chapter 7 Trustee to avoid the preferential transfers made to Buck by his own hand. As Buck has failed to prove by a preponderance of the evidence that EES acted without a legitimate purpose, and EES was primarily motivated by legitimate purposes, this Court should not find EES acted in bad faith in filing the Petition pursuant to the improper purpose test.

### 4. Reasonable Person Test

A third line of cases used to determine the existence of bad faith sufficient to support an award under 11 U.S.C. §303(i)(2) utilizes an objective test whereby the court inquires into "what a reasonable person would have believed." <u>Bayshore</u>, 209 F.3d at 105. In the instant case, EES performed a carefully researched analysis prior to the filing, determined that the Debtor was not paying its debts as they came due, that EES was owed a significant amount of money in excess of the statutory minimum required by 11 U.S.C. §303(b)(2), that the debt in question was not subject to a bona fide dispute, and that Buck had been engaging in conduct that was causing dissipation of assets of the Debtor resulting in Buck obtaining a disproportionate share of the Debtor's assets when compared to other creditors. (ECF #18, pg. 7)

Colon had been stymied by Buck in her efforts to obtain business records necessary to determine the extent of Buck's fraudulent conduct as a manager of the Debtor and, apparently due to Colon's efforts to retake control of the Debtor, EES was repeatedly threatened by Buck's counsel with a dissolution lawsuit. (ECF#18, pgs. 4-5)A reasonable person would suspect that the continued efforts of Buck to hide the business records of the Debtor, even after he was terminated as a manager of the Debtor, were an indication that Buck made improper preferential transfers that could be investigated and recovered by the Chapter 7 Trustee. See, e.g. Hentges, 351 B.R. at 775.

Buck fails to address this test, or the allegations of fraud made by EES against Buck, in any of his moving papers. Instead, Buck argues that Colon filed the Petition to "saddle" Buck "with the legitimate debts" of the Debtor, but fails to provide any evidence or law indicating that the filing of the Petition is an effort that a "reasonable person" would not have undertaken. Based on the investigation by EES, and the actions of Buck to prevent access to the business records of the Debtor, a reasonable person would believe that the Petition was not filed in bad faith and, thus, an award under 11 U.S.C. §303(i)(2) would be improper.

### 5. Reasonable Inquiry Into Facts and Law

A fourth, and final, line of cases model the bad faith inquiry on the standards set forth in Bankruptcy Rule 9011. Bayshore, 209 F.3d at 106. "An analysis under Rule 9011 inquires into a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law. In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, such as to harass, to cause delay, or to increase the cost of litigation." (Internal quotation marks and citations omitted.) Id.

The "improper purpose" prong of the test under F. R. Bankr. P. 9011 has been addressed above. EES has not engaged in, nor has Buck proven by a preponderance of the evidence, that the filing of the Petition was to harass, cause delay, or otherwise increase the cost of litigation. On the contrary, EES filed the Petition in the hope that a Trustee would be appointed to recover the preferential transfers at issue and conduct an orderly wrap-up of the Debtor, in order to avoid the time and expense of a separate dissolution action in Superior Court. Further, while Buck asserts that the filing was intended solely to harass him personally, Buck, personally, has no stake in the filing. Buck's position as a minority shareholder with no managerial authority in the Debtor undermines any argument that he might otherwise have that the filing of the Petition was intended to directly harass him.

As for the second prong of the test, EES undertook a reasonable inquiry into both the facts and law surrounding the filing of the Petition, prior to the filing itself. As explained in greater detail later in this brief, Mejias, in his capacity as Chief Financial Officer of EES, performed an exhaustive review of the customer files, BEST QuickBooks' company files, bank account transactions and statements, and utility invoicing systems. Unfortunately, due to Buck's failure to provide all relevant business records, only an estimate of the amount owed by the Debtor to EES was able to be ascertained. However, EES was able to conclusively determine that *at least* $363,436.31 was owed by the Debtor to EES.

Buck's counsel argues that the uncertainty of EES as to the exact amount that is owed by the Debtor to EES renders the Petition a "bad faith" filing.[3] EES acknowledges that the amount owed by the Debtor to EES has been somewhat of a "moving target." Nonetheless, the fact that a portion of the true amount of the EES claim is in dispute or is otherwise unproven as to

---

[3] Buck's counsel does not argue that the Petition must fail because (1) the Debtor has 13 or more creditors (11 U.S.C. §303(b)(2)), or (2) that the Debtor is not otherwise generally paying its bills (11 U.S.C §303(h)(1)).

contingency is irrelevant, so long as the threshold amount provided by 11 U.S.C. §303(b)(1) is satisfied.  See, e.g., <u>Focus Media, Inc. v. Nat'l Broadcasting Co. (In re Focus Media, Inc.)</u>, 378 F.3d 916, 926 (9th Cir. 2004) ("'[I]f at least a portion of the debt that is the subject of the petition is undisputed, the undisputed portion is sufficient to create a debt under Section 303(b)(1) not subject to bona fide dispute'"), quoting <u>IBM Credit Corp. v. Compuhouse Sys., Inc.</u>, 179 B.R. 474, 479 (W.D.Pa.1995), aff'd 85 F.3d 612 (3d Cir.1996); see also <u>In re EM Equipment, LLC</u>, 504 B.R. 8 (Bankr. D. Conn. 2013); <u>In re Food Gallery at Valleybrook</u>, 222 B.R. 480, 489 (Bankr. W.D. Pa. 1998); <u>In re Willow Lake Partners II, L.P.</u>, 156 B.R. 638, 643 (Bankr. W.D. Mo. 1993) (creditor is qualified to be a petitioning creditor "even though a portion of the creditor's claim is the subject of a bona fide dispute, where the undisputed portion of the claim is not contingent as to liability"), citing <u>In re Broadview Lumber Co.</u>, 137 B.R. 775, 776 (Bankr. W.D. Mo. 1992); <u>In re F.R.P. Industries, Inc.</u>, 73 B.R. 309, 312 (Bankr. N.D. Fla. 1987); <u>In re Onyx Telecommunications, Ltd.</u>, 60 B.R. 492, 498 (Bankr. S.D.N.Y. 1985).

In the instant case, the investigation performed by EES prior to the filing of the Petition conclusively determined that (1) the Debtor was not currently paying its debts as they became due, (2) that the Debtor had fewer than 13 creditors, and (3) that EES had an un-contingent debt due and owing from the Debtor of *at least* $15,775.[4] See 11 U.S.C. §303. As EES performed a reasonable inquiry into the legal requirements of the filing of the Petition pursuant to 11 U.S.C. §303, along with the factual bases underlying the filing of the Petition, it is submitted that there is no "bad faith" present under the standards imposed by F. R. Bankr. P. 9011, and an award of fees to Buck is inappropriate.

---

[4] The Court should take notice of the evidence presented by EES in response to Buck's Motion of overbilling by the Debtor in favor of EES in the amount of $72,257.04. (ECF #18.)

### v. Even If Otherwise Entitled to an Award Under 11 U.S.C. §303(i), the Award Sought by Buck is Unreasonable

As evidenced by the text of §303(i), a debtor's entitlement to a §303(i) award is not automatic. The operate phrase is "the court *may* grant judgment." (Emphasis added.) 11 U.S.C. § 303(i). From the use of the word "may" rather than the word "shall," the Court must infer that Congress anticipated that some petitioning creditors would not be obligated to reimburse an involuntary debtor for its reasonable attorneys' fees and costs. See Jama v. Immigration & Customs Enforcement, 543 U.S. 335, 346 (2005) (stating "[t]he word 'may' customarily connotes discretion"); In re Reid, 854 F.2d 156, 159 (7th Cir. 1988) ("the plain language of the statute clearly contemplates that fees and costs will not be awarded in all cases, even though a party will ordinarily incur attorneys' fees in seeking to dismiss the petition."); In re Tarasi & Tighe, 88 B.R. 706, 711 (Bankr. W.D. Pa. 1988) ("An award of relief is discretionary with the Court and the mere fact that the conditions precedent to the allowance of costs and fees permitted by § 303(i) are met is enough to warrant the exercise of this Court's discretion in favor of such an award."); In re Ross, 135 B.R. 230, 234 (Bankr. E.D. Pa. 1991) ("Clearly, the grant of such an award is discretionary."). Problematically, §303(i) does not provide any guidance as to how a bankruptcy court should exercise its discretion. See, e.g., Ross, 135 B.R. at 235 ("Unfortunately, the statute itself provides no framework or list of factors Congress expected courts to consider in the exercise of their discretion.").

