## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | | |
|---|---|---|---|
| IN RE: | : | CHAPTER | 7 |
| | : | | |
| BEST HOME PERFORMANCE OF CT, | : | | |
| LLC, | : | CASE NO. | 19-20688 (JJT) |
| | : | | |
| DEBTOR. | : | RE: ECF NOS. | 1, 9, 12, 39, |
| | : | | 53, 74, 76, 80 |
| | : | | (and Related Filings) |

## MEMORANDUM OF DECISION AND ORDER ON MOTION TO DISMISS
## CASE AND ORDER TO APPEAR AND SHOW CAUSE WHY CASE SHOULD NOT
## BE DISMISSED AND WHY APPROPRIATE SANCTIONS SHOULD NOT BE ISSUED

### I.   INTRODUCTION

Before the Court is the Motion to Dismiss ("Motion," ECF No. 9) filed by Justin Buck

("Mr. Buck"), the minority stakeholder[1] of the alleged Debtor, Best Home Performance of CT,

LLC ("Best"). Also under consideration is the Court's own Order to Appear and Show Cause

("Show Cause Order," ECF No. 12), which required both Best and Energy Efficiencies

Solutions, LLC ("EES" or "Petitioner") to appear and show cause why the case should not be

dismissed and why appropriate sanctions should not be issued against the Petitioner and/or its

counsel. After hearings on May 31 (ECF No. 21), June 4 (ECF No. 27) and June 21, 2019 (ECF

No. 45), the Court indicated that it intended to dismiss the case and would consider appropriate

sanctions and/or an attorney's fee award against EES; its managing member, Leticia Colon ("Ms.

Colon"); its attorney, Marc. T. Miller ("Attorney Miller") and Attorney Miller's law firm,

O'Connell, Attmore & Morris, LLC ("OAM"). Thereafter, on July 30, 2019, the Court held a

---

[1] Although the parties repeatedly referred to themselves as "shareholders," or to their respective ownership interests in the subject companies as "shareholder interests," the Court notes that both Best and EES are LLCs, thus, the Court will simply refer to the appropriate parties as "members" and any "interest" they possess therein as a "stakeholder interest" or "equity interest."

fourth hearing on those issues (ECF Nos. 66 ). Having considered the record, the parties' arguments and the relevant legal principles cited in their memoranda,[2] the Court DISMISSES this involuntary petition under 11 U.S.C. § 303(b)(2) and 11 U.S.C. § 305(a)(1) and, pursuant to 11 U.S.C. § 303(i)(1) enters Judgment in favor of the Debtor for attorney's fees incurred by Mr. Buck, to be held in trust and paid to Natale & Wolinetz for legal fees incurred upon its behalf, as described herein, in the amount of $32,000 against Ms. Colon individually. The Court further orders and awards Mr. Buck concurrent punitive damages under 11 U.S.C. § 303(i)(2) in the amount of $32,000, also against Ms. Colon individually. The Court also sanctions Attorney Miller and OAM, jointly and severally, pursuant Federal Rule of Bankruptcy Procedure 9011 and 11 U.S.C. § 105 in the additional amount of $32,000 in legal fees and expenses payable directly to the law firm of Natale & Wolinetz. The Court's assessment and the allocation of this aggregate award and sanction of $64,000 is more particularly explained herein.

## II.    BACKGROUND AND FACTS

This case arises from a vicious dispute among family members. Mr. Buck and Ms. Colon are siblings who have worked together for a number of years in the home insulation business and, according to the record, they each accuse the other of numerous business misdeeds and forms of self-dealing. The following facts and procedural history have been established by the evidentiary record or are derived from judicial notice of the docket and/or admissions of the parties. The case was commenced on April 30, 2019, when Ms. Colon, as the managing member of EES, signed and filed an involuntary petition under Chapter 7 of the Bankruptcy Code against Best ("Petition," ECF No. 1). At that time, Attorney Miller represented EES with respect to the

---

[2] The Court reviewed all memoranda of record, including a thorough review of the authorities advanced in the sixty-four page memorandum of law filed by the Petitioner, who, despite labeling this case as "simple," argued some forty issues therein.

bankruptcy and consulted with Ms. Colon and Mr. Mejias, Ms. Colon's former husband and the former CFO of EES (collectively the "EES control parties"), as to the Petition's accuracy and bona fides. Specifically, in reliance on the EES control parties, Attorney Miller asserted in the Petition that Best had fewer than twelve creditors, that the amounts listed on the Petition were not subject to a bona fide dispute, that Best was not paying its bills in the ordinary course and that the Petition was otherwise proper under 11 U.S.C. § 303. The Petition listed EES as the sole petitioning creditor, and that the amount claimed to be owed to it was $363,436.31.

Best was formed in 2014 to do home insulation work and was operated principally by Ms. Colon and Mr. Buck as a subcontractor of EES (Tr. 5/31 14:30), servicing home improvement contracts obtained by EES throughout the State of Connecticut (Tr. 5/31 15:30). Ms. Colon was, and remains, the controlling stakeholder of both companies, with a 60 percent membership interest in Best and a controlling interest in EES.[3] Prior to the filing, Mr. Buck was the General Manager of Best and had a 40 percent membership interest therein, while also retaining a minority interest in EES and a position as its Field Manager. Although separate legal entities, the two companies shared employees, clients, costs, business administration and the same physical place of business where EES paid the shared overhead expenses.

In late 2018 and early 2019, Ms. Colon became unhappy with Mr. Mejias because she believed he had overpaid Best, and by extension, Mr. Buck (Tr. 7/30 2:24:45).[4] Around that same time, Mr. Buck, after reviewing the accounting records of Best and EES, believed that the opposite was true, namely, that EES owed a significant sum of money to Best, which he claimed approximated $265,000. When Mr. Buck disclosed this number to his sister in late January,

---

[3] The allocation of equity in EES between Mr. Buck and Ms. Colon is disputed.
[4] Not long thereafter, Mr. Mejia resigned or was removed from his role as the chief financial officer of EES (Tr. 7/30 2:24:00), as well as his role in Best, but he remained employed in some managerial capacity by EES (Tr. 7/30 58:45).

2019, despite the fact that he derived his entire income from his employment at Best, she summarily removed him from his position with Best and allegedly stripped him of his manager status with the Secretary of State,[5] leaving Ms. Colon to assume dominion and control of Best, its business, its records, its assets and its affairs (Tr. 7/30 1:21:00). Mr. Mejias testified that as of the date of Mr. Buck's firing, he was aware that Mr. Buck claimed that EES owed Best approximately $265,000, although he challenged that assertion (Tr. 7/30, Part I, 1:14:45). According to Mr. Mejias, the decision to fire Buck was made jointly by both he and Ms. Colon (Tr. 7/30, Part I, 1:23:00). After Mr. Buck's termination and removal, employees of EES took over the remaining business and operations of Best (Tr. 7/30, Part I, 1:41:00).

On February 6, 2019, approximately one week after Mr. Buck's firing, Ms. Colon and Mr. Mejias (along with other EES staff) met with Attorney Miller to discuss the possibility of forcing Best into an involuntary bankruptcy (Tr. 7/30, Part II, 6:30). During that meeting, Attorney Miller learned that Mr. Buck had been fired and there were generalized concerns that funds were missing (Tr. 7/30, Part II, 8:45). At the hearings on the Motion, Attorney Miller represented that Ms. Colon urgently wanted to file everything at that moment because the state court alternative would take too long (Tr. 7/30, Part II, 6:45) and that, although Ms. Colon was adamant about filing to the point of being pushy (Tr. 7/30, Part II, 28:00), she first wanted to transfer two vehicles to EES that were owned by Best prior to the filing (Tr. 7/30, Part II, 34:45). According to Attorney Miller, the continued depletion of assets or diversion of funds from Best by Mr. Buck was not discussed at the February 6th meeting. (Tr. 7/30, Part II, 11:15). Attorney Miller also contended that he informed Ms. Colon and Mr. Mejias at that meeting that he would

---

[5] While the Petitioner advanced this claim during the course of the proceedings, no substantiating evidence of its propriety was ever offered by the Petitioner so as to undermine Mr. Buck's status as a managing member or stakeholder. Furthermore, on multiple occasions throughout these proceedings, and in communications with Attorney Natale, Attorney Miller expressly recognized Mr. Buck's stakeholder interest. See Ex. O.

need a report from an accountant as to amounts owed to EES by Best before filing a petition and that, if possible, he would like to have the underlying contracts so that he could substantiate the debt (Tr. 7/30, Part II, 22:45). Additionally, Attorney Miller learned at the meeting that Ms. Colon had caused criminal complaints and police inquiries to be directed against Mr. Buck based upon a sweeping set of allegations of unlawful corporate behaviors. Rather than pursue civil proceedings in state court for dissolution, misappropriations or like misconduct, she instead steadfastly and vehemently insisted that legal counsel file this Petition, even though Attorney Miller advanced generalized concerns about its timing and substantive support (Tr. 7/30, Part II, 2:15:30).

Relevant to Attorney Miller's request that an accountant provide him with the amounts owed, approximately one month later, on March 8, 2019, Attorney Miller learned that the outside accountant for EES and Best had performed a very limited analysis of the allegedly relevant business records due to the accountant's heavy work load during tax season. Furthermore, he learned that the accountant performed this *limited review* exclusively for the purpose of performing a cash flow analysis (Tr. 7/30 22:00). Attorney Miller represented to the Court that analysis showed only a few thousand dollars' worth of discrepancies (Tr. 7/30, Part II, 1:08:00) and did not confirm or rebut whether any amounts were in fact owed to EES by Best. Despite this lack of foundational information, Ms. Colon signed the Petition on that day and instructed Attorney Miller to fill in the appropriate date when the Petition was to be ultimately filed (Tr. 7/30, Part II, 19:00). According to Attorney Miller, Mr. Mejias indicated that a more thorough "report" by the accountant would be forthcoming after tax season.