In the absence of statutory guidance, the majority of bankruptcy courts have read §303(i) to establish that the dismissal of an involuntary petition creates a rebuttable presumption in favor of an award of reasonable attorneys' fees and costs. In re Express Car & Truck Rental, Inc., 440 B.R. 422, 431 (Bankr. E.D. Pa. 2010) ("a majority of courts have held that there is a presumption

in favor of awarding costs and reasonable attorney's fees under § 303(i)(1)."). Within this framework, Buck bears the initial burden of establishing the reasonableness of its attorneys' services. Once the underlying reasonableness of the fees is established, the petitioning creditors bear the burden of establishing that a §303(i) award is otherwise inappropriate. In re Diloreto, 388 B.R. 637, 648 (Bankr. E.D. Pa. 2008).

Important to the present dispute, a court does not determine "reasonableness" through hindsight, In re Brous, 370 B.R. 563 570 (Bankr. S.D.N.Y. 2007), or penalize counsel simply because it rendered services prosecuting an application that failed or opposing one that succeeded. In re JLM, 210 B.R. 19, 25 (2d Cir. 1997); In re West End Fin. Advisors, LLC, No. 11–11152 (SMB), 2012 WL 2590613, at *6 (Bankr. S.D.N.Y., July 3, 2012). The test is an objective one and considers "what services a reasonable lawyer or legal firm would have performed in the same circumstances." In re Ames Dep't Stores, Inc., 76 F.3d 66, 72 (2d Cir. 1996) (citing In re Taxman Clothing Co., 49 F.3d 310, 315 (7th Cir.1995) (Posner, C.J.)); accord In re Angelika Films 57th, Inc., 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998), aff'd, 246 B.R. 176 (S.D.N.Y. 2000); In re Keene Corp., 205 B.R. 690, 696 (Bankr. S.D.N.Y. 1997); In re Drexel Burnham Lambert Grp., Inc., 133 B.R. 13, 23 (Bankr. S.D.N.Y. 1991). A plain reading of the Motion, wherein Buck requests an award of more than $38,000, representing some 137 hours of time spent to file a Motion to Dismiss, is patently unreasonable.

### 1.    Lump Billing Renders Fee Unreasonable on its Face

In cases where courts have identified the "lumping" of entries and were otherwise unable to discern the amount of time devoted to each task, they have denied the allowance of fees for the time spent on the "lumped" entries. See, e.g., In re Hirsch, Case No. 1–02–17966, 2008 WL 5234057 at *5–6 (Bankr. E.D.N.Y. 2008); In re Dimas, LLC., 357 B.R. 563, 576 (Bankr. N.D.

Cal. 2006); <u>In re Worldwide Direct, Inc.</u>, 316 B.R. 637, 643 (Bankr. D.Del. 2004); <u>In re Ward</u>,

190 B.R. 242, 246 (Bankr. D.Md. 1995); <u>In re Poseidon Pools of America</u>, 180 B.R. 718, 731

(Bankr. E.D.N.Y. 1995), aff'd, 216 B.R. 98, 100 (E.D.N.Y. 1997). <u>In re DiLeito</u>, 468 B.R. 510

(Bankr. D. Conn. 2012); <u>In re Frenz</u>, 142 B.R. 611 (Bankr. D. Conn. 1992).

 The instant case exhibits an extreme example of "lumping" billing entries, by all three

attorneys ostensibly involved in this litigation (ECF #40-1) As an example, on May 21, 2019,

Attorney Angela Vickery billed 10.8 hours on this file. Her billing entry for this time is:

> Research for use in memorandum of law in support of motion to dismiss re
> intervention/standing of shareholders and interested parties, cases involving
> similar facts, etc.; Draft/File appearance of A. Natale in bankruptcy court;
> Draft/finalize motion to dismiss/memo of law in support/affidavit of J.
> Buck/affidavit of A. Natale; Meet with client re: affidavit/documents to
> review/etc.; Telephone conference with client re: revisions to affidavit/finalized
> affidavit/etc.; Review file/invoices/quickbooks entries/correspondences from
> Mary Miller an L. Colon re: amounts owed by EES and/or Best Home for use in
> memo of law; Review correspondence from Marc Miller and Mary Miller for use
> in memorandum of law.

ECF#40-1, pg. 4.

 Based on the information provided, it is impossible for the Court to determine if this

billing entry is reasonable. Did Attorney Vickery spend 10 hours drafting and filing Attorney

Natale's appearance, or a tenth of an hour? The aforementioned example is merely one of many

improper time entries advanced by Buck as "reasonable." In fact, at least 37 of the 60 time

entries are improperly "lumped." As any and all questions must be resolved against the party

seeking sanctions, all of the time entries evidencing lump billing must be disregarded by the

Court.

## 2. Double Billing Renders Fee Unreasonable on its Face

 The lump billing of Buck's counsel is not the only facial defect of Buck's purportedly

"reasonably incurred" attorneys' fees. Even a cursory review of the billing records provided by

Buck reveals rampant double billing. By way of example, Attorney Vickery and Attorney Natale both billed for their attendance at the hearings before this Court on May 31, 2019 and June 3, 2019. In addition, on May 10, 2019, both Attorney Natale and Attorney Vickery participated in a "telephone conference with Bankruptcy Atty. #1."[5] Similarly, on May 17, 2019, both Attorney Natale and Attorney Vickery participated in a "telephone conference with Bankruptcy Atty. #2." On May 29, 2019, both Attorney Natale and Attorney Vickery participated in a meeting "with Client in preparation for hearing."[6]

Further, the duplicative nature of the billing activities of Buck's counsel is not only limited to hearings and meetings. On June 18, 2019, Attorney Natale, Attorney Vickery and Attorney Wareing all revised the memorandum of law in support of Buck's motion for sanctions. (ECF #40-1, pgs. 10-11.) Similarly, on June 18, 2019 and June 19, 2019, both Attorney Vickery and Attorney Wareing drafted and revised an objection to the EES motion to quash.[7] (ECF #40-1, pg. 11.) The patently unreasonable nature of this unnecessarily duplicative billing by Buck's counsel should be considered by the court in determining the propriety of any award under 11 U.S.C. §303(i).

Generally, courts do not permit the recovery from an adversary fees incurred by multiple attorneys performing the same task or attending the same proceeding. Halderman by Halderman v. Pennhurst State Sch. & Hosp., 49 F.3d 939, 943 (3d Cir. 1995) ("the attendance of additional counsel representing the same interests as the lawyers actually conducting the deposition is wasteful and should not be included in a request for counsel fees from an adversary"); In re

---

[5] The propriety of either Attorney Natale or Attorney Vickery billing for time spent either attempting hire a bankruptcy attorney or learning bankruptcy law is questionably "reasonable."

[6] It is impossible to know if both Attorney Natale and Attorney Vickery participated in the same meeting with Buck on May 29, 2019, as the otherwise improper lumped billing of both Attorney Natale and Attorney Vickery does not distinguish between the time spent on these meetings as opposed to other activities.

[7] The improper lumped billing employed by both Attorney Vickery and Attorney Wareing preclude a clear determination of how much time both attorneys spent on this project, but in excess of six billable hours was indicated by the billing records of these two attorneys in simply dealing with an objection to the Motion to Quash.

Channel Master Holdings, Inc., 309 B.R. 855, 863 (Bankr. D. Del. 2004) (disallowing compensation for more than one attorney attending the same hearings); In re Forever Green Athletic Fields, Inc., 2017 WL 1753104 (E.D. Pa.).

Buck has presented no evidence of the necessity of having multiple attorneys attend court hearings, attend conference calls, attend client meetings or in duplicating the same work efforts to produce the same work product. Accordingly, should the Court determine an award is appropriate under 11 U.S.C. §303(i), the matters double billed by Buck's attorney should be disregarded by the Court in making its determination.