Despite not having any verifiable numbers from the accountant, in an email dated March 18, 2019, from Attorney Miller to Ms. Colon, Attorney Miller indicated that he had everything

he needed to file the Petition (Ex L; Tr. 7/30, Part II, 24:45). The previously referenced "report," which was ultimately held out as the basis for the debt referenced in the Petition, was, in fact, to be provided to Attorney Miller well after Attorney Miller's March 18th email to Ms. Colon. What is more, rather than a formal "report" from the accountant, Attorney Miller received a compilation of business papers composed by Mr. Mejias on EES letterhead, which was created largely in anticipation of these proceedings, and which was not, as Attorney Miller suggested, prepared by the accountant. Relevant to these proceedings, the aforementioned "report" contained two material sections: a section relating to the companies' cash flow, which was the *only* part of the "report" prepared by the accountant; and a second section containing a spread sheet, which was generated by EES staff and which showed that $265,000 was potentially *owed to Best by EES* (as claimed by Mr. Buck) (Tr. 7/30, Part II, 1:19:45).[6] On April 30, after having read the *entire* "report" (including the aforementioned spread sheet showing the existence of a possible bona fide dispute) (Tr. 7/30, Part II, 1:20:40), and after being informed by Mr. Mejias that the accountant had performed a *full review* of the "report" (Tr. 7/30, Part II, 1:21:00, 1:58:33); and after receiving an email from Ms. Colon, dated April 26, 2019, indicating that she was now in possession of the Best trucks and their corresponding titles (Tr. 7/30, Part II, 2:17:30), Attorney Miller filed the subject Petition (Tr. 7/30, Part II, 19:15).

Thereafter, on May 17, 2019, Attorney Anthony J. Natale, a partner in the law firm of Natale & Wolinetz and legal counsel for Mr. Buck, contacted Attorney Miller alerting him to the fact that there was a bona fide dispute with respect to the amount claimed in the Petition and that the Petition had been filed for an improper purpose (Exhibit O, email to Attorney Miller). In that

---

[6] The portion of the "report" admitted into evidence confirmed accounts owed to Best by EES! The balance of the "report" prepared by EES's staff, which allegedly supports the Petition, was not admitted into evidence after objection.

correspondence, counsel indicated that Mr. Buck would allow EES to withdraw the Petition prior

to filing his Motion in Opposition, wherein he would seek its dismissal (*id.*). In his reply, rather

than engaging in a discourse about the dispute, Attorney Miller stated that Mr. Buck simply

lacked the authority to challenge the Petition and that EES had enlisted the services of a

reputable accounting firm and that the amount provided in the Petition was provided to him by

the accountant (*id.*).[7] When counsel for Mr. Buck pressed Attorney Miller for the "report" from

the accountant, Attorney Miller was less than forthcoming in his reply when he stated, "I don't

have any report, *only an oral statement by [the accountant]* as to the most conservative amount

that Best could owe EES. That oral statement was the basis for the filing."[8] *Id.*

---

[7] In that email, Attorney Miller states: "Finally, your suggestion that the monies claimed to be owed by Best to EES are somehow in dispute as to liability or amount is not well taken. Since the email you referenced was sent, Best has engaged the services of [a reputable accounting firm] to review the available financial records of Best in order to determine the amount that Best owes to EES. The amount noted in the petition was provided to me by [the accountant]. Again, this number is based on the available financial records, but I have been advised by my client that Ms. Colon, in her capacity as sole manager of Best, agrees with [the accountant's] base line determination. I nonetheless remain confident that an affidavit from Ms. Colon, in her capacity as sole manager of Best, stating that that amount owed to EES is not in dispute, should alleviate any concerns that might otherwise be raised. Should you choose to ignore the applicable law and instead file an inappropriate answer to the [in]voluntary petition on behalf of Mr. Buck, please be advised that such conduct will potentially subject you and your client to sanctions . . . ." Ex. O, email correspondence dated May 17, 2019.

[8] The following exchange occurred on the record between Attorney Natale and the accountant during the accountant's deposition on July 2, 2019:

"Q. [You] never orally or in writing provided a monetary figure that you believe was owed by EES to anyone, including [Attorney] Miller?

"A. Correct. . . .

"Q. [A]nd there was this bigger report—I don't have it in front of me. Do you happen to have that report?

"A. I don't think I ever got the final report. And from that meeting that we had, that was where it was determined that [a] report would be put together.

"Q. So you actually never saw a final report?

"A. I saw a draft of the report, correct. . . .

"Q. Have you spoken with Marc Miller at any point concerning this matter?

"A. I haven't spoken to [Attorney] Miller [since] our meeting.

"Q. [T]he meeting that took place in March?

"A. Correct. . . .

***

"Q. [And] [y]ou were never engaged for [the] purpose of determining the amounts that may have been owed between [EES and Best]?

"A. I was not engaged.

"Q. You were never asked to provide a figure as to the amounts that may have been owed between those two companies?

"A. That's correct.

7

On May 21, 2019, Mr. Buck filed the present Motion. The Motion indicated that Mr. Buck was seeking to intervene on behalf of Best under Fed. R. Bankr. P. 2018 and to dismiss the case pursuant to 11 U.S.C. § 303(b)(2),[9] arguing, *inter alia*, that the Petitioner was an ineligible insider, that the alleged Debtor was generally paying its debts in the ordinary course, and that the amount claimed on the Petition was subject to a bona fide dispute.

Over the course of the four hearings, the Court heard testimony and was presented with other evidence relating to the misconceived filing of the Petition. On that basis, this Court has determined that:

1. Best had never been sued by a creditor for non-payment of any debt (Tr. 7/30, Part I, 2:48:20).

2. Further, the Petitioner was unable to adduce any credible evidence that Best's debts were generally unpaid or material.

3. There were no outstanding invoices indicating Best owed money to EES (Tr. 7/30, Part I, 1:13:45). In fact, Ms. Colon, who attested to and signed the Petition, ostensibly could not unequivocally state how much was owed at that time without the purported assistance of an accountant. While the Petitioner's papers refer to the fact that an accountant had been retained to determine whether there were any amounts owed to

---

"Q. [Attorney] Miller, to my right, never asked you about your own opinion concerning what amounts were owed between those two companies?

"A. I don't believe so.

"Q. He never sought [that] you . . . orally confirm that a certain amount of money owed by Best to EES, correct?

"A. I don't believe so." Ex. R, pp. 19–20, 22–23.

[9] Title 11 U.S.C. § 303(b) provides in relevant part: "An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title–(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775 1 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims; (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 1 of such claims[.]"

EES by Best, in fact, no such retention existed and, accordingly, no such report or opinion was ever issued by the accountant to that effect.[10]

4. Best had open purchase order contracts with two large Connecticut utility companies, Eversource and United Illuminating, which could have been serviced in order to generate income to pay any debts if Ms. Colon elected to do so (Tr. 7/30, Part I, 1:02:15).

5. Prior to the filing, Ms. Colon and Mr. Mejias represented to Attorney Miller in conflicting, but conclusory fashion, that Best was not paying its bills in the ordinary course, that the amounts owed to EES were not subject to a bona fide dispute, and that Best had fewer than twelve creditors (Tr. 7/30, Part II, 47:00).

6. Attorney Miller believed that the cost of litigation was a driving factor as to why the alleged claims identified by Ms. Colon against Best and/or Mr. Buck were not brought in state court by EES (Tr. 5/31 23:15).

7. Attorney Miller believed that these claims could have been brought as a civil action in state court, but that it would have been more expensive than filing the Petition (Tr. 7/30, Part II, 39:45, 02:17:00).

8. While filing a voluntary Chapter 7 bankruptcy petition was considered, Ms. Colon was unable to duly authorize a voluntary Chapter 7 petition because she did not have a sixty-six percent super majority stakeholder interest in Best, which would have

---

[10] The following exchange also occurred between Attorney Natale and the accountant during the accountant's deposition on July 2, 2019:

"Q. Did you do anything with respect to the draft report?

"A. As I stated before, the only thing I did was I read through it and gave him some grammatical changes that I thought he needed to do.

"Q. But you didn't review it for substance or approve any of the contents?

"A. Correct." (Ex. R., p. 44).

allowed her, under its organizational documents, to take such action outside the ordinary course of business without Mr. Buck's consent (Tr. 5/31 33:15).

9. Following Mr. Buck's firing, Best was maintained as a shell company of EES and is now principally controlled and operated by Ms. Colon and/or EES (Tr. 7/30, Part I, 01:05:00).

10. As the alleged managing member and control party of Best, Ms. Colon does not challenge the Petition[11] and agreed with the Petitioner's claim that Best owed EES at least $72,000.[12] (Tr. 5/31 31:45).

11. At all relevant times prior to these proceedings, Outside General Counsel for EES (Attorney Miller's wife) also provided legal services to Best (Tr. 6/21 4:00).

12. Attorney Miller knew that this matter engendered a high-pitched, aggressive, ongoing familial dispute between Ms. Colon and Mr. Buck over their businesses (see generally Tr. 7/30, Part II, 47:00).