### 3.    Buck Has Failed to Comply With Local Rule 2016-1 Regarding Compensation of Professionals

In addition to the other fatal deficiencies of Buck's Motion, Buck's counsel disregards the provisions of both F. R. Bankr. P. 2016 and Local Rule 2016-1.[8] First, pursuant to F. R. Bankr. P. 2016, any application for compensation shall "set forth a detailed statement of (1) the services rendered, time expended and expenses incurred and, (2) the amounts requested." Additionally, the Local Rule modifier requires a fee application cover sheet and must comply with the Court's Guidelines for Allowance of Compensation and Expense Reimbursement of Professionals (hereinafter the "Guidelines"). L. R. Bankr. P. 2016-1. The Guidelines provide, in part, that the following factors are relevant in determining whether a fee award is proper:

> a. Whether the expense is reasonable and economical.
> b. Whether the requested expenses are customarily charged to non-bankruptcy clients of the applicant.
> c. Whether applicant has provided a detailed itemization of all expenses including the date incurred, description of expense (type of travel, type of fare, rate, destination), method of computation, and, where relevant,

---

[8] The undersigned acknowledges that the provisions of F.R. Bankr. P. 2016 are typically limited to fee applications pursuant to 11 U.S.C. §330. Nonetheless, neither F.R. Bankr. P. 2016 or L. R. Bankr. P. 2016-1 are explicitly limited to applications pursuant to 11 U.S.C. §330, and the guidelines are otherwise helpful for the court in determining the propriety of any fee award.

name of the person incurring the expense and purpose of the expense.
Itemized expenses should be identified by their nature (long distance
telephone, copy costs, messengers, computer research, airline travel, etc.)
and by the month incurred. Unusual items require more detailed
explanations and should be allocated, where practicable, to specific
projects.

In the instant case, Buck's counsel admitted that his firm lacks experience in bankruptcy

court and, as a result of Buck's inability to pay a retainer to an attorney with bankruptcy

experience, his office was forced to undertake the representation in a field of law that it was

otherwise inexperienced. Considering the more than 85 hours spent by Buck's counsel in

preparing and filing a motion to dismiss, it seems likely that counsel's admitted lack of

bankruptcy experience resulted in an unreasonable and uneconomical use of time.

Further, Buck's counsel admitted in his affidavit that he is overcharging for services both

due to the fact that it seemed unlikely that Buck would pay in a timely fashion and that he took

the matter on a de facto contingency basis, due to the "fee shifting" provisions of 11 U.S.C.

§303(i). See ECF #40, ¶ 16. Buck's counsel's admitted padding of the bill to take advantage of a

statutory fee-shifting provision should be neither encouraged, nor tolerated by this court.

Finally, as noted above, the billing records submitted by Buck's counsel in no way

provide a "detailed itemization of all expenses." Buck's counsel used lumped, or block, billing

for all matters, preventing the court from being able to adequately determine the reasonableness

of the time spent on a given project. Buck's counsel's suggestion that "the time in which [she]

writes briefs is intertwined with the time in which [she] perform[s] the necessary research for use

in such briefs" is unavailing. (ECF #41, ¶ 12b). Did Attorney Vickery spend two hours drafting

and nearly nine hours researching Buck's brief on May 21, 2019, or vice versa? It is simply

impossible for the court to determine from Buck's submission. Buck's counsel's lack of

specificity in the invoices, combined with the admitted padding of the invoices, renders an award unreasonable and inappropriate in the given situation.

### 4. Buck's Counsel Performed and Billed For Unnecessary Work

While Buck's counsel has admittedly increased their normal hourly rates for this matter, and the time entries provided lack any practical means for determining the reasonableness of the time spent, there is the additional problem of performing work for no apparent benefit.

On May 14, 2019, Attorney Vickery includes a time entry to "prepare revised retention agreement re: wage claims/bankruptcy claims/strategy."[9] While Buck may otherwise be entitled to an award of fees incurred in prosecuting the Motion, the undersigned counsel questions whether the preparation of a revised retention agreement falls within the bounds of a "reasonable expense" in filing the Motion.

Similarly, on May 28, 2019, Attorney Vickery includes a time entry of "review quickbooks for both LLCs" and "cross exam of EES/etc." The Court should not be forced to speculate as to what LLC is being referred to in this time entry, how Buck's counsel intended to cross examine a business entity, or what "etc." refers to. Nonetheless, based on the dubious billing records provided by Buck's counsel, on May 28, 2019, Attorney Vickery could have spent 6 hours on "etc."[10]

On May 30, 2019, Attorney Natale has a time entry for "develop cross examination of various witnesses, including Leticia, Edgardo and Rebecca." Similarly, on that same date Attorney Vickery has a time entry for "cross exam of EES"[11] with no reference to what potential

---

[9] Attorney Vickery's time entry for May 14, 2019 is, again, unreasonably lumped together. Accordingly, it is impossible to determine how much of the 1.3 hours indicated was devoted to the preparation of a revised retention agreement.

[10] In the submitted billing records the undersigned counsel notes no fewer than 19 billing entries for "etc.," which Buck's counsel seeks compensation for.

[11] Again due to the unreasonable lumping, it is impossible to determine how much of the 6.6 hours indicated was devoted to "cross exam of EES."

witness these efforts regarded. (ECF #41-1, pg. 5.) Buck's counsel had no reason to expect that any representative of EES would be present at the hearing in question and, indeed, Buck's counsel did not subpoena any potential witnesses to the hearing. Indeed, while both Colon and Mejias submitted affidavits in opposition to Buck's motion,[12] they were not filed until late in May 30, 2019. Buck's counsel also references a "Rebecca" and no similar affidavit was filed by any person with that name. (ECF #41-1, pg. 5.)

Buck's counsel has submitted that they performed legal work preparing for the examination of "witnesses" that were not otherwise identified by either Buck or EES, were not subpoenaed by any party, and were never even called as witnesses at the May 31, 2019 evidentiary hearing. While the undersigned counsel can certainly appreciate the need to be prepared ahead of an evidentiary hearing, Buck's counsel took it upon themselves to fabricate possible witnesses to be cross-examined purely for the purpose of preparing (and billing) without taking any steps to ensure that these "witnesses" would actually appear for the evidentiary hearing.

As there is no reasonable basis for a substantial amount of the work ostensibly performed by Buck's counsel in responding to the Petition, it is submitted that the award of fees requested by Buck is unreasonable on its face and should be denied.

### 5. 137 Hours to File a Motion to Dismiss is Facially Unreasonable

Finally, the Court should note that the Motion requests an award of $38,477.10, for 137 hours of "legal work" performed by Buck's counsel.[13] (ECF# 41-1.) Indeed, in the two work weeks immediately prior to the evidentiary hearing Buck's counsel submits 73.8 hours of legal

---

[12] It is assumed that "Leticia" and "Edgardo" identified in the billing records are Leticia Colon and Edgardo Mejias, the CEO and CFO, respectively of EES.
[13] Buck also requests further fees and costs that are incurred subsequent to the date that the memorandum of law was filed with the court on June 21, 2019.

work, or nearly 7.4 hours per day. (ECF #41-1.) Again, the undersigned counsel recognizes the important of being prepared, but there is distinction between billing your client to learn a new field of law and preparing for a simple evidentiary hearing.[14]

A review of the Motion indicates that Buck's overarching argument is that the debt allegedly owed by the Debtor to EES is actually the subject of a bona fide dispute, rendering the Petition deficient under 11 U.S.C. §303(b)(1). Rather than assert this argument with a simple affidavit that the debt was subject to a bona fide dispute along with a short motion, Buck's counsel filed a 107-page omnibus motion for relief. (ECF #9.) While the voluminous filing is certainly within the discretion of Buck's counsel to file, the reasonableness of doing so, and requesting compensation for same, should be rightfully questioned.

There are limited cases within this jurisdiction in which an award of attorneys fees pursuant to 11 U.S.C. §303(i) has been approved by the court, let alone considered. Nonetheless, a review of the case law illustrates that billing 137 hours and $38,477.10 to object to an involuntary petition is unreasonable. In the matter of In re Frenz, counsel requested an award for fees incurred in the filing and prosecution of a motion to dismiss, along with various other motions. 142 B.R. 611 (Bankr. D. Conn. 1992). The fees requested were for a total of 16.7 hours spent by three different attorneys. After review, the court, Shiff, J., awarded fees amounting to 10.75 hours. Similarly, in the matter of In re Squillante, the court examined a request for an award of legal fees pursuant to 11 U.S.C. §303(i). 259 B.R. 548 (Bankr. D. Conn. 2001). There, counsel for the putative debtor drafted and filed a motion to vacate an order of relief, drafted and filed a motion to dismiss the case, and appeared and contested an evidentiary hearing on the motion to dismiss. Counsel for the putative debtor requested $7,959.75 for this work, but the

---

[14] Attorney Natale noted during oral argument that his associate had to "hit the books" regarding how to bring the instant motion in bankruptcy court. (ECF #36, pg. 45)

Court did not reach a conclusion as to whether the fee was reasonable, as the Court declined to award any fees at all. Id.