13. Although unsuccessful, throughout and up to the hearings on the Motion, Ms. Colon and Mr. Mejias promoted criminal charges and allegations to the local police against Mr. Buck.

14. After Mr. Buck was terminated, he became employed by a third-party home insulation company. Upon learning this information, without solicitation or prompting, Ms. Colon contacted Mr. Buck's new employer. In doing so, she informed

---

[11] The Court notes that if Ms. Colon, as the principal control party of the Debtor, was unable to authorize a voluntary petition under Best's organizational documents because that authorization fell outside the ordinary course of business, she, by extension, also likely lacked the authority to consent to the present Petition, thus, creating a circumstance where, due to the corporate deadlock, the Debtor was unable to answer the Petition and Ms. Colon was hopelessly conflicted.

[12] The Petition stated that the claimed amount was $363,436.31. Later, in an affidavit filed by Ms. Colon, she indicated, after a subsequent review of the relevant books and records, that only roughly $72,000 of the amount listed in the Petition could be substantiated. See ECF No. 18. The fodder of these unreliable and inconsistent numbers alone supports the existence of a bona fide dispute.

it of her allegations against Mr. Buck, along with information pertaining to Mr. Buck's alleged criminal background.

15. At the time that these criminal charges and allegations were made, Ms. Colon and Mr. Mejias knew that a clean criminal record was a material consideration in Mr. Buck's employment and with respect to the licensing of home insulation contractors in Connecticut.

16. After the Motion was filed, Attorney Miller again discussed the consequences of filing a wrongful petition with Ms. Colon and she indicated to him that she wanted to "double down" on it (Tr. 7/30, Part II, 2:05:30) and that she knew what the risks were when the Petition was filed (Tr. 7/30, Part II, 1:34:45).

17. Attorney Miller did not speak to Outside General Counsel for EES and Best regarding any unpaid bills owed to EES by Best prior to the filing (Tr. 7/30, Part II, 47:30).

18. Neither Attorney Miller nor Outside General Counsel sent a demand letter on behalf of EES to Best or Mr. Buck for any allegedly unpaid debts (Tr. 7/30, Part II, 1:38:45).

19. At the time the Petition was filed, Attorney Miller did not know about an email from Outside General Counsel of EES to counsel for Mr. Buck stating that as of mid-January, 2019, Best had no outstanding payments due to EES (Tr. 7/30, Part II, 47:30).

20. Prior to the bankruptcy filing, Attorney Miller did not speak substantively to counsel for Mr. Buck regarding any payments on unpaid bills owed to EES by Best.

21. During the pre-petition period, Attorney Miller did not: review either of the company's books or records, or even ask to review the books or records (Tr. 7/30, Part II, 51:15); make a point to establish whether Mr. Buck retained the ability after

11

his termination to manage the company or its affairs (Tr. 7/30, Part II, 10:00); pull a credit report on Best to see if it was generally not paying its bills (Tr. 7/30, Part II, 42:15); inquire of EES as to what proof it had that Best was not paying its bills in the ordinary course (Tr. 7/30, Part II, 43:00); perform a search of the state court docket to see if there were any pending lawsuits against Best alleging nonpayment of its debts (Tr. 7/30, Part II, 43:30); or request that the Petitioner present evidence, other than its own affirmations, that 11 U.S.C. § 303 could otherwise be satisfied (Tr. 7/30, Part II, 58:15).

22. Attorney Miller, instead, relied upon generalized and unsubstantiated assertions from Ms. Colon and Mr. Mejias as the basis for filing the Petition (Tr. 7/30, Part II, 02:05:00). Despite also submitting affidavits from EES employees in support of the Petition, Attorney Miller thereafter failed to call the employees as witnesses or otherwise offer a proper basis for the admissibility of the facts advanced in those affidavits into the record.

23. Despite relying on other preliminary information prepared by the accountant as the basis for the filing, Attorney Miller did not confirm his conclusions with the accountant for EES that Best owed the sums alleged in the Petition (Tr. 7/30, Part II, 1:01:15). See footnote 8 of this Decision.

24. Despite being held out in such capacity, the accountant was neither retained to establish what amounts were actually owed between the companies, nor was he employed to provide an opinion letter to that effect. Furthermore, the accountant informed Ms. Colon, Mr. Mejias and Outside General Counsel that he would *not*

confirm the amounts claimed in the Petition because there was a lack of foundational or otherwise reliable documentation (Ex. R, accountant deposition transcript, p. 36).

25. Ms. Colon's alleged concerns for Best's other creditors were not advanced in any pre-petition communication between EES, Ms. Colon, Mr. Mejias or Attorney Miller (Tr. 7/30, Part II, 38:15).

26. Prior to the bankruptcy filing, neither the "report," that was allegedly used to substantiate the Petition, nor a summary of that "report," was ever provided to Mr. Buck or his legal counsel (Tr. 7/30, Part II, 2:19:45).

27. Attorney Miller discussed the risks associated with filing the Petition with Ms. Colon, and she elected to file, notwithstanding those risks (Tr. 7/30, Part II, 01:34:45).

28. Ms. Colon directed and endorsed the filing of the Petition, but, nonetheless, failed to appear, testify or seek an opportunity to support it at the hearings.[13] Instead, the only EES representative that testified on behalf of the Petition was Mr. Mejias, despite Ms. Colon's previous criticism of him for his financial mismanagement of the companies. EES did not file a motion for a continuance, seek an opportunity to depose Ms. Colon, or otherwise request that the Court reschedule the hearings so that Ms. Colon might participate and testify. Attorney Miller further emphasized to the Court that it was her choice not to testify in these hearings (Tr. 7/30, Part II, 1:11:15).

29. Mr. Mejias was designated by Ms. Colon as a suitable party to testify on behalf of the Petitioner in her stead. During his testimony, Mr. Mejias asserted his Fifth

---

[13] The fact that the Ms. Colon, who claimed to be ill, refused to testify or otherwise make herself available during these proceedings may very well have warranted an adverse inference. See footnote 21 of this Decision. For the reasons stated herein, the Court has declined to do so.

Amendment Privilege on several occasions when asked whether he and/or Ms. Colon may have pillaged or misused the corporate funds of EES.

30. No documents were ever presented by the Petitioner to the Court to substantiate the amount claimed on the Petition (Tr. 7/30, Part II, 1:09:30).

31. At the time of the first hearing on the Motion, on May 31, 2019, the Petitioner still had not ascertained a rough count of the number of creditors that Best carried with any reasonable degree of certainty or proof (Tr. 5/31 35:15).

32. A common sense review of the facts and representations presented during the hearings revealed that Best's potential universe of creditors (which included various vendors, suppliers, credit card companies, employees, utility companies, and customers) could easily have been more than twelve. Attorney Miller's responses to the Court's inquiries on this issue were evasive, inconclusive and unsubstantiated. In effect, there was no credible evidence advanced by the Petitioner, the party now in control of the Debtor's books, records and business, that Best had less than twelve creditors.

III.   STANDING

From the outset, the Petitioner's primary defensive contention has been that Mr. Buck lacks standing to challenge the Petition because of his status as a mere stakeholder in Best. In response, Mr. Buck asserts that although 11 U.S.C. § 303(d) of the Bankruptcy Code does not explicitly provide him with statutory standing in the present case to challenge the Petition, the Court can grant him standing as a party in interest as courts have done when confronted with abusive involuntary petitions involving internal corporate feuding where the debtor would

14

otherwise be rendered defenseless and its control party is utterly conflicted. This Court agrees with Mr. Buck.

In the context of an involuntary bankruptcy proceeding where the petitioning creditor and the debtor are not owned by the same person, there is no real issue with respect to who can contest the petition under 11 U.S.C. § 303(d) or what can be advanced as a bona fide defense. That said, where the Debtor's control party also happens to be the control party of the Petitioner, as in the present case, the underlying purpose of the statute would be thwarted in favor of manipulation and abuse if no one was to have a voice for the corporation. "Although the Bankruptcy Code does not unambiguously create a mechanism for conferring standing on parties other than a trustee or debtor-in-possession to prosecute estate claims, the majority of courts addressing the issue recognize the legitimacy of derivative standing when such standing is in the best interests of the bankruptcy estate." *In re David X. Manners Co. Inc.,* No. 15-51490, 2018 WL 1057140, at *1 (Bankr. D. Conn. Feb. 23, 2018), appeal dismissed sub nom. *In re Manners*, No. 18CV778, 2018 WL 3079470 (D. Conn. June 21, 2018)).

In Connecticut, whether a party might be accorded derivative standing as to a limited liability corporation is governed by Conn. Gen. Stat. §§ 34-271a and 34-271b. In relevant part, Conn. Gen. Stat. § 34-271b provides: "A derivative action to enforce a right of a limited liability company may be maintained only by a person that is a member at the time the action is commenced and: (1) Was a member when the conduct giving rise to the action occurred . . . ." In the present case, it is undisputed that Mr. Buck was a member of the Debtor at the time of the Petition and also at the time that he sought to oppose it. Although the Petitioner alleged that Ms. Colon unilaterally stripped Mr. Buck of his management role in both Best and EES prior to filing the Petition, the Petitioner has failed to present any substantiating evidence that would suggest

15

that Mr. Buck no longer possessed a membership or colorable management interest in Best. See footnote 5 of this decision. Accordingly, for the purposes of Conn. Gen. Stat. § 34-271b, Mr. Buck's membership interest in Best satisfies the requirements set forth therein.