In the instant case, Buck's counsel claims the equivalent of three-and-a-half weeks of Monday through Friday, 9am to 5pm, attorney time. Buck's counsel contends that it has taken nearly a month of time to file and prosecute the Motion. However, the Motion, which tracks the language of 11 U.S.C. §303, is a simple one. Rather than seeking compensation for reasonable attorneys fees, Buck improperly seeks retribution. His counsel has spent hours upon hours researching, discussing, conferencing, drafting, reviewing and revising the Motion, all in the name of taking advantage of the fee shifting provisions of 11 U.S.C. §303. Furthermore, Buck's counsel has billed for multiple attorneys attending the same proceedings, the same conferences and the same meetings. Finally, the lack of clarity in the billing records rife with busywork makes it impossible for the court to separate reasonable from unreasonable actions.

The burden of showing the reasonableness of the requested counsel fees lays at the feet of Buck. Buck has not met his burden. For the foregoing reasons, it is submitted that Buck has failed to meet his burden of showing that his attorneys' fees incurred are reasonable in nature or otherwise proper; therefore, an award pursuant to 11 U.S.C. §303(i) must be denied.

**b. Requested Relief Under F. R. Bankr. P. 9011 is Improper and Must Be Denied**

**i. Buck's Request for Rule 9011 Relief Procedurally Defective and Must Be Denied**

F. R. Bankr. P. 9011(c)(1)(A) provides, in relevant part, that "[a] motion for sanctions under this rule shall be made separately from other motions or requests . . . ." In the instant case, the Motion fails to satisfy this requirement, precluding the Court from awarding sanctions under

Rule 9011. Where the moving party has failed to comply with this requirement, it is an abuse of discretion for the bankruptcy court to impose sanctions. In re Baumblit, 15 Fed. Appx. 30 (2d Cir. 2001); see also In re Cultrera, 2007 WL 1891482 at *2 (Bankr. D. Conn. 2007) (motion for Rule 9011 sanction contained within motion to dismiss insufficient to satisfy the procedural requirement); In re Chan, 556 B.R. 61, 67, (Bankr. E.D.N.Y 2016); In re Hoffman, 403 B.R. 237, (Bankr. E.D.N.Y. 2009); In re Miller, 414 Fed. Appx. 214, 218 (11th Cir. 2011) ("the mere filing of a motion to dismiss in conjunction with the service of a motion for sanctions does not provide a party with specific notice as to which of its factual or legal claims allegedly violate the Bankruptcy Rule 9011 standards").

In the instant case, Buck incorporates his motion for sanctions pursuant to Rule 9011 as part of, and in conjunction with, his motion to dismiss the Petition. Therefore, Buck's motion for sanctions pursuant to Rule 9011 fails to comply with the procedural requirements under Rule 9011(c)(1)(A) and it is improper to award sanctions. See Miller, 414 Fed. Appx. at 218.

### ii.  Rule 9011 Award Against EES is Improper

#### 1.  Standard of Review

If the Court determines an award under F. R. Bankr. P. 9011 is proper, notwithstanding Buck's failure to comply with the procedural requirements note above, the rule authorizes a court to impose sanctions upon attorneys, law firms, or parties for the filing and prosecution of pleadings and other papers which are found to be frivolous under Rule 9011(b). In re Belmonte, 524 B.R. 17, 29 (Bankr. E.D.N.Y. 2015) (citing F. R. Bankr. P. 9015(b)). The burden is on Buck to show sanctionable conduct by "clear" or "substantial" evidence. See In re Cohoes Industrial Terminal, Inc., 931 F.2d 222, 227 (2d Cir. 1991)

In the Second Circuit, the substantive standard for imposing Rule 9011 sanctions when initiated by a party's motion is one of objective unreasonableness. See In re Pennie & Edmonds LLP, 323 F.3d 86, 90 (2d Cir. 2003). The Second Circuit, in interpreting 9011, held that sanctions shall be imposed against an attorney and/or his client when it appears that a pleading has been "interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." Eastway Const. Corp. v. City of New York, 762 F.2d 243 (2d Cir. 1985). The Rule is violated "where it is patently clear that a claim has absolutely no chance of success." Id. at 254.

Additionally, the Second Circuit has held that the imposition of sanctions is improper for a filing that advances nonfrivolous substantive claims, even when the motives for asserting those claims are less than pure. In re 680 Fifth Avenue Associates, 218 B.R. 305, 313 (Bankr. S.D.N.Y. 1998) (citing Sussman v. Bank of Israel, 56 F.3d 450 (2d Cir. 1995) holding "a party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper").

Since the language of F. R. Civ. P. 11 tracks the language of F. R. Bankr. P. 9011(a) this Court may look to case law interpreting the former for guidance in determining whether particular conduct by a party is sanctionable under the latter. In re Frenz, 142 B.R. 611 613 n.1, (Bankr. D. Conn. 1992) (citing Cinema Serv. Corp. v. Edbee Corp., 774 F.2d 584, 585 (3rd Cir.1985)). Fed. R. Civ. P. 11 was revised in 1993 to include the language that "the court may impose an appropriate sanction," making it clear that sanctions under Rule 11 are discretionary, not mandatory. Further, a sanction imposed for a violation of Bankruptcy Rule 9011 should be

limited to what is sufficient to prevent or deter similar conduct. Fed. R. Bank. P. 9011(c)(2); see also In re Parikh, 508 B.R. 572 (Bankr. E.D.N.Y 2014). Sanctions under Rule 9011 should be invoked sparingly because a "request for sanctions under Rule 11 is not a tactical device." In re Taub, 439 B.R. 276, 281 (Bankr. E.D.N.Y. 2010) (quoting Nakash v. U.S. Dep't of Justice, 708 F.Supp. 1354, 1370 (S.D.N.Y.1988)). Conduct must be egregious to warrant sanctions. In re Parikh, 508 B.R. at 587.

### 2. EES Performed a Reasonable Investigation Into the Facts Alleged in the Petition, Which Was Well Grounded in Fact

EES performed a reasonable investigation, over a period of several months prior to the filing, into the facts alleged in the Petition. Edgardo, Mejias, Chief Financial Officer of EES, directed this investigation. See Affidavit of Edgardo Mejias in Opposition to Motion for Attorneys Fees (hereinafter the "Mejias Aff.,") ¶ 4.His investigation prior to the filing of the bankruptcy consisted of four different components. Mejias Aff. ¶ 5. First, EES reviewed the invoices sent by Best to EES from 2017 and 2018 in order to determine if the invoiced amount paid by EES to Best was, in fact, correct. Mejias Aff. ¶ 6. The investigation determined it was not. Id.

The working agreement between Best and EES would be that Best would bill EES 60 percent of the contracted price, in order to cover the materials purchased by Best for the given project. Mejias Aff. ¶ 7.The two years of randomly sampled contracts and invoices Mejias reviewed showed a pattern in which Best was consistently over invoicing EES above the agreed-upon 60% rate of the customer contract. Mejias Aff. ¶ 8.  Besides determining that EES was not being invoiced at 60%, EES also found additional issues with the contract billing resulting in an overpayment by EES to Best. Mejias Aff. ¶ 9.

The EES investigation of contracts and invoices over the three months prior to the bankruptcy filing was very time consuming, in part because the invoicing process was changed by Buck. Mejias Aff. ¶ 12. In November of 2017 Buck began to invoice EES on a monthly basis, rather than on a project-by-project basis. Mejias Aff. ¶ 13.These invoices sent by Best to EES contained little to no information on what customer insulation jobs were included in these particular invoices. Mejias Aff. ¶ 14. In these cases, Mejias, along with EES staff pulled and reviewed each and every customer's file that were scheduled during the invoiced time period as part of the investigation prior to the filing, these files were then cross-referenced with Best QuickBooks, EES QuickBooks, the Best checking account, the EES checking account, and the monies paid to Best from the utility invoicing systems. Mejias Aff. ¶ 15.