Next, Conn. Gen. Stat. § 34-271a provides that "[a] member may maintain a derivative action to enforce a right of a limited liability company if: (1) The member first makes a demand on the other members in a member-managed limited liability company, or the managers of a manager-managed limited liability company, requesting that they cause the company to bring an action to enforce the right, and the managers or other members do not bring the action within ninety days; or (2) a demand under subdivision (1) of this section would be futile."[14] In the present case, prior to intervening, Mr. Buck's legal counsel properly provided written notice to an appropriate representative of both Best and EES wherein he stated a position in opposition to the Petition and requested its withdrawal (Ex. O). Furthermore, after acknowledging Mr. Buck's position and intentions, Attorney Miller roundly and unequivocally rejected them. Accordingly, by either the operation of the Petitioner's rejection of Mr. Buck's request to withdraw the Petition, or through the express futility exception set forth in by Conn. Gen. Stat. § 34-271a(2), the Court finds that Conn. Gen. Stat. § 34-271a has been satisfied.

Given Mr. Buck's undisputed status as a member stakeholder of the Debtor and the fact the Debtor, as wielded by Ms. Colon as the principal control party, lacked the corporate volition or interest to oppose the Petition, the requirements of Conn. Gen. Stat. §§ 34-271a and 34-271b have been satisfied. The Court further finds that the demands made upon both Best and EES

---

[14] Due to its recent enactment, there is limited decisional law on derivative standing under the Connecticut Uniform Limited Liability Company Act. Despite that, Connecticut courts regularly decide analogous issues under the State's corporate statutes that are relevant to the present case, see Conn. Gen. Stat. §§ 33-771 and 33-772; and while there is no controlling caselaw in this State on whether a common law "futility" exemption exists for corporate shareholders that would excuse a failure to notice a subject corporation per the requirements of Conn. Gen. Stat. § 33-722; see *Beckworth v. Bizier*, 138 F. Sup. 3d 144, 156 (D. Conn. 2015), the plain language of Conn. Gen. Stat. § 34-271a expressly provides a "futility" exception.

were sufficient or, alternatively, are excused for futility. Because Mr. Buck is the only suitable member and stakeholder who could adequately represent the interests of Best, the Court grants and recognizes his derivative standing as a matter of right and fundamental fairness.

Additionally, it has been recognized in bankruptcy jurisprudence that "under certain circumstances, stockholders might be permitted to contest an involuntary petition against their corporation where there was a plan or scheme to achieve fraud or other proscribed conduct." *In re Westerleigh Dev. Corp.*, 141 B.R. 38, 40 (Bankr. S.D.N.Y. 1992) (internal quotation marks omitted) (in granting the shareholder standing to challenge the involuntary petition, the court held that the use of the Bankruptcy Code as a weapon to get more leverage in an internal two-party dispute was impermissible).

In support of that determination, the *Westerleigh* court cited to various cases from the First, Seventh and Ninth Circuits, some of which dated back to the 1940s, and all of which supported a long-held proposition that, under certain circumstances, stakeholders may be granted standing in order to defend against an involuntary petition. See *In re Nat'l Republic Co.*, 109 F.2d 167, 170 (7th Cir. 1940) ("Stockholders and state court receivers have never had such absolute right [to contest an involuntary petition], although it lay within the discretion of the District Court to permit them to intervene upon a proper showing."); *In re Oakland Popcorn Supply, Inc.*, 213 F. Supp. 665, 667 (N.D. Cal. 1963) ("While it is true that stockholders of a bankrupt corporation have no statutory right to contest an involuntary petition, it is within the discretion of the bankruptcy court to permit them to do so. . . [W]here it is evident that the purported president of the bankrupt was not properly representing the interests of the corporation, it was a proper exercise of discretion to entertain the petition of the stockholders to dismiss the proceeding."); *In re Autumn Press, Inc.*, 20 B.R. 60, 63 (Bankr. D. Mass. 1982)

("[A]s a stockholder, Dreier has standing to contest the filing of this petition on the ground of lack of corporate volition."). This Court notes, as did the *Westerleigh* court, that shareholder standing is particularly appropriate when, as in the present case, a debtor is unable to answer the petition because its only two stakeholders are on opposite sides of the case, with neither having authority to act for the corporation. See *In re Westerleigh Dev. Corp.*, *supra*, 141 B.R. 40. Accordingly, the Court grants and recognizes Mr. Buck standing as a shareholder in interest under the aforementioned cases and further grants Mr. Buck's Motion for Permissive Intervention under Fed. R. Bankr. P. 2018 (see ECF No. 9).[15]

Lastly, a bankruptcy court is endowed with a degree of discretion when recognizing a designee of a debtor for the purposes of proceedings before the court. See Fed. R. Bankr. P. 9001(5). Accordingly, the Court finds that Mr. Buck is the only appropriate designee for the Debtor under the present set of circumstances. Under § 303(d) of the Code, "[t]he debtor, or a general partner in a partnership debtor that did not join in the petition, may file an answer to a petition under this section." See also Fed. R. Bankr. P. 1011(a) ("The debtor named in an involuntary petition may contest the petition."). The Code defines "debtor" as "a person or municipality concerning which a case under this title has been commenced"; see 11 U.S.C. § 101(13); and thereafter provides that the term "person" is to include, among other things, a "corporation." See 11 U.S.C. § 101(41).

---

[15] Alternatively, the Court grants Mr. Buck's Motion to Intervene as a party in interest pursuant to Rule 7024 of the Federal Rules of Bankruptcy Procedure. Rule 7024(a)(2), which mirrors the language in Rule 24 of the Federal Rules of Civil Procedure, permits a party to intervene as a matter of right when that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impeded the movant's ability to protect its interest, unless existing parties adequately represent that interest." In the present case, Mr. Buck claims an interest relating to the property or transaction that is the subject of the action. As a practical matter a disposition by this Court granting the Petitioner's request for relief would impair Mr. Buck's ability to protect that interest and, given the hopelessly conflicted control parties of Best, neither Best's nor Mr. Buck's interest are adequately represented without such intervention. Accordingly, the Court grants Mr. Buck permissive intervention pursuant to Fed. R. Bankr. P. 2018 *and*, alternatively, intervention as a matter of right, pursuant to Fed. R. Bankr. P. 7024.

Relevant to the issue now before the Court, Rule 9001(5) of the Federal Rules of Bankruptcy Procedure provides that when a debtor is a corporation, a debtor may include, if designated as such by the court: "any and all of its officers, members of its board of directors or trustees or a of a similar controlling body, a controlling stockholder or member, or any other person in control . . . ." Although Rule 9001(5) does not specifically identify minority shareholders or disputed member managers by name, it nonetheless lists what can only be construed as otherwise *suitable* designees that would likely be in a position to act as representatives of the debtor. In construing Rule 9001(5), it is noteworthy that the list of possible designees is not exclusive, but rather *inclusive*, which is plainly indicated by the use of "includes," rather than the use of a more restrictive qualifier. Here, given the overt conflict of interest facing the managing member and control party of the Debtor (Ms. Colon) and the Petitioner (which is also controlled by Ms. Colon and now operates the Debtor), and the fact that Mr. Buck is a 40 percent stakeholder of the Debtor and was, for the large majority of the Debtor's existence, the managing member, Mr. Buck is in the best position to address the underlying unsubstantiated allegations presented in the Petition on behalf of the Debtor. Pursuant to Fed. R. Bankr. P. 9001(5), the Court finds that Mr. Buck is a suitable designee to represent the Debtor in these proceedings and, therefore, also accords him such standing to prosecute the Motion on behalf of the Debtor.

Because the majority control party of the Debtor is also the majority control party of the Petitioner, and the control parties have advanced materially false and unsubstantiated claims to advance the interest of Ms. Colon, Mr. Buck is recognized as a party vested with a sufficient pecuniary interest and aggrievement to defend the Debtor. The Court simply does not accept the notion that Mr. Buck and the Debtor ought to be deprived of the ability to oppose a patently

improper involuntary petition simply because of Ms. Colon's corporate control and calculated maneuvering. Accordingly, for the purposes of 11 U.S.C. § 303(d), the Court grants Mr. Buck's motion to intervene pursuant to Fed. R. Bankr. P. 2018 and, alternatively, pursuant to Fed. R. Bankr. P. 7024, accords him statutory standing on a derivative basis under Conn. Gen. Stat. §§ 34-271a and 34-271b, and accords him standing as a suitable designee of the Debtor pursuant to Fed. R. Bankr. P. 9001(5). The Court further recognizes his stakeholder standing as a bona fide party in interest on behalf of himself and Best pursuant to the reasoning articulated in *In re Westerleigh Dev. Corp.*, *supra*, 141 B.R. 40, and its progeny.