The EES review of the data concerning multiple contracts and invoices from 2017 and 2018, prior to the bankruptcy filing, indicated that Best had a repeated pattern of overbilling EES. Mejias Aff. ¶ 19. Based on the sales reported by the Best QuickBooks accounting software, the amount of $334,674.37 was calculated off the average consensus that Buck was invoicing EES consistently at 100% for all insulation jobs completed, rather then 60%, resulting in a 40% overpayment by EES in favor of Best. Mejias Aff. ¶ 19.

The second component of the EES investigation concerned sales that were improperly diverted to Best from EES. Mejias Aff. ¶ 20. The business relationship between Best and EES was a simple one. Mejias Aff. ¶ 21. EES was responsible for all operational expenses of the joint business venture with Best, including rent, utilities, office expenses, employee payroll, scheduling of jobs, printed materials and invoicing, websites and marketing, employee payroll, workers compensation payments, and equipment. Mejias Aff. ¶ 22. Best was responsible only for the purchase of materials necessary to complete the jobs obtained by EES. Mejias Aff. ¶ 23. All

sales were only to be done directly through contracts written to EES; Best would invoice EES for

60% of the total insulation project contract, in order to cover the purchase of materials, use of

truck, insurance and tax liabilities, and payroll for Buck and Colon. Mejias Aff. ¶ 24.

During the EES investigation, Mejias found altered invoices and emails directing EES

customers to make payments directly to Best, rather than EES. Mejias Aff. ¶ 25.Furthermore,

EES was contacted by several customers which paid Best directly, where EES has no record of

the customer, nor of any payments. Mejias Aff. ¶ 26. In order to ascertain the amount of money

that was improperly diverted away from EES in favor of Best, Mejias and the EES team

reviewed all of the bank account statements of Best held at Webster Bank, then cross-referenced

the deposits in the Best bank account with deposits paid by EES to Best. Mejias Aff. ¶ 28. In

accordance with the joint venture agreement, the only monies that should have been deposited

into the Best bank account were funds paid by EES. Mejias Aff. ¶ 29.This investigation

discovered that from 2017 to 2019, $179,911.80 in funds were deposited into the Best account

from entities other than EES. Mejias Aff. ¶ 30. Assuming these funds that are otherwise

unaccounted-for are the result of sales contracts diverted from EES to Best, EES is owed 40% of

the price of those contracts by Best, in accordance with the joint venture agreement. Mejias Aff.

¶ 31. The EES investigation determined that Best owes EES the sum of $71,964.72 from the

diverted sales.  Mejias Aff. ¶ 32.

The third inquiry made as part of the investigation prior to the filing of the bankruptcy

was cross-referencing withdrawals and payments from the Best bank account with the Best

QuickBooks records. Mejias Aff. ¶ 33. In this investigation, EES determined that a total of 31

unauthorized ATM cash withdrawals, unauthorized check to cash bank transactions,

unauthorized payroll transactions and unauthorized purchases were debited from the Best bank

account and credit card listed in the Best QuickBooks accounting software. Mejias Aff. ¶ 34. While the EES investigation was able to ascertain the purpose of some of these expenditures, the investigation was hampered by the fact that EES was not provided with credit card statements from Buck, despite due demand for same. Mejias Aff. ¶ 36. Accordingly, expenses paid with the Best credit card that could not be researched were not included in the calculation of monies owed to EES, but nonetheless supported the concern EES had over improper dissipations of Best's assets. Mejias Aff. ¶ 37.

Nonetheless, between 2016 and 2019, EES was able to ascertain unreported and otherwise unauthorized expenditures in the amount of $55,890.33 which were debited from the Best accounts.  Mejias Aff. ¶ 38. Several of these expenditures are directly for the benefit of Buck, which raised concerns within EES that Buck was favoring paying himself over paying the debts owed to EES. Mejias Aff. ¶ 39.Though EES was owed money by Best, Buck, in his capacity as a manager of Best, improperly made preferential payments for his own benefit rather than to EES. Mejias Aff. ¶ 40.

The fourth component of the investigation prior to the bankruptcy filing was a cash flow analysis with a cross reference of the deposits and withdrawals in the Best bank account, with the deposits and withdrawals reported in the Best QuickBooks accounting records. Mejias Aff. ¶ 41. Based on the review, it was determined that in 2017 there were $41,776.34 in unaccounted-for deposits and withdrawals in the Best bank account. Mejias Aff. ¶ 42. Furthermore, in 2018, there were $39,278.08 in unaccounted-for deposits and withdrawals in the Best bank account. Mejias Aff. ¶ 43. These unaccounted-for deposits raised grave concerns within EES that Buck was operating an alter-ego of Best in avoidance of the joint venture agreement with EES.

The investigation undertaken by EES prior to the filing of the Petition, took three months, and involved countless hours of review of contracts and invoices and QuickBooks accounting records. Mejias Aff. ¶ 45.Following the completion of the investigation, EES came to two conclusions. Mejias Aff. ¶ 46. First, Buck had been using his position as manager of Best to systematically overbill EES for contracts in order to enrich the financial coffers of Best at the expense of EES. Mejias Aff. ¶ 47.This resulted in a substantial debt due to EES from Best. Mejias Aff. ¶ 51. Second, the questionable accounting practices of Buck during his tenure as manager of Best had rendered it difficult, if not impossible, to track where all of the monies that were flowing into Best from EES were being sent. Mejias Aff. ¶ 48. Nonetheless, based on the investigation EES was able to determine that some of the monies paid into Best were being used for the direct benefit of Buck at the expense of other creditors, including EES. Mejias Aff. ¶ 49.

In effect, Buck was using his position as manager of Best to obtain preferential treatment, and to pay himself rather than pay the debt owed to EES. Mejias Aff. ¶ 50. The investigation undertaken by EES prior to the filing of the Petition conclusively determined that EES is owed money by Best well in excess of $15,775 that was not subject to a bona fide dispute, that there were fewer than 12 creditors of Best, and that Best was systematically not paying its bills. Mejias Aff. ¶ 66.

F. R. Bankr. P. 9011 requires a determination that the "allegations and other factual contentions have evidentiary support." Rule 9011(b)(3) places a duty upon signers to make at least some affirmative investigation into the facts represented in documents submitted to the court. In re Parikh, 500 B.R at 585 (citing In re Obasi, 10–10494 SHL, 2011 WL 6336153 at *5 (Bankr. S.D.N.Y. Dec. 19, 2011)).  While "the investigation performed by a signatory need not

be to the point of certainty to be reasonable," a "signer must explore readily available avenues of factual inquiry." Id.

In the instant case, the inquiry performed by EES into the relevant facts was eminently reasonable. Furthermore, any limitation on the investigation performed by EES was not due to their own inactions, but due to Buck's refusal to provide the necessary access in order to reach a conclusion of the facts with certainty. Where the party seeking sanctions is withholding information necessary to perform an investigation, sanctions for failing to perform a complete investigation are improper. See In re Squillante, 259 B.R. at 554.

Furthermore, the investigation conducted by EES supports the conclusion that the Petition was valid under existing law. As noted previously, the three threshold requirements of the Petition are: (1) fewer than 13 creditors; (2) a debt not subject to a bona fide dispute of more than $15,775; and (3) that the debtor is not generally paying debts when due. 11 U.S.C. §303. The EES investigation included inquiring with the sole manager of the Debtor as to the number of legitimate creditors, inquiring as to whether the debts were being paid when due, and an exhaustive review of the available records to determine the amount owed by the Debtor to EES that wasn't the subject of a bona fide dispute.[15] Based on this reasonable investigation, EES accurately determined that the threshold requirements of 11 U.S.C. §303 had been met, rendering the Petition otherwise meritorious and not sanctionable.

### 3. EES Has Not Filed the Petition for an Improper Purpose

---

[15] Colon, in her capacity as sole manager of the Debtor, confirmed that the amount due to EES was not the subject of a bona fide dispute prior to the filing of the Petition.

As noted above, Buck has failed to establish by clear or substantial evidence that EES filed the Petition for some improper purpose.[16] EES filed the Petition in order to prevent Buck, a creditor engaging in various fraudulent acts to strip assets from the Debtor, from obtaining and maintaining an unfair advantage over EES. Mejias Aff. ¶¶ 54-56. See In re Petralex Stainless, 78 B.R. at 738. While it is arguably true that Buck's diversion of assets from the Debtor during the time that his sister, the majority shareholder, was dangerously ill has led to sibling discord, so long as there is some legitimate purpose for the filing of the Petition, there can be no finding by the Court that the Petition was filed for an improper purpose. See In re Turner, 80 B.R. at 618.