## IV.    DISMISSAL

Under 11 U.S.C. § 303(b) an involuntary case is commenced when one creditor, in the event the debtor has fewer than twelve creditors, or a minimum of three creditors, in the event that the debtor has twelve or more creditors, files an involuntary petition under Chapter 7 or 11 indicating that the petitioning creditor is either a holder of a non-contingent claim against the debtor or a holder of a claim that is not subject to a bona fide dispute. Although the requirements of 11 U.S.C. § 303(b) are not jurisdictional, *see Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 164–70 (2d Cir. 2010), these requirements are not waivable by the Debtor. Importantly, the plain language of 11 U.S.C. § 303(b)(2) indicates that the petitioning creditor cannot be an insider of the alleged debtor. See *In re Runaway II, Inc.*, 168 B.R. 193, 198 (Bankr. W.D. Mo. 1994) ("When there are less than 12 creditors, employees, insiders and creditors receiving avoidable preferences cannot file an involuntary petition.");[16] see also 11 U.S.C. §§ 101(31)(B)(ii) and (iii)

---

[16] While the Court acknowledges a split of authority on this issue, the Court concludes that the more appropriate plain language reading of 11 U.S.C. 303(b)(2) is that an insider is not an eligible petitioner when there is only one petitioning creditor. See *An Issue that Has Confounded Courts: Do Insiders Have Standing to File an Involuntary Petition in Small Cases*, [Dec./Jan.] Am. Bankr. Inst. J. (ABI) Feature (2002), https://www.abi.org/abi-journal/an-issue-that-has-confounded-courts-do-insiders-have-standing-to-file-an-involuntary. Furthermore, to the extent that courts have relied on Congress's intent to prevent collusion between a debtor and a friendly creditor as support for

(defining the term "insider").[17] Under Federal Rule of Bankruptcy Procedure 1013(a), "[t]he court shall determine the issues of a contested petition at the earliest practicable time and forthwith enter an order for relief, dismiss the petition, or enter any other appropriate order." In adjudicating matters brought under 11 U.S.C. § 303, a bankruptcy court has the discretion to award attorney's fees and costs for improper involuntary petitions, as well as punitive damages in instances of bad faith. See 11 U.S.C. §§ 303(i)(1) and (2).[18]

   a.   Ms. Colon and EES are indisputably "insiders"

Under 11 U.S.C. § 101 of the Bankruptcy Code, the term "insider," as it relates to a corporation, includes a "*director of the debtor; officer of the debtor; person in control of the debtor*; partnership in which the debtor is a general partner, general partner of the debtor; or relative of a general partner, director, officer, or person in control of the debtor." 11 U.S.C. § 101(31)(B) (emphasis added). "Persons falling within this definition are considered 'statutory insiders.'" *In re PHS Grp. Inc.*, 581 B.R. 16, 31 (Bankr. E.D.N.Y. 2018). As stated previously in this Decision, the term "person" includes, among other things, a "corporation." See 11 U.S.C. § 101(41). Ms. Colon is indisputably an officer, director and/or person in control of the Debtor, and, thus, a statutory insider. Moreover, it is not in dispute that EES is a "person in control of the debtor" due to its total dominion over Best, its books, records, business affairs and assets, and, thus, it is also a statutory insider pursuant to 11 U.S.C. § 101(31)(B).

---

the contrary position, the Court notes that its present rendering of 11 U.S.C. 303(b)(2) is consistent with Congress's intent to prevent debtor/creditor collusion.

[17] Sections 101(31)(B)(ii) and (iii) provide in relevant part: "The term 'insider' includes . . . (B) if the debtor is a corporation . . . (ii) officer of the debtor; [or] (iii) person in control of the debtor . . . ."

[18] Title 11 U.S.C. § 303(i) provides: "If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—(1) against the petitioners and in favor of the debtor for—(A) costs; or (B) a reasonable attorney's fee; or (2) against any petitioner that filed the petition in bad faith, for—(A) any damages proximately caused by such filing; or (B) punitive damages."

"Courts have additionally recognized as insiders some persons not on that list—commonly known as 'non-statutory insiders.' The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). Critically, "[t]he non-statutory insider need not have *actual* control over the Debtor; rather, the question there 'is whether there is a close relationship [between debtor and third party] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length.'" *In re PHS Grp. Inc.*, *supra*, 581 B.R. 31 (emphasis added).

"To decide whether a particular creditor is a non-statutory insider, a bankruptcy judge must tackle three kinds of issues—the first purely legal, the next purely factual, the last a combination of the other two. . . . Initially, a bankruptcy court must settle on a legal test to determine whether someone is a non-statutory insider (again, a person who should be treated as an insider even though he is not listed in the Bankruptcy Code) . . . . Along with adopting a legal standard, a bankruptcy court evaluating insider status must make findings of what we have called 'basic' or 'historical' fact—addressing questions of who did what, when or where, how or why." *Village at Lakeridge, supra*, 138 S. Ct. 965–66.

Generally, "[c]ourts will determine whether a party is an insider on an individualized basis based on the 'totality of the circumstances.'" *In re TS Employment, Inc.*, 603 B.R. 700, 708 (Bankr. S.D.N.Y. 2019). When analyzing whether a party is an insider a court should consider: (1) the close relationship between the debtor and the third party; (2) the degree of the individual's involvement in the debtor's affairs; (3) whether the defendant had opportunities to self-deal; and (4) whether the defendant holds or held a controlling interest in the debtor corporation. *In re PHS Grp. Inc.*, *supra*, 581 B.R. 33.

22

Applying the criteria to Ms. Colon' and EES's relationship to Best, it is hard to see the dynamics as anything other than deeply interrelated and dominating. Ms. Colon is the majority stakeholder of the Debtor. Ms. Colon is also the control party of the Petitioner. Furthermore, EES and Best share the same stakeholder members. And despite being separate legal entities, EES and Best share the same business location, employees, and intermingle business administration, expenses, operating costs and, lastly, assets. Moreover, the payment and apportionment of costs and profits from contracts obtained by EES and serviced by Best have not been consummated through the likes of any formal agreements, which is common to almost all arms-length commercial transactions. EES and Best historically have functioned as a cohesive unified business operation, sharing employees, objectives, contracts and customers despite their legal formalities. Furthermore, evidence was presented that the assets of Best were conveniently transferred to EES without any ascertainable consideration paid just prior to the filing of the Petition—which is the essence of self-dealing and commingling. The totality of circumstances test weighs all these connections in favor of confirming EES's status as a "non-statutory insider." To determine otherwise would be to unduly elevate form over substance and economic realities.

Both in her individual capacity and her capacity as the managing member of both companies, Ms. Colon is the quintessential "insider" and control party. Given the evidence of Ms. Colon's unilateral dominion over both entities (and their operations), the identical stakeholder makeup therein, the minimal evidence that Best and EES transacted business at arms-length, and the fact that Ms. Colon was the signatory on the Petition for the sole petitioning creditor, the collective failure to acknowledge the ineligibility of the Petitioner as an "insider" by

EES, Ms. Colon and Attorney Miller is inexcusable. Here, the Petition was filed by an "insider" (both statutory and non-statutory) and must be DISMISSED for lack of a qualified petitioner.[19]

    b.  Bad Faith

Title 11 U.S.C. § 303(i) provides in relevant part: "If the court dismisses a petition under this section other than on consent of all petitioners and the debtor . . . the court may grant judgment—(1) against the petitioners and in favor of the debtor for—(A) costs; or (B) a reasonable attorney's fee; or (2) against any petitioner that filed the petition in bad faith—(A) any damages proximately caused by such filing; or (B) punitive damages."

---

[19] The Court notes that the Petition would fail because the Petitioner has also failed to meet its burden of proof as to: a bona fide debt, its claim that Best is not generally paying its debts as they come due, and the threshold issue relating to the number of creditors Best carries. See Fed. R. Bankr. P. 9011(b)(3) (articulating counsel's affirmative obligation that allegations and other factual claims have, or are likely to have, evidentiary support).
    During the hearing on May 31, 2019, the following exchange took place on the record:
    "[The Court]: You indicated that you want to work here for the benefit of creditors. What creditors?
    "[Attorney Miller]: Your Honor, there are a couple of creditors aside from EES. Ms. Colon has paid a substantial amount of her own funds . . . .
    "[The Court]: You indicated that there are merchants, vendors, suppliers.
    "[Attorney Miller]: Yes, that is my understanding Your Honor, because Best was in charge of purchasing insulation and materials associated with the operation of the business.
    "[The Court]: Has the Petitioner gone to look at what the suppliers are owed?
    "[Attorney Miller]: No, not at this point Your Honor.
    "[The Court]: Why?
    "[Attorney Miller]: Because it wasn't necessary for the filing of an involuntary petition. . . . Your Honor, the [due] diligence that was conducted was [that] I inquired of Ms. Colon, who is the majority owner of Best, I inquired as to whether she had more than twelve creditors. She indicated that Best had fewer than twelve creditors. That's the diligence I've performed Your Honor" (Tr. 05/31 35:00-38:00).
    Despite Attorney Miller's representation to the Court that, to the best of his knowledge, and on the basis of Ms. Colon's statements, the alleged Debtor had fewer than twelve creditors, his hedged answers in response to the Court's inquiry, coupled with his failure to perform even the most basic due diligence as to the number of creditors that Best carried, leads the Court to find those representations to be evasive and unreliable. In the Court's eyes, Attorney Miller failed to meet his initial burden with respect to the statutory requirements of 11 U.S.C. § 303(b). See also In re QDOS, Inc., 591 B.R. 843, 847 (Bankr. C.D. Cal. 2018) ("Petitioning Creditors bear the burden of proving all the statutory requirement elements of 11 U.S.C. § 303(b)(1)."). "If they meet this burden, the burden of proof then shifts to the alleged debtor to show that there is a dispute as to a material fact. If there is a genuine issue of material fact that bears upon the debtor's liability or amount of the claim, then the petition must be dismissed." Id. See Part II of this decision (¶¶ 2 and 3 [the Petitioner was unable to adduce any reliable evidence that Best's debts were generally unpaid and there were no outstanding invoices indicating Best owed money to EES]; ¶ 30 [no documents were ever presented by the Petitioner to substantiate the amount listed on the Petition]; and ¶ 31 [at the time of the first hearing on the Motion, on May 31, 2019, Attorney Miller still had not ascertained an approximation of the number of creditors that Best carried with any reasonable degree of reliability or proof]).