### 4.  The Relief Sought by Buck is Unsupported

Finally, even if the Court determines an award pursuant to F.R. Bankr. P. 9011 is proper, the amount of the award sought by Buck and his counsel is patently unreasonable. The Court must exercise its discretion to determine the nature of the appropriate sanction. See In re Omega Trust, 120 B.R. 265, 270 (S.D.N.Y.1990). Generally, the Court should award the minimum sanction necessary to deter future sanctionable conduct. Id. at 271. The Court may also consider, *inter alia*, the reasonableness of costs and expenses incurred by the party seeking sanctions, prejudice suffered by the party seeking sanctions, the relative culpability of client and counsel, the degree to which the party seeking sanctions caused the expenses for which recovery is sought, whether the sanctionable conduct was a conscious disregard of duty, and the general reputation of the individual to be sanctioned. Id. at 271; In re Witt, 481 B.R. 468, 480 (Bankr. N.D. Ind. 2012).

As explained above in detail, the billing records provided by Buck's counsel in support of Buck's claim for an award of attorneys fees are in shambles, entirely lack the required specificity

---

[16] This inquiry is only necessary if this Court disregards the rule that the Court cannot conclude a pleading was filed with an improper purpose when it is otherwise non-frivolous on its face. 680 Fifth Avenue Associates, 218 B.R. at 313 (citing Sussman, 56 F.3d 457-59).

and exhibit improper double billing for simple matters. In short, the vast majority of the costs incurred by Buck's counsel, which forms the basis of the award sought, is due to their efforts to run up the bill in order to seek higher sanctions.[17]

Buck claims that Rule 9011 requires an award of all fees incurred in order to compensate Buck for the actions of EES. In making this argument, Buck ignores that a sanction pursuant to Rule 9011 should be only the minimum necessary to deter similar conduct in the future—not to fully compensate Buck for the unreasonable attorneys' fees incurred by his chosen counsel. See In re Hill, 377 B.R. 8, 22 (Bankr. D. Conn. 2007). For the foregoing reasons, an award of Rule 9011 sanctions against EES is improper and must be denied.

### iii.  An Award Against Counsel of Record is Improper

#### 1.  Standard of Review

Whether to impose sanctions against an attorney pursuant to F. R. Bankr. P. 9011 is a matter of the Court's discretion. See Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004). Attorney's fees may be imposed either on the attorney, or on the party he represents, or on both pursuant to Fed. R. Civ. P. 11.[18] See Oliveri v. Thompson, 803 F.2d 1265, 1274 (2d Cir.1986).

An award of sanctions pursuant to Rule 9011 will lie "when it appears that a competent attorney could not form the requisite reasonable belief as to the validity of what is asserted in the paper." Oliveri, 803 F.2d at 1275; see also Ball v. A.O. Smith Corp., 451 F.3d 66, 70 (2d. Cir. 2006) ("Rule 11(b) is violated when an attorney presents a pleading for an improper purpose or presents a frivolous claim or legal contention . . . ."). Ultimately, the standard requires a finding

---

[17] In addition, Buck's counsel has refused to accept the willingness of both EES and the Debtor to voluntarily dismiss the Petition and have the matter adjudicated in state court. Colon, in her capacity as majority member of the sole petitioning creditor, EES, and sole manager of the Debtor, has the authority to consent to a voluntary dismissal of the Petition (and avoid fees pursuant to 11 U.S.C. §303(i)) Nonetheless, Buck's counsel has refused to accept this dismissal and seeks the instant sanctions.

[18] As noted elsewhere, interpretation of F. R. Civ. P. 11 may be used to guide interpretation of F. R. Bankr. P. 9011.

of objective unreasonableness of the individual making the statement in the pleading. See Margo v. Weiss, 213 F.3d 55, 65 (2d Cir.2000); see also Oliveri, 803 F.2d at 1275 ("[T]here is no necessary subjective component to a proper rule 11 analysis.").

In determining whether the rule has been violated, courts should avoid hindsight and resolve all doubts in favor of the signer of a pleading. Calloway v. Marvel Entertainment Group, 854 F.2d 1452, 1469–70; Eastway Const. Corp., 762 F.2d at 254. The signer's conduct is to be judged at the time the pleading or paper is signed, and Rule 9011 imposes no continuing obligation to withdraw or correct papers previously filed. Calloway, 854 F.2d at 1470; Oliveri, 803 F.2d at 1274–75. Where an attorney has an objectively reasonable basis to pursue a factual claim, sanctions may not be imposed under Rule 9011. Calloway, 854 F.2d at 1470. Sanctions are not permitted when only one of several arguments or allegations in a pleading is frivolous or of a harassing nature. See Murphy v. Business Cards of Tomorrow, Inc., 854 F.2d 1202, 1205 (9th Cir.1988); Golden Eagle Distributing Corp. v. Burroughs Corp., 801 F.2d 1531, 1540 (9th Cir.1986); Two Star Surgical Supply, Inc. v. New York State Dep't of Social Serv. (In re Two Star Surgical Supply, Inc.), 92 B.R. 26, 29 (E.D.N.Y.1988).

### 2. Counsel Performed a Reasonable Investigation Into the Facts Alleged

On or about February 6, 2019, representatives from EES first contacted the undersigned counsel regarding the possibility of filing the Petition. Miller Aff., ¶4. Soon thereafter, the undersigned counsel had an in-person meeting with Colon, Mejias, and various staff members of EES. Miller Aff., ¶ 5. This meeting, which lasted for several hours, involved a detailed description of the internal investigation already performed by EES as well as an informal summary of the findings. Miller Aff., ¶ 6. EES had determined that more than $400,000.00 was

due from the Debtor to EES. Miller Aff., ¶ 7. During this meeting, the undersigned counsel advised the other attendants that, while he had no reason to disbelieve what was being said, an investigation by an outside accountant needed to be undertaken prior to any filing being made. Miller Aff., ¶ 8.

The undersigned counsel also inquired as to statutory requirements for the filing of the Petition. Miller Aff., ¶ 9. The undersigned counsel was informed that there were fewer than 13 creditors, that the Debtor was not generally paying its debts as they came due, and the amount owed by the Debtor to EES was not the subject of a bona fide dispute. Miller Aff., ¶ 10. When the undersigned counsel inquired as to how EES could be sure of these facts, he was advised that Colon was the sole manager of the Debtor and, in that capacity, was fully familiar with the relevant records of the Debtor, and the only individual that could conclusively determine these facts. Miller Aff., ¶ 11.

Over the next several weeks, the undersigned counsel participated in several telephone discussions with representatives of EES in an effort to refine the amount owed by the Debtor to EES. Miller Aff., ¶ 12. During these conversations, the undersigned counsel was advised that the services of Andrew Lattimer, a CPA and Partner in Blum Shapiro, had been retained to ascertain the amount owed by the Debtor to EES with certainty. Miller Aff., ¶ 13. In furtherance of that effort, representatives of EES invited the undersigned counsel and Lattimer to a meeting on March 8, 2019 to discuss findings. Miller Aff., ¶ 14.

During that meeting, the undersigned counsel was advised that Lattimer had only been able to conduct a partial review of the books and records of EES and the Debtor, due to his tax-season time constraints, but that Lattimer "had no reason to disagree" with the EES findings. Miller Aff., ¶ 15. The undersigned counsel then indicated that this partial review by Lattimer was

insufficient and that until a complete review of the records was done by Lattimer indicating that the statutory requirements of 11 U.S.C. §303 were met, he would not file the Petition. Miller Aff., ¶ 16.

From March 8, 2019 through April 28, 2019, the undersigned counsel engaged in further telephonic and email communications with representatives of EES regarding Lattimer's review. Miller Aff., ¶ 17. With regard to the email communications, on March 18, 2019, Mejias informed the undersigned counsel that he "will be sending Andrew [Lattimer] the final draft of the report for him to review tonight." Miller Aff., ¶ 18, Ex. A. Then, on April 28, 2019, the undersigned counsel received a report detailing the findings of the investigation into the monies due to EES from the Debtor (the Report). Miller Aff., ¶ 19. The Report stated:

> This report was created from information obtained from reviewing customer files, BEST QuickBooks' company files, bank account transactions & statements, and utility invoices. The audits were performed by: Andrew Lattimer, CPA, Partner blumshapiro, accountant for both EES and BEST, Edgardo Mejias, CFO Energy Efficiencies Solutions . . .