24

"In determining bad faith under the 'totality of circumstances [test],' courts consider whether the involuntary petition was meritorious and whether the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing. . . . Where an involuntary petition has no basis in law or fact, the intent of the creditor is malicious. . . . On this score, bad faith is measured by 'what the petitioning creditor knew or should have known' with respect to the petition's merit, and whether the petitioning creditor 'knowingly alleg[ed] false information' or displayed a 'reckless disregard of the truth.'. . . Creditors act in bad faith when they file an involuntary petition knowing their claims are in bona fide dispute." *In re Anmuth Holdings LLC*, 600 B.R. 168, 197 (Bankr. E.D.N.Y. 2019) (citations omitted). This Petition has no support in fact or law.

Here, where the Petitioner controlled both entities and had access to their books and records, the lack of reliable inquiry and claimed ignorance of the facts is not excusable. See *In re Better Care, Ltd.*, 97 B.R. 405, 412–13 (Bankr. N.D. Ill. 1989) ("Where the attorney advises the client that this purpose should be effectuated by an involuntary bankruptcy, it is the attorney who is responsible for the improper use, not the client. Where, however, the purpose is improper, the client will usually come into the attorney's office with that purpose already formed. It is the purpose which constitutes bad faith in such a case and it is the client who is responsible for the purpose. . . . They cannot now hide behind that advice when the consequences of their decision are visited upon them.").

Critically, the bankruptcy court should not be used by one shareholder to gain leverage over the other. *See In re Westerleigh Dev. Corp., supra*, 141 B.R. 40–41. "The bankruptcy court cannot properly be employed as a rented battlefield, to achieve ends for which it never was intended. . . . To use an involuntary filing as a tactic to 'work it out' with one's alleged obligor is

an abuse of the bankruptcy process." *In re Anmuth Holdings LLC*, *supra*, 600 B.R. 193–94

(citations omitted and internal quotation marks omitted).[20] "While the existence of a two-party

dispute does not, by itself, warrant dismissal of a case where there are other legitimate

bankruptcy objectives to achieve (such as avoiding a fire sale of significant estate assets, or

providing an opportunity to appeal an adverse judgment), it is a factor repeatedly considered in

determining whether cases are filed in good faith, or where there otherwise is cause for

dismissal. . . . [I]t weighs in favor of dismissal when it is present." *In re Murray,* 543 B.R. 484,

493 (Bankr. S.D.N.Y. 2016), aff'd, 565 B.R. 527 (S.D.N.Y. 2017), *aff'd*, 900 F.3d 53 (2d Cir.

2018) (footnotes omitted). See also § 305(a)(1). The Petitioner's objective here was singular,

focused and self-serving to Ms. Colon's interests.

During the May 30, 2019 hearing on the Motion, Petitioner's counsel conceded that this

was essentially a two-party dispute that should have been filed in state court and that the Petition

was filed because Ms. Colon (through EES) was frustrated because she was unable to

unilaterally liquidate Best, despite being the majority stakeholder of both EES and Best. See 11

U.S.C. § 305(a)(1). Counsel further stated that the principal objective behind filing the Petition

was to use the bankruptcy process as a way to shift the legal costs and expenses associated with

winding down the business onto the Debtor's estate by triggering the appointment of a Chapter 7

trustee who would be responsible for maximizing the value of the Debtor's estate for the benefit

of its creditors. The effect being that EES would not have to shoulder the risk, marshal the

evidence or bear the costs and challenges associated with bringing a corporate dissolution in state

---

[20] Relevant to the present case, "[c]ourts have employed a more expansive definition of bad faith to include ill will or malice toward the debtor or its owners." *In re Anmuth Holdings LLC*, *supra* 600 B.R. 194 (citation omitted). Ms. Colon's ill will and disdain for her brother, and the business he ran, is palpable here.

court, and at the same time, the Chapter 7 trustee would set about assessing and litigating the allegedly improper transactions and mismanagement by Mr. Buck.

Lastly, at the time of the filing, it is notable that the Debtor was a going-concern business. It is particularly anomalous that the Petitioner has claimed that the Debtor was unable to pay creditors when it was in control of the resources that might have allowed the Debtor to pay said creditors. This dynamic, especially under the present circumstances, is particularly emblematic of bad faith. In reviewing the totality of the circumstances, the Court concludes that the Petitioner's reasons, motivations and process behind the Petition are patently improper and abusive.[21] Accordingly, the Court finds that the Petition was filed in bad faith and must also be DISMISSED for that cause.

## V.    FEE, COSTS AND SANCTIONS

An involuntary petition triggers extraordinary relief and should be invoked with great care. "Involuntary bankruptcy is an extreme remedy with dire consequences upon [an alleged debtor]. . . . As a result, courts expect petitioning creditors to carefully examine the risks undertaken in the filing of an involuntary petition." *In re Anmuth Holdings LLC*, *supra*, 600 B.R. 188–89 (citations omitted and internal quotation marks omitted). If used as an improper tool of aggression, its consequences for the ill-prepared practitioner can be severe. When confronted with such conduct, bankruptcy courts also have the "inherent power of every federal court to sanction [those] abusive litigation practices." *Marrama v. Citizens Bank of Massachusetts*, 549

---

[21] Ms. Colon's lack of participation at the hearings is fundamentally inexplicable given that she was central to all facets of the decision-making in this case. While the Court *could* entertain an adverse inference for her non-appearance and failure to address the claimed defects in the Petition (especially given that the claimed illness that prevented her participation was never in any way substantiated or given that Attorney Miller never sought any continuances to accommodate her unavailability)—not to mention that the otherwise generous amount of misconduct previously described herein might warrant it—the Court needn't entertain or rely on such an inference in coming to its conclusion that Ms. Colon through EES pursued this Petition in bad faith. See generally *Cousin v. Office of Thrift Supervision*, 73 F.3d 1242, 1248 (2d Cir. 1996) (adverse inference may be drawn from the failure to testify on one's own behalf in a civil matter).

U.S. 365, 376 (2007) (internal quotation marks and citation omitted). Additionally, Fed. R. Bankr. P. 9011 and 11 U.S.C. § 105 provide that a bankruptcy court may impose sanctions for conduct including, but not limited to, the failure to make a reasonable inquiry into the circumstances underlying representations made to the court. The Court is particularly cognizant of these rules when the effects of such representations will have a significant impact on an opposing party, a business, its creditors, its customers and its stakeholders, such as in an involuntary bankruptcy. Accordingly, the Court has exercised herein its authority to assess and allocate sanctions and damages among the responsible parties under these various rules and authorities. Here, it is appropriate and just that reasonable attorney's fees, costs and expenses incurred by Mr. Buck in contesting this Petition, on behalf of the Debtor, be reimbursed by the offenders of this process.

      a.   11 U.S.C. 303(i)

          i.   § 303(i)(1)

In this Circuit, "[w]hen an involuntary petition is dismissed, there is a presumption that costs and attorney's fees will be awarded to the alleged debtor." *In re TPG Troy, LLC*, 793 F.3d 228, 235 (2d Cir. 2015) (internal quotation marks omitted). "The burden of proof is on the petitioner to justify a denial of costs and fees." *In re Anmuth Holdings LLC*, *supra*, 600 B.R. 186. "Unlike an award under § 303(i)(2), bad faith is not a prerequisite to an award of costs and attorney's fees under § 303(i)(1)." *Id*. (citing to *In re Bayshore Wire Prod. Corp*., 209 F.3d 100, 105 (2d Cir. 2000)).

  "In addition to the discretion to determine whether a § 303(i) award is appropriate, the bankruptcy court also retains the discretion to allocate liability for such an award among the Petitioning Creditors." *Id.,* at 205. Critically, the term "petitioner," as used in 11 U.S.C § 303(i),

may be interpreted to include those agents and/or principals who sign the involuntary petition on behalf of the creditors, who cause the petitioning creditors to file the petition or who are otherwise intertwined or intimately connected with the petitioning creditor. *DVI Receivables XIV, LLC v. Rosenberg (In re Rosenberg)*, 779 F.3d 1254, 1261, 1269 (11th Cir. 2015). "[A] bankruptcy court has discretion to hold all or some petitioners jointly or severally liable for costs and fees, to apportion liability according to petitioners' relative responsibility or culpability, or to deny an award against some or all petitioners, depending on the totality of the circumstances." *Sofris v. Maple-Whirworth, Inc. (In re Maple-Whitworth, Inc.)*, 556 F.3d 742, 746 (9th Cir. 2009).

In determining the amount of a reasonable award of legal fees, "both [the Second Circuit] and the Supreme Court have held that the lodestar—the product of a reasonable hourly rate and the reasonable number of hours required by the case—creates a 'presumptively reasonable fee.'" *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (citing to *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 183 (2d Cir.2008)). In calculating an award of fees and costs, a court must first determine the reasonable hourly rate, that is, "what a reasonable, paying client would be willing to pay." *Arbor Hill, supra*, 522 F.3d at 184. The court must then multiply that rate by "the number of hours reasonably expended on the litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). "[I]n exercising [the court's] considerable discretion," the amount may increase or be reduced in accordance with equitable considerations such as the *Johnson factors. Arbor Hill*, *supra*, 522 F.3d at 190.