Miller Aff., ¶ 20, Ex. B.

The report further conclusively stated that $406,639.09 was owed by the Debtor to EES. Miller Aff., ¶ 21.  Based on a review of this report, the undersigned counsel reasonably believed that the investigation and audit that he had requested was performed by EES and was approved by Lattimer. Miller Aff., ¶ 22.

Following receipt of the Report, the undersigned counsel again contacted representatives of EES to determine the proper amount to list as the debt on the Petition. Miller Aff., ¶ 23. The undersigned counsel advised EES that the most important issue, so long as the threshold requirements provided by 11 U.S.C. §303 was met, was to have a debt that could be easily proven based on available documentary evidence in order to address any concerns that might

otherwise be raised by the Court or Buck. Miller Aff., ¶ 24. With that understanding, EES informed the undersigned counsel that the amount of *at least* $363,436.31 could be easily proven based on available documentary evidence. Miller Aff., ¶ 25. The undersigned counsel then signed the Petition using that number, relying on the Report and his reasonable understanding that Lattimer had reviewed and approved the numbers contained therein. Miller Aff., ¶ 26.

Following the issuance of the Court's Order to Show Cause (ECF #17-20), the undersigned counsel looked to Lattimer to assist with the EES response. Miller Aff., ¶ 27. Only then did he become aware that Lattimer had not audited the numbers referenced in the Report, but had actually only performed a two-year cash flow analysis to determine that funds in the amount of $81,054.42 were unaccounted for on Buck's watch. Miller Aff., ¶ 28. The undersigned counsel also became acutely aware that the documentary evidence for the debt that EES and its representatives had indicated would be readily accessible if a dispute arose, was likewise unavailable. Miller Aff., ¶ 29. As a result of the lack of readily accessible documentation, EES was only able to present evidence of a debt owed by the Debtor in favor of EES in the amount of $72,257.04. Miller Aff., ¶ 30. (ECF #18, pg.5.) While less than the amount of the debt otherwise claimed in the Petition, said amount far exceeds the monetary threshold provided by 11 U.S.C. §303. Miller Aff., ¶ 31.

Buck's counsel attempts to argue that the statements of the undersigned counsel regarding a "mistake" and that EES "screwed up" should be taken to mean that an insufficient investigation was undertaken by counsel or EES. Miller Aff., ¶ 32. Nothing could be further from the truth. While it is true that the Report lacked verification by Lattimer, the undersigned counsel performed an objectively reasonable inquiry into the facts at issue prior to the signing of

the Petition. Miller Aff., ¶ 33. See In re Obasi, 2011 WL 6336153 (Bankr. S.D.N.Y. 2011) ("the investigation performed by a signatory need not be to the point of certainty to be reasonable").

Furthermore, none of these factual issues identified by Buck's counsel and acknowledged by the undersigned counsel at oral argument were readily apparent to the undersigned counsel at the time of the filing of the Petition. Miller Aff., ¶ 34. Had he been aware that the Report was unverified by Lattimer and not easily proven with documentary evidence, he would not have filed the Petition. Miller Aff., ¶ 35. Nevertheless, the Court cannot use hindsight to determine the propriety of sanctions under Rule 9011 and must resolve all doubts in favor of the party against whom sanctions are sought. Miller Aff., ¶ 36. In addition to the thorough inquiry made by the undersigned counsel, EES was also able to prove with documentary evidence that it met the threshold requirements of 11 U.S.C. §303. Miller Aff., ¶ 37. Therefore, the undersigned counsel performed a reasonable investigation prior to the filing of the Petition. Miller Aff., ¶ 38.

### 3.    Counsel Has Not Presented a Frivolous Claim

The Second Circuit has held that "[i]n order to impose a Rule 9011 sanction, a court must find that an attorney has submitted a claim that has no chance of success under existing precedents and that fails to advance a reasonable argument to extend, modify or reverse the law as it stands." In re Cohoes, 931 F.2d at 227. Buck has the burden of proving that the undersigned counsel filed an involuntary petition that was entirely without merit. In re Squillante, 259 B.R. at 552 (citing Sherman v. Reilly (In re Reilly), 244 B.R. 46, 50 (Bankr. D. Conn. 2000)).

Here, the undersigned counsel performed a reasonable inquiry into the facts necessary to support the Petition under the requirements of 11 U.S.C. §303 and, indeed, provided evidentiary support for the Petition in response to the Court's Order to Show Cause. (See ECF #17-20.) Based on the reasonable inquiry, along with the evidentiary support provided, it cannot be said

that the Petition was frivolous. As Buck has failed to show that the Petition was frivolous, sanctions are inappropriate and must be denied.

### 4.    Counsel Has Not Filed the Petition for an Improper Purpose

Buck's final argument in favor of sanctions under F.R. Bankr. P. 9011 is that the comments of the undersigned counsel at oral argument that we "need to find out if Mr. Buck did anything wrong" represents an improper purpose. Notably, Buck fails to cite any authority for the proposition that the need to uncover fraud by one creditor in order to take a disproportionate advantage over another creditor is somehow an improper purpose.

In determining whether an attorney filed papers for an improper purpose, the Second Circuit has noted that courts apply an objective standard and consider whether there was an objectively reasonable basis for the claim at the time that it was made. Calloway, 854 F.2d at 1470. Creditors may properly "use the bankruptcy process to install a trustee to prevent future transfers or wasting or dissipation of assets, or to investigate and to challenge the legitimacy of entities that may be operating as alter egos of the debtor." In re Hentges, 351 B.R. 758, 772 (Bankr. N.D. Okla. 2006). Any ambiguity as to whether the basis for assertions in papers are objectively reasonable must be resolved in favor of the non-filing party and against the party seeking Rule 9011 sanctions. Oliveri, 803 F.2d at 1275.

Unlike in most cases, however, there is clear evidence of the purpose of the filing of the Petition articulated by the undersigned counsel prior to the filing. On February 7, 2019, the undersigned counsel received an email from Lattimer, inquiring as to the purpose of the bankruptcy filing. Miller Aff. ¶ 40. On that same date, the undersigned counsel responded that the motivations were twofold. Miller Aff. ¶ 41. First, the filing of the Petition was intended to "counteract Justin's actions," referring to the fraudulent transfers uncovered by EES. Miller Aff.

¶ 42, Ex. C. There is no mention or indication of ill will or malice in that message. Second, the undersigned counsel notes the interest of EES in having a trustee appointed to reverse preferential transfers in accordance with 11 U.S.C. §547. Id. At no time does counsel state the purpose of the filing is to somehow eliminate Buck's interest in he Debtor or to inflict harm upon him. On the contrary, the stated purpose is to, effectively, ensure that all creditors are treated equally under the Bankruptcy Code, rather than permitting one creditor from taking undue advantage of the circumstance. Id. For these reasons, there is no improper purpose to the filing of the Petition, and sanctions are inappropriate.

### 5.   The Relief Sought by Buck is Unsupported

Finally, even if the Court determines an award pursuant to F.R. Bankr. P. 9011 is proper, the amount of the award sought by Buck and his counsel is patently unreasonable. As explained above, the fees requested lack sufficient factual support. In addition, a sanction pursuant to Rule 9011 need not be a full award of fees, but should be only the minimum sanction necessary to deter similar conduct in the future. See In re Hill, 377 B.R. at 22. For the foregoing reasons, an award of Rule 9011 sanctions against the undersigned counsel is improper and Buck's request should be denied.

### c.   Requested Relief Under 28 U.S.C. § 1927 is Improper and Must Be Denied

### i.   Standard of Review

Courts in this Circuit construe §1927 "narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." (Internal quotations marks omitted.) Mone v. Comm'r of Internal Revenue, 774 F.2d 570, 574 (2d Cir. 1985); accord Romeo v. Sherry, 308 F. Supp. 2d 128, 148 (E.D.N.Y. 2004). To impose sanctions under §1927 (or the inherent powers discussed in the following section), "a court must find clear evidence that

(1) the offending party's claims were entirely without color, and (2) the claims were brought in bad faith—that is, 'motivated by improper purposes such as harassment or delay.'" Eisemann v. Greene, 204 F.3d 393, 396 (2d Cir. 2000) (quoting Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 337 (2d Cir.1999)); accord Pacific Electric Wire & Cable Co., Ltd. v. Set Top Int'l Inc., No. 03 Civ. 9623(JFK), 2005 WL 2036033, at * 5 (S.D.N.Y. Aug. 23, 2005). Finally, the Second Circuit has held for some time that attorneys should not be "disciplined by financial reprisal for conduct attributable to mistake, inadvertence or error of judgment." In re Sutter, 543 F.2d 1030, 1035 (2d Cir.1976) (lawyers attentive to their responsibilities need not be apprehensive about financial reprisals due to honest mistakes or errors of judgment).