The twelve *Johnson factors* are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's

customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Arbor Hill*, *supra*, 522 F.3d 187 (citing to *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), abrogated by *Blanchard v. Bergeron*, 489 U.S. 87 (1989)). The Court has weighed each of these factors in this instance in favor of the awards and sanctions described herein. The skill, effort, novelty, risk of collectability and result achieved by counsel heavily tip the balance in support of this award.

In Attorney Natale's Motion for Attorney's Fees (ECF No. 39), he included a breakdown for amounts billed, which contained itemized billing for May 3 to 31, 2019, which totaled approximately $24,000 in fees, and an itemization for June 4 to 19, 2019, which totaled just under $15,000 in fees and costs. Together they totaled just under $38,500. By Order of this Court (ECF No. 77), Attorney Natale was requested to submit any additional requests for fees incurred during the later portion of these proceedings. Attorney Natale filed a Supplemental Motion for Attorney's Fees (ECF No. 80), which contained itemized billing for services rendered for June 20 to July 30, 2019, which totaled just under $31,000; making for a total of approximately $69,500 in fees and costs to date. While the Petitioner claims otherwise, this claim for legal fees is not subject to the same recording rigors imposed on those representing a bankruptcy estate. See 11 U.S.C. §§ 329 and 330. This Court, being familiar with the context, course and complexity of these proceedings, requires adequate detail and description in the application to facilitate its measurement of what is reasonable under these circumstances. It does not require an audit. Both the application and supporting affidavits sufficiently delineate the categories of legal

30

tasks, preparations, research, writing and litigation that were encompassed in this representation (see ECF No. 58, p. 2–3; ECF No. 81, ¶¶ a–q). Such entries were generally necessary, reasonable and justifiably related to the challenges of this matter.

In reviewing Attorney Natale's motions for attorney's fees, and the supplemental papers attached thereto, the Court notes that in the first itemized billing statement, Attorney Natale billed just under $24,000 in legal fees. Almost $15,000 of that was billed in the week preceding the May 31, 2019 hearing, and which the Court will categorize generally as "trial related preparation" (see ECF No. 40-1). While the Court acknowledges the high degree of opposition that Attorney Natale faced from an otherwise recalcitrant Attorney Miller, the Court finds that this amount modestly exceeds what might otherwise be customary, necessary and reasonable in the bankruptcy practice area for such a defense. Additionally, the Court notes there are a number of billing entries for dual attendance at hearings before the Court, or that relate to generalized bankruptcy research, and what could otherwise be referred to as "learning curve activities" or case administration. Again, while the Court acknowledges the challenges of preparation for these hearings and the need for associate support in prosecuting Mr. Buck's opposition to the Petition, the Court finds that the total amount of fees requested by Attorney Natale is modestly more than what is customary, necessary and reasonable under the circumstances. Accordingly, the Court applies a $5,500 discount to the aggregate fees and expenses claimed in its determination of the reasonable attorney's fees and costs to be assessed and allocated hereunder.[22]

Consistent with the decisions of bankruptcy courts in other jurisdictions which have encountered a closely-held corporation faced with corporate internecine wars, the Court finds

---

[22] The Court notes that, as a practical means of evaluating a claim for reasonable legal fees and expenses, modest across-the-board cuts are justifiable in the present case. See *Lilly v. City of New York*, 934 F.3d 222, 234 (2d Cir. 2019) (district courts have the legal authority and discretion to either reduce an attorney's hourly rate for time spent on clerical tasks or apply an across-the-board reduction to the hours billed or total fee award).

that Mr. Buck, as an intervening equity holder, derivatively stands in the shoes of the alleged

Debtor for the purposes of 11 U.S.C. § 303(i) in order to compensate lead counsel who has ably

afforded the Debtor a defense and secured this dismissal of an improper involuntary petition. In

that regard, based upon the Court's knowledge and experience on the bench and in thirty-eight

years of commercial litigation practice in Connecticut, the Court finds that Attorney Natale's

rates and hours are generally reasonable and consistent with the going market rate for matters of

this character. After reviewing Attorney Natale's affidavits, time sheets and the records of these

proceedings, and acknowledging the highly professional effort demonstrated by Attorney

Natale's firm in defense of this improper Petition, the Court finds that the aggregate amount of

fees requested in his Motion for Attorney's Fees should be equitably adjusted to $64,000 as

assessed and allocated herein. Given the amount of additional time that was required by Attorney

Natale and the attorneys in his office to newly orient themselves to bankruptcy issues so that they

could provide competent representation and given this Court's equitable discounting of duplicate

entries and fees associated with generalized learning and case administration, the adjustments

made herein are fair and accord justice.

These adjustments do not diminish the Court's recognition of the thoroughness, vigor,

focus, integrity and high quality advocacy demonstrated by Attorney Natale's firm during the

course of this difficult contest. The Petitioner, who filed in excess of 100 pages of legal

memoranda, in addition to six affidavits (not admitted into evidence) and a motion to quash, and

caused the deposition of the accountant to be necessary, thus, adding to the four days of hearings,

is in no credible position to argue that these matters were "simple" or straightforward or that the

legal work of Attorney Natale was unwarranted.

The Court concludes that an award for $64,000 in the aggregate for attorney's fees and costs is reasonable and appropriate. Such an award, however, shall be allocated as prescribed herein. Given that Mr. Buck is also a stakeholder of EES, such an award (which could lie against EES) would simultaneously penalize Mr. Buck for prevailing in these proceeding. Accordingly, the Court has refrained from doing so for that reason. The Court awards costs and fees of $32,000 against Ms. Colon *individually* with no right of set off or contribution from any party in any current or future proceeding. Such award in favor of the Debtor is to be paid in good funds directed to the law offices of Natale & Wolinetz who defended against the Petition on behalf of Best and Mr. Buck.

        ii.  § 303(i)(2)

"Section 303(i)(2) of the Bankruptcy Code [also] gives the Court discretion to award punitive damages upon a finding that the involuntary petition was filed in bad faith. . . . The purpose of punitive damages under § 303(i)(2) is to punish a wrongdoer and deter similar conduct in the future. . . . Unlike compensatory damages, punitive damages are neither measured by actual loss nor are they measured strictly in light of the impact of the creditor's bad faith on the alleged debtor. . . . Punitive damages under § 303(i)(2) may be awarded whether or not there is proof of actual damages." *In re Anmuth Holdings LLC*, *supra*, 600 B.R. 202–03 (citations omitted and internal quotation marks omitted); see also *Orange Blossom Ltd. P'ship v. S. Cal. Sunbelt Developers, Inc.* (*In re S. Cal. Sunbelt Developers, Inc.*), 608 F.3d 456, 465 (9th Cir. 2010) ("Section 303(i)(2) expressly authorizes a standalone award of punitive damages."); *Jaffe v. Wavelength Inc.* (*In re Wavelength, Inc.*), 61 B.R. 614, 619 (9th Cir. BAP 1986) ("The legislative history of Section 303(i) indicates the use of the term 'or' is not exclusive, and therefore punitive damages, if appropriate, may be added to an award of costs and reasonable

attorneys' fees."). "[T]he alleged debtor has the burden of proving bad faith." *In re Bayshore*, *supra*, 209 F.3d 105 (citation omitted and internal quotation marks omitted). Notably, a 11 U.S.C. § 303(i)(2) award is not explicitly limited to the Debtor by its own language. See footnote 18 of this Decision.

Having found that the Petition was filed in bad faith in Part IV of this Decision, the Court further finds that Ms. Colon, in her individual capacity as the dominant control party of EES and the signatory on the Petition, was a major participant and a driving force behind the Petition and, therefore, shares substantial responsibility for the present circumstances. Accordingly, the Court finds that an award against her is also warranted under 11 U.S.C. § 303(i)(2). In that respect, 11 U.S.C. § 303(i)(2) allows a bankruptcy court to award compensatory and/or punitive damages when there is a finding of bad faith. In the present case, because Ms. Colon's conduct demonstrates not only recklessness and irrationality, but also ill will and malice, the Court awards Mr. Buck punitive damages under 11 U.S.C. § 303(i)(2)(B) in the amount of $32,000, against Ms. Colon *individually* with no right of set off or contribution from any party in any present or future proceeding, which is to be paid in good funds into a constructive trust held by Mr. Buck, which will be for the benefit of the law offices of Natale & Wolinetz. This award for punitive damages is intended to be *concurrent with* the prior award of fees and costs under 11 U.S.C. § 303(i)(1).

b.  Rule 9011

Rule 9011(b) of the Federal Rules of Bankruptcy Procedure provides in pertinent part: "By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry

34

reasonable under the circumstances—(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief."

"Although an attorney may generally rely on objectively reasonable client representations . . . the attorney must independently verify publicly available facts to determine if the client representations are objectively reasonable. . . . If independent verification reveals inconsistencies or other problems, an attorney must 'probe further—by asking questions, obtaining additional documents, or by some other means.'" *In re Parikh*, 508 B.R. 572, 585 (Bankr. E.D.N.Y. 2014) (citations omitted); see also *In re Dean*, 401 B.R. 917, 920 (Bankr. D. Idaho 2008) ("Simply put, having previously identified that a problem may exist with the Gladman lien, Beeman could not reasonably rely upon his clients' statements[.]").