Notably, the "'[t]he test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice.'" Pacific Electric Wire & Cable Co., 2005 WL 2036033, at *5 (quoting Sierra Club v. U.S. Army Corps of Engineers, 776 F.2d 383, 390 (2d Cir.1985)). "Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney." Wolters Kluwer Fin. Servs. v. Scivantage, 564 F.3d 110, 114 (2d Cir. 2009).

### ii.  The Petition Filed by Counsel is Not Motivated by Improper Purposes

As explained above, the Petition was filed to combat Buck's improper diversion of the assets of the Debtor. Buck paid himself instead of paying legitimate creditors like EES. Even if Buck argues that the filing was done out of harassment or delay, he has failed to put forth any evidence for same. Nevertheless, even if the Court were to assume malice or ill will was a reason for the filing of the Petition, the fact that there exists a proper purpose of ensuring equal treatment of creditors renders Buck's argument insufficient. See In re Turner, 80 B.R. at 618.

### iii.  The Petition Filed by Counsel is Not Entirely Without Color

Buck has also failed to prove that the Petition is entirely without color. In order to find that a claim has been made "entirely without color," the court must decide "whether a reasonable attorney could have concluded that the facts supporting the claim *might* be established, and not whether such facts had been established." Schlaifer Nance & Co. 194 F.3d at 337. Here, the Petition is based on facts ascertained from a review of the relevant books and records of both EES and the Debtor. The review was ostensibly performed by a CPA from a reputable firm and by the Chief Financial Officer of EES.[19] This review was bolstered by statements made by Colon who, in her capacity as sole manager of the Debtor and the majority shareholder of EES, stated that the EES was owed money by the Debtor, that it was not the subject of a bona fide dispute, and that the Debtor had fewer than 13 legitimate creditors. In light of the above, a reasonable attorney could have concluded that the facts supporting the claim might be established, sufficient to render the claim colorable.

### iv.   The Relief Sought by Buck is Unsupported

Finally, even if the Court determines an award pursuant to 28 U.S.C. §1927 is proper in the given circumstance, the amount of the award sought by Buck and his counsel is patently unreasonable. As explained above, the vast majority of the fees sought by Buck lack clarity, specificity and overall justification. "The party seeking the sanction [under 28 U.S.C. §1927] must provide the Court with contemporaneous time and expense records that specify, for each attorney, the date, amount of time, and nature of the work performed, and must also show that the fees and expenses were reasonable and necessary." In re Spectee Group, 185 B.R. 146, 160 (Bankr. S.D.N.Y 1995). Work that would have been required even if the bad faith conduct had not been undertaken is not compensable. In re St. Stephen's 350 E 116th St., 313 B.R. 161, 172

---

[19] The undersigned counsel now recognizes that this review was not performed by a CPA but, based on the information available and presented at the time of the filing of the Petition, a reasonable attorney would have concluded that the report was reviewed by a CPA and that the facts supporting the Petition might be established.

(Bankr.S.D.N.Y.2004). "Only fees that are directly caused by the sanctionable conduct may be awarded. In re Green, 422 B.R. 469, 477 (Bankr. S.D.N.Y 2010). As before, a sanction pursuant to 28 U.S.C. §1927 should be only the minimum necessary to deter similar conduct in the future. Oliveri, 803 F.2d at 1281. For the foregoing reasons, an award of sanctions pursuant to 28 U.S.C. §1927 is improper and Buck's request should be denied.

### d.   Requested Relief Under 11 U.S.C. §105 is Improper and Must Be Denied

#### i.   Standard of Review

Buck argues that §105(a)(3) and the inherent power of the Court authorize the relief requested. Although a bankruptcy court's powers under §105(a) are extensive and include its inherent power to impose sanctions, under standards well-established in this Circuit, a trial court's inherent power must be exercised with restraint and not utilized unless the challenged conduct is "entirely without color" and "motivated by improper purposes." Milltex Industries Corp. v. Jacquard Lace Co., Ltd., 55 F.3d 34, 35 (2d Cir. 1995). Likewise, the Supreme Court has admonished that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion," Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991), and with "great caution," id. at 43.

In addition, "bad faith is ordinarily a prerequisite to the issuance of sanctions pursuant to the court's inherent sanctioning power." Id. at 50; see also, United States v. Seltzer, 227 F.3d 36, 41–42 (2d Cir. 2000) (clarifying the circumstances in which a finding of bad faith is required in order to impose sanctions on attorneys in the Second Circuit); Phillips v. Berlex Laboratories, Inc., No. 3:05CV81, 2006 WL 1359124, *2 (D.Conn., May 11, 2006).

#### ii.   The Petition Filed by Counsel is Not Motivated by Improper Purposes

As explained above, the Petition was filed to combat Buck's improper diversion of the assets of the Debtor. Buck paid himself instead of paying legitimate creditors like EES. Even if Buck argues that the filing was done out of harassment or delay, he has failed to put forth any evidence for same. Nevertheless, even if the Court were to assume malice or ill will was a reason for the filing of the Petition, the fact that there exists a proper purpose of ensuring equal treatment of creditors renders Buck's argument insufficient. See <u>In re Turner</u>, 80 B.R. at 618.

### iii.   The Petition Filed by Counsel is Not Entirely Without Color

Buck has failed to prove that the Petition is entirely without color under Second Circuit authority because "a reasonable attorney could have concluded that the facts supporting the claim *might* be established." See <u>Schlaifer Nance & Co.</u> 194 F.3d  at 337. It was reasonable for undersigned counsel to believe that the Petition was based on relevant books and records of both EES and the Debtor and that these records had been subjected to an outside audit by a reputable accounting firm. While the latter belief was a grave misunderstanding by the undersigned counsel, it was not unreasonable, given the specific facts outlined in greater detail above. A reasonable attorney could have concluded that the facts supporting the claim might be established, sufficient to render the claim colorable.

### iv.   Relief Sought by Buck is Unsupported

Finally, even if the Court determines an award pursuant to 11 U.S.C. §105(a) is proper in the given circumstance, the amount of the award sought by Buck and his counsel is patently unreasonable. As addressed above, the vast majority of the costs incurred by Buck's counsel, lack clarity, specificity and overall justification. "The party seeking an award of fees [under the Court's inherent authority] bears the burden of proving the reasonableness and necessity of the hours spent on the task and the hourly rate charged." <u>In re Ambotiene</u>, 316 B.R. 25, 40 (Bankr.

E.D.N.Y. 2004) (citing <u>Cruz v. Local Union No. 3 of International Brotherhood of Electrical Workers</u>, 34 F.3d 1148, 1160 (2d Cir. 1994)). For the foregoing reasons, an award of sanctions pursuant to 11 U.S.C. §105(a) is improper and Buck's request should be denied.

**IV.    CONCLUSION**

Buck fails to establish a right to an award of fees under any of the statutory schemes he advances in the Motion. Accordingly, any award in favor of Buck and against either EES or the undersigned counsel would be improper and the Motion should be denied.

RESPECTFULLY SUBMITTED

O'CONNELL ATTMORE & MORRIS, LLC

  /s/ Marc T. Miller, Esq.
Marc T. Miller, Esq.
Federal Bar No. CT28743
280 Trumbull Street, 23rd Floor
Hartford, CT 06103
Telephone: (860) 548-1300
Facsimile: (860) 548-0023
Email: mmiller@oamlaw.com

## CERTIFICATION

This is to certify that on this 3rd day of July, 2019 a copy of the foregoing was filed electronically. Notice of this filing will be sent by electronic mail to all counsel and pro se parties of records by operation of the Court's electronic filing system.

          /s/ Marc T. Miller, Esq.
          Marc T. Miller, Esq.
          Federal Bar No. CT28743
          280 Trumbull Street, 23rd Floor
          Hartford, CT 06103
          Telephone: (860) 548-1300
          Facsimile: (860) 548-0023
          Email: mmiller@oamlaw.com