"If a court makes a finding that Rule 9011(b) has been violated, Rule 9011(c)[23] permits the court, within its discretion, to impose sanctions upon the offending attorney or party. . . . 'Absent exceptional circumstances' an attorney's law firm will be held jointly and severally liable for Rule 9011(b) violations by its attorneys or employees. . . . Assuming the movant has

---

[23] Rule 9011(c) of the Federal Rules of Bankruptcy Procedure provides: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated  below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation."

complied with the safe harbor provisions of Rule 9011(c), awarding sanctions pursuant to the 'improper purpose' prong of Rule 9011(b)(1) requires a finding of subjective bad faith. This differs from sanctions under Rule 9011(b)(2), where an attorney fails to make a reasonable inquiry into whether claims asserted are 'warranted in law,' which uses an objective bad faith standard that requires frivolousness. . . . [See] *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 254 (2d Cir.1985), cert. denied, 484 U.S. 918, 108 S. Ct. 269, 98 L. Ed. 2d 226 (1987) (sanctions can be imposed for filings made for an 'improper purpose' even where the attorney conducted a reasonable investigation)." *In re Parikh*, *supra*, 508 B.R. 584–85 (citations omitted and footnote added).

Here, the Petitioner was unable to present any objective evidence of a debt not subject to a bona fide dispute (Tr. 7/30, Part II, 1:13:00). Furthermore, Attorney Miller knew there was a high-pitched ongoing familial dispute between Ms. Colon and Mr. Buck (Tr. 7/30, Part II, 47:00) but failed to speak with Outside General Counsel for EES and Best to verify whether there were any unpaid bills owed to or by Best to EES prior to the filing (Tr. 7/30, Part II, 47:30). By his own admission, Attorney Miller did not review or ask to review the books or records of either company; do any additional research using publicly available resources to see if Best was paying their bills in the ordinary course (Tr. 7/30, Part II, 42:15); inquire as to any evidence of whether Best was in fact paying its bills in the ordinary course (Tr. 7/30, Part II, 43:00); or require that the Petitioner present evidence, other than their own self-serving statements, that 11 U.S.C. § 303 could otherwise be satisfied (Tr. 7/30 58:15). Most glaringly, Attorney Miller seemingly ignored the disqualifying "insider" status of both the Petitioner and Ms. Colon. Attorney Miller instead relied upon generalized, unsubstantiated assertions by Ms. Colon and Mr. Mejias (Tr. 7/30, Part II, 52:15) and did not confirm his conclusions that Best owed the sums alleged in the

Petition with the accountant for EES, despite allegedly relying on other ostensibly preliminary information prepared by the accountant as the basis for filing (Tr. 7/30 2:04:30). He did so, in part, because he expected no one could oppose his assertions. What is more, at the time of the May 31, 2019 hearing on the Motion, Attorney Miller still had not been able to ascertain a reasonable approximation of the number of creditors that Best carried (Tr. 5/31 35:00). The chronology of events relating to the filing of the Petition suggests folly and an overwhelming desire to abide by Ms. Colon's insistence.

The Court finds that the care and diligence of Attorney Miller in preparing and prosecuting the Petition was stunningly lacking and that the purpose was, both subjectively and objectively, manifestly improper. In the preparation and filing of the underlying Petition, it is apparent that he did not conduct a proper or substantial inquiry as to the number of creditors Best carried nor did he adequately investigate or verify the representations made by Ms. Colon. Additionally, Attorney Miller filed the Petition without having sound accounting as to the amounts allegedly owed to EES or to the amounts claimed that EES owed Best, while also patently ignoring the language of 11 U.S.C. § 303(b)(2), which indicates that an "insider" was ineligible to file an involuntary petition.

Had Attorney Miller performed even a modest amount of research and due diligence, he would not have been able to ignore the glaringly obvious improper purpose that was behind his client's intentions and behind the Petition. For these reasons, and those identified in Part IV of this Decision, the Court finds that Attorney Miller undertook these actions for an improper purpose and without making a proper inquiry into the facts underlying the Petition, and, therefore, Rule 9011 sanctions are warranted. See *Kearney* 121 B.R. 642; *Keiter*, 192 B.R. 150, 154–56. The Court sanctions Attorney Miller and his firm, O'Connell, Attmore & Morris, LLC,

jointly and severally, without setoff or right of contribution in any present or future proceeding, in the amount of $32,000, which likewise shall be payable in good funds to the law firm of Natale & Wolinetz.

### c.   11 U.S.C. § 105

Section 105 may also provide a basis for this Court to impose sanctions, but only against bad-faith conduct and only when it is tied to a specific provision of the Bankruptcy Code, "rather than to further the purposes of the Code generally . . . and not merely [tied] to a general bankruptcy concept or objective." *In re Smart World Technologies, LLC*, 423 F.3d 166, 184 (2d Cir. 2005) (internal quotation marks and citations omitted); but see *In re Sanchez*, No. 18-679, 2019 WL 5581587, at *2 (2d Cir. Oct. 30, 2019) ("[I]nherent sanctioning powers are not contingent on Article III, but rather are, as their name suggests, inherent in the nature of federal courts as institutions charged with judicial functions. . . . We therefore hold that bankruptcy courts, like Article III courts, possess inherent sanctioning powers." [citations omitted]).

"In the Second Circuit, inherent power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes. . . . Specifically, [c]onduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney." *In re Parikh*, *supra*, 508 B.R. 597 (citations omitted and internal quotation marks omitted); see also *Sierra Club v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir.1985) ("The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice."). Given the conduct described herein and determinations already articulated by the Court in this Decision, 11 U.S.C § 105 of the Code also supports each of this

Court's subordinate determinations that the sanctions and equitable allocations assessed herein are proper.

## VI.    CONCLUSIONS

The Petitioner's misplaced belief that Mr. Buck would be powerless to contest the Petition seems to have informed much of the Petitioner's overarching strategy and aggressiveness relating to this bankruptcy filing. It also seems to have blinded the Petitioner and Attorney Miller to both their and this Court's independent duty to scrutinize the present Petition. Despite Attorney Miller's representations to the Court that this was not his first time at the helm of an involuntary petition, his actions during the course of this bankruptcy case seem to indicate that he did not appreciate the gravity of improperly placing a business in involuntary proceedings, particularly, a business in the midst of familial and stakeholder feuding. It also appears from the record that Ms. Colon did not want to hear any such warnings Attorney Miller may have advanced, but preferred to strike hard and aggressively against her brother, rather than advisedly. She shares the responsibility equally, if not more, for the conduct criticized herein, and her nonappearance before this Court does not diminish her accountability or responsibilities.

Having fully considered the arguments and evidence adduced, the following is clear: This is essentially a two-party dispute involving two closely-held going concern companies with sibling stakeholders who, for reasons of corporate and familial discord, are incapable of continuing their business affairs. There are proper venues for such disputes, and in the present case, the Petitioner's use of an involuntary Chapter 7 petition as the battle field to resolve their conflicts was both improper and a significant misstep. *In re Anmuth Holdings LLC, supra*, 600 B.R. 188.

On the basis of Attorney Miller's acknowledgements that he made no meaningful inquiry into the critical facts underlying the Petition before filing, his representations to the Court as to Ms. Colon's motives, and the improper purpose of the Petition previously discussed, the Court finds that both the coordinated and individual actions of EES, Ms. Colon, and Attorney Miller, when taken together, constitute bad faith and also provide good and sufficient cause to dismiss the case. As previously discussed, and notably disposed of, the Court finds that the Petition was fatally endorsed by a "statutory insider," and filed by a single "non-statutory insider" creditor, thereby violating the express language of 11 U.S.C. § 303(b), for an inherently improper purpose, over debts that were materially contested, against an alleged Debtor that likely had more than twelve creditors. In the present case, the flaws of this Petition and its prosecution are both many and profound.

In sum:

(1) For the reasons stated herein, the Court DISMISSES the Petition on Mr. Buck's Motion and its own Order to Show Cause under 11 U.S.C. §§ 303(b)(2) and 305(a)(1);

(2) The Court GRANTS Mr. Buck's request to intervene under Fed. R. Bankr. P. 2018 or, alternatively, under Fed. R. Bankr. P. 7024, and further GRANTS Mr. Buck standing under Conn. Gen. Stat. §§ 34-271a and 34-271b and Fed. R. Bankr. P. 9001(5), such that he stands in the shoes of the Debtor for the purposes of 11 U.S.C. § 303(d), and, additionally, finds that Mr. Buck possesses shareholder standing and a party in interest standing pursuant to *In re Westerleigh Dev. Corp.*, *supra*, 141 B.R. 40 and its progeny;

(3) Pursuant to 11 U.S.C. § 303(i)(1) the Court enters Judgment and awards reasonable costs and attorney's fees to the Debtor against Ms. Colon individually in the amount of $32,000 and, pursuant to 11 U.S.C. § 303(i)(2)(B), upon its findings of bad faith, concurrently awards punitive damages to Mr. Buck against Ms. Colon individually in the amount of $32,000, such amounts to be held in trust for the benefit of and paid to the law offices of Natale & Wolinetz;

(4) Pursuant to Fed. R. Bankr. P. 9011 and its inherent powers, the Court sanctions Attorney Miller and O'Connell, Attmore & Morris, LLC, jointly and severally in the amount of $32,000;

(5) The Judgments, sanctions and awards rendered herein are to be paid in good funds within 21 days, unless otherwise stayed by a court of competent jurisdiction;

(6) Upon receipt of such payments in good funds, the law firm of Natale & Wolinetz shall file an appropriate Certification of Compliance with this Court; and

(7) In the event of the failure to make payments as directed, upon motion and further hearing, the Court will consider whether to issue further sanctions against the respondents, including, but not limited to, contempt orders.

IT IS SO ORDERED at Hartford, Connecticut this 2nd day of December 2019.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